JUDGE OETKEN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 17 CV 972 |
| Plaintiff, | ECF CASE |
| vs. | |
| SHAOHUA (MICHAEL) YIN, | |
| Defendant, and | |
| LIZHAO SU, ZHIQING YIN, JUN QIN, YAN ZHOU, and BEI XIE, | |
| Relief Defendants. | |



RECEIVED
FEB 10 2017
U.S.D.C. S.D. N.Y.
CASHIERS

**COMPLAINT**

February 9, 2017

DAVID STOELTING
stoeltingd@sec.gov
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0174
GARY Y. LEUNG[1]
leungg@sec.gov
AMY J. LONGO[2]
longoa@sec.gov
SECURITIES AND EXCHANGE COMMISSION
444 South Flower Street
Los Angeles, CA 90071
(323) 965-3835

---

[1] Not admitted in SDNY, *pro hac vice* application to be filed.

[2] Not admitted in SDNY, *pro hac vice* application to be filed.

Plaintiff Securities and Exchange Commission ("SEC") alleges, for its Complaint against defendant SHAOHUA YIN and relief defendants LIZHAO SU, ZHIQING YIN, JUN QIN, YAN ZHOU, and BEI XIE, as follows:

## SUMMARY

1.      This is an insider trading case arising from the enormous position that defendant Shaohua (Michael) Yin ("M. Yin") amassed, from April 4 to April 25, 2016, in the securities of DreamWorks Animation SKG, Inc. ("DreamWorks"). M. Yin traded in five brokerage accounts controlled by him, but nominally held by a group of relief defendants living in Beijing, China, including his elderly mother and father. During that three-week period in April, the five brokerage accounts collectively bought nearly 2.15 million shares in DreamWorks. Before April 4, 2016, the accounts had never traded in DreamWorks. Placed in context, the purchases by these five individual trading accounts – nominally owned by two elderly retirees, an electrical company employee, a teacher and a natural resources manager – accounted for 16.9% of all market trading in DreamWorks. These trades were made at a weighted average price of $26.25 per share. And they proved to be massively profitable.

2.      After the markets closed on April 26, 2016, rumors of DreamWorks' potential acquisition by Comcast Corporation ("Comcast") were publicly reported for the first time. Two days later, on April 28, Comcast and DreamWorks jointly announced that Comcast would acquire DreamWorks at a price of $41 per share. The market's reaction to this news was immediate – from April 26 to April 28, 2016, DreamWorks' share price rose 47.3%, from $27.12 per share to $39.95 per share. In all, the five brokerage accounts realized more than $29 million in profits from their trading in DreamWorks. The precision with which these trades were timed, combined with the sheer scale in which they occurred, could not be the product of chance. M. Yin works in the financial industry in China and is a partner with Summitview Capital Management, a registered

investment adviser. On information and belief, M. Yin coordinated the five nominee accounts' massive trading in DreamWorks securities while in possession of material, nonpublic information concerning the company's sale.

3.      Nor was DreamWorks the first, or the last, block of suspicious trades by M. Yin and the five nominee accounts. Those same accounts also profitably traded in the securities of three China-based public companies – 58.com Inc. ("58.com"), Ctrip.com ("Ctrip"), and Giant Interactive Group Inc. ("Giant Interactive") – in advance of market-moving announcements, and just this past November, the accounts again engaged in suspicious and profitable trading in a different U.S. public company, Lattice Semiconductor Corporation ("Lattice"). Returns from this additional trading constitute another $20 million in highly suspect trading profits. Although the five accounts had traded in over 200 different securities from account opening through the end of January 2017, trading in DreamWorks, 58.com, Ctrip, Giant Interactive, and Lattice constituted 97% of the accounts' overall profits, even though those trades comprised just 3.2% of the total dollar amounts invested.

4.      On February 3, 2017, the FBI executed a search warrant on M. Yin at the San Jose International Airport, just before he boarded a flight to China. From February 5 to 7, a flurry of activity in the five brokerage accounts ensued – a rash of serial withdrawal requests, stock sales, and communications to the brokerage firm hurriedly occurred. Altogether, M. Yin and/or relief defendants have attempted to withdraw more than $22 million from the five nominee accounts in just the last few days. The SEC now brings this enforcement action to freeze those accounts, and put a stop to this illegal conduct.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

5.      The SEC brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

COMPLAINT                                      3

6.     The SEC seeks a permanent injunction against defendant Shaohua (Michael) Yin, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l].  The SEC seeks disgorgement of all ill-gotten gains from that illegal trading, along with prejudgment interest, from relief defendants Lizhao Su, Zhiqing Yin, Jun Qin, Yan Zhou, and Bei Xie.  The SEC further seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

8.     Venue lies in this Court pursuant to Section 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange. During the time of the conduct at issue, shares of DreamWorks and Comcast stock were traded on the NASDAQ Stock Exchange ("NASDAQ"), which is headquartered in New York, New York.

## DEFENDANT

9.     **Shaohua (Michael) Yin** ("M. Yin") is 44 years old and a citizen of China.  His email address is yinmic@gmail.com.  He maintains residences in the Shunyi district of Beijing, China and Palo Alto, California.  On information and belief, he is primarily based in Beijing.  He is a partner at Summitview Capital Management Limited ("Summitview"), which has its principal

office in Hong Kong, China.  He is also a partial owner of Beijing Yuanshan Jingxing Investment

Consultancy LLC, which provides investment consultancy services (including research services) to

Summitview.  He has an MBA in Finance from the Wharton School of Business at the University of

Pennsylvania.  M. Yin has worked in the financial industry for over 10 years, first with UBS

Investment Bank and then with Warburg Pincus Asia LLC, a private equity firm, before becoming a

partner at Summitview Capital in 2011.

      10.     M. Yin is the sole owner of three accounts at Fidelity Brokerage Services LLC

("Fidelity") (with account numbers ending in XXX-XX9920, XXX-XX1290, and XXX-XX3404).

He is also the joint owner, with his wife Jing Wang, of a fourth Fidelity account (with an account

number ending in XXX-XX2962).

      11.     All of M. Yin's accounts at Fidelity list his address as 663 Georgia Ave., Palo Alto,

California.  He has never traded in DreamWorks in any of his Fidelity accounts, however, as alleged

below, both of M. Yin's parents (each of who is a relief defendant) traded profitably in

DreamWorks, realizing profits of over $25 million.

      12.     M. Yin has a bank account at HSBC Bank USA, N.A. (with an account number

ending in XXX-XXXX77-833).  He also has an account, with his wife Jing Wang, at Wells Fargo

(with an account number ending in XXXXXX4648).

## RELIEF DEFENDANTS

      13.     **Lizhao Su** ("Su") is 78 years old and resides in Beijing, China.  Her email address is

lizhao.su@gmail.com.  On information and belief, Su is the mother of defendant M. Yin and is the

wife of co-relief defendant Zhiqing Yin.

      14.     On June 4, 2008, Su opened an account at E*Trade Financial Corporation

("E*Trade") (with an account number ending in XXXX-2058) through its Hong Kong office.  On

January 19, 2015, E*Trade notified Su that it was exercising its discretion to close her account.

15.     On or about October 3, 2013, Su opened a trading account at Interactive Brokers LLC ("Interactive Brokers") (with an account number ending in UXXX9828) that is still active.

16.     As of October 19, 2015, she also had a margin securities trading account at BOCI Securities, Ltd. ("BOCI") (with an account number ending in XXXXXXX-2000).

17.     Su has a bank account at HSBC Hong Kong (with an account number ending in XXX-XXXXX5-833).

18.     Su's Interactive Brokers account purchased nearly 850,000 shares of DreamWorks from April 4, 2016 through April 21, 2016, using margin to cover the cost of over $21.8 million. On April 28, 2016, her account began selling its DreamWorks positions, which were now worth nearly $34 million, resulting in a net gain of approximately $12 million.

19.     According to information provided to Interactive Brokers when she opened the account, Su is retired but nonetheless has a net income of $100,000-$150,000.  Her trading in DreamWorks was also disproportionate to her stated net worth of $1,000,000-$5,000,000.

20.     **Zhiqing Yin** ("Z. Yin") is 79 years old and resides in Beijing, China.  On information and belief, he is the father of defendant M. Yin and the husband of co-relief defendant Su.

21.     Z. Yin opened an account at Interactive Brokers (with an account number ending in UXXX9198) on May 28, 2015.  This account was initially funded by transfers from a bank account in the name of Zhiqing Yin at HSBC in Hong Kong (with an account number ending in XXX-XXXXX4-888).

22.     Z. Yin's Interactive Brokers account purchased nearly 1 million shares of DreamWorks from April 5, 2016, through April 25, 2016, using margin to cover the cost of over

$26.5 million.  On April 28, 2016, his account began selling its DreamWorks shares, which were now worth almost $40 million, resulting in a net gain of more than $13.2 million.

23.    According to information provided to Interactive Brokers when he opened the account, Z. Yin is retired but nonetheless has a net income of $250,000-$500,000.  His trading in DreamWorks was also disproportionate to his stated net worth of $5,000,000,000-$10,000,000.

24.    **Jun Qin** ("Qin") is 45 years old and resides in Beijing, China.  He is a Quality Department Manager at Legrand (Beijing) Electrical Co., Ltd.

25.    Qin opened an account at Interactive Brokers on June 16, 2015 (with an account number ending in UXXX8920).  This account was initially funded by transfers from a bank account in the name of Jun Qin at HSBC in Hong Kong (with an account number ending in XXX-XXXXX9-833).

26.    Qin's Interactive Brokers account purchased over 201,000 shares of DreamWorks from April 12, 2016 to April 19, 2016, using margin to cover the cost of over $5.2 million.  On April 28, 2016, his account began selling its DreamWorks shares, which were now worth over $8 million, resulting in a net gain of nearly $2.8 million.

27.    According to information provided to Interactive Brokers when he opened the account, Qin has a net income of $150,000-$250,000.  His trading in DreamWorks was also disproportionate to his stated net worth of $1,000,000-$5,000,000.

28.    **Yan Zhou** ("Zhou") is 33 years old and resides in Beijing, China.  She is a teacher at Beijing Menghuanxuanly International Education Advisory Co., Ltd.

29.    Zhou opened an Interactive Brokers account (with an account number ending in UXXX1566) on January 18, 2015.  This account was initially funded by transfers in February 2015 totaling $400,000 from an account in her name at HSBC in Hong Kong (with an account number

ending in XXX-XXXXXX-8880).

30.      From April 11-14, 2016, Zhou's Interactive Brokers account purchased 55,400

shares of DreamWorks at a cost of about $1.4 million.  On April 20, her account sold 15,400

DreamWorks shares for about $416,000.  The next day, her account purchased 10,000 DreamWorks

shares for about $271,500, resulting in her holding exactly 50,000 shares.  After the news broke, her

account sold all 50,000 shares on April 27, 2014, for about $1.7 million.  Her total profits from

DreamWorks trading were approximately $400,000.

31.      According to information provided to Interactive Brokers when she opened the

account, Zhou has a net income of $150,000-$250,000.  Her trading in DreamWorks was

disproportionate to her stated net worth of $500,000-$1,000,000.

32.      **Bei Xie** ("Xie") is 29 years old and resides in Beijing, China.  She is a section

member at PetroChina Coalbed Methane Co., Ltd.

33.      Xie opened an Interactive Brokers account (with an account number ending in

UXXX3862) on February 17, 2016.  This account was initially funded by transferring

HDK$2,000,000 (Hong Kong dollars, worth approximately $257,350) and $341,900 (in U.S.

dollars) from an HSBC account in her name (with an account number ending in XXX-XXXXX4-

888).

34.      Xie's Interactive Brokers account purchased 80,549 shares of DreamWorks from

April 5, 2016 to April 14, 2016 at a cost of over $2 million.  On April 20, 2016, she sold 30,549

shares for $827,878, leaving her with exactly 50,000 shares of DreamWorks.  She held these until

after the news broke.  From April 27-29, 2016, Xie sold her remaining 50,000 shares for

approximately $1.9 million.  Her total profits from the DreamWorks trades were approximately

$600,000.

35.     According to information provided to Interactive Brokers when she opened the account, Xie has a net income of $250,000-$500,000.  Her trading in DreamWorks was disproportionate to her stated net worth of $1,000,000-$5,000,000.

## RELEVANT ENTITIES

36.     **DreamWorks Animation SKG, Inc.** ("DreamWorks") is a Delaware corporation with its principal place of business in Glendale, California.  Securities in DreamWorks are publicly traded on NASDAQ under the ticker DWA.

37.     **Comcast Corporation** ("Comcast") is a Pennsylvania corporation with its principal place of business in Philadelphia, PA.  Securities in Comcast are publicly traded on NASDAQ under the ticker CMCSA.  NBCUniversal is a division of Comcast with its headquarters in New York, NY.

38.     **PAG Asia Capital** ("PAG") is an Asia-focused private equity fund manager based in Hong Kong and Shanghai, China.

39.     **Giant Interactive Group Inc.** ("Giant Interactive") is a China-based online game developer and operator in China.  Securities (American depositary receipts) in Giant Interactive are publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol GA.

40.     **58.com Inc.** ("58.com) is a China-based company that operates an online marketplace.  Securities (American depositary receipts) in 58.com are publicly traded on the NYSE under the ticker symbol WUBA.

41.     **Jinpan International Limited** ("Jinpan") is a China-based company that designs, manufactures and sells electrical power control and distribution products.  Securities in Jinpan are publicly traded on NASDAQ under the ticker symbol JST.

42.     **CTrip.com International Ltd.** ("CTrip") is a China-based international travel company.  Securities in CTrip are publicly traded on NASDAQ under the ticker symbol CTRP.

43.     **Lattice Semiconductor Corporation** ("Lattice") is a Delaware corporation with its principal place of business in Portland, Oregon.  Securities in Lattice are publicly traded on NASDAQ under the ticker symbol LSCC.

## FACTUAL ALLEGATIONS

**A.     Insider Trading in DreamWorks**

44.     The five Interactive Brokers accounts of relief defendants Su, Z. Yin, Qin, Zhou and Xie all purchased, in total, over $56 million of DreamWorks stock between April 4 and April 25, 2016, when the company was engaged in confidential merger acquisitions with PAG and Comcast. On March 31, 2016, PAG made a confidential offer to acquire the company at $35 per share.  That offer was discussed by DreamWorks' board of directors on April 4.  On April 19, Comcast made a confidential offer to acquire DreamWorks of its own.  And then on April 26, rumors of a merger were published.  On every single trading day between that April 4th board meeting to consider PAG's offer and the eve of that April 26th news leak, the relief defendants' accounts, which had never before traded in DreamWorks stock, purchased almost 2.15 million DreamWorks shares at an average price of $26.25 per share.  In so doing, the relief defendants' accounts collectively became one of the ten largest shareholders of the company, based on holdings reported to the SEC by institutional investors.  They then made over $29 million in profit when they ultimately sold their large, accumulated stake in the film studio shortly after the company officially announced the deal on April 28th.  On information and belief, M. Yin controlled and effectuated all of these account purchases, generating over $25 million of profit for the accounts of his mother and father, Su and Z. Yin.

1.     **The DreamWorks' Deal and Announcement**

45.     In early December 2015, PAG discussed with the Zhonghong Group the possibility of exploring a deal involving DreamWorks.  These discussions were preliminary in nature and no

specific deal terms were discussed.

46.    In early February 2016, PAG approached DreamWorks about a possible investment deal.  After PAG executed a confidentiality agreement, the CEO and chairman of PAG met with the CEO of DreamWorks on or about February 9, 2016.  Discussions and due diligence carried out pursuant to the confidentiality terms regarding PAG acquiring DreamWorks continued throughout February, March, and April 2016.

47.    On March 8, 2016, PAG submitted a signed, non-binding letter of interest to DreamWorks' CFO and Board of Directors expressing interest in acquiring DreamWorks at $35 per share.

48.    On March 29, 2016, DreamWorks's CFO sent PAG a confidential, non-binding term sheet regarding the acquisition of DreamWorks by PAG.

49.    On March 31, 2016, PAG sent a revised, confidential, non-binding term sheet to DreamWorks' CFO regarding the acquisition of DreamWorks by PAG.

50.    On April 4, 2016, the board of directors of DreamWorks met to consider the revised term sheet for an acquisition by PAG.  Under the terms of that confidential term sheet, the DreamWorks shares would be purchased at a price of $35 per share.  This proposed transaction price represented about a 40% premium over the closing price on April 4 of $24.99 per share.

51.    In a confidential meeting on April 4, 2016, the transaction committee of the board of directors of DreamWorks, composed of the board's independent directors, voted unanimously to authorize continued discussions with PAG on the terms outlined in the term sheet, including the purchase price of $35 per share.

52.    Following this vote, the approved term sheet was sent to PAG and its legal advisors later that day, April 4, 2016.  PAG and DreamWorks then began drafting a merger agreement and

continued with due diligence.

53.     On April 11, 2016, after several days of confidential negotiations and due diligence by PAG, DreamWorks's outside counsel sent a draft of the definitive merger agreement for the proposed deal to PAG.

54.     On April 13, 2016, the CEO and chairman of the board of Comcast contacted the CEO of DreamWorks to express interest in a possible acquisition of DreamWorks.

55.     The next day, on April 14, 2016, Comcast commenced confidential negotiations to acquire DreamWorks. Meanwhile, DreamWorks continued to move forward with its confidential negotiations with PAG.

56.     On April 19, 2016, Comcast delivered a confidential proposal to DreamWorks proposing that Comcast acquire DreamWorks at a price of $35 per share.

57.     Meanwhile, on April 27, 2016, PAG contacted DreamWorks to reiterate its proposal to acquire DreamWorks at $35 per share and sent confirmation of its ability to fund the deal.

58.     After further confidential discussions between the two companies, Comcast ultimately offered, in a confidential offer on April 27, 2016, to acquire DreamWorks at a price of $41 per share, subject to certain conditions.

59.     On April 28, 2016, the DreamWorks board convened and voted unanimously to approve the merger agreement with Comcast.

60.     The DreamWorks-Comcast agreement was announced the same day, April 28, 2016 at 6:00 a.m. PST.

### 2.     The Price Movement of DreamWorks Stock on the News of the Deal

61.     In April 2016, before news of the acquisition of DreamWorks became public, shares of DreamWorks had traded in a range between $24.08 and $27.35 per share. The share price closed at $27.15 per share on April 26, 2016.

62.     Late in the evening of April 26, 2016, after the markets had closed, various publications reported rumors that Comcast was in discussions to acquire DreamWorks for over $3 billion. Additional articles reporting similar rumors were published on April 27, 2016

63.     After the market opened on April 27, 2016, the price of DreamWorks shares went up, closing on April 27, 2016 at $32.20 per share, an increase of about 18.7%.

64.     When the rumors were confirmed with DreamWorks' official announcement of the acquisition and its terms – issued before the markets opened on April 28, 2016 – the stock price rose further, closing that day at $39.95, about a 24% increase over the prior day. This also represented an approximate 47.3% increase over the price the shares were trading at before the rumors of an acquisition were reported on April 26th.

65.     The news further triggered a large increase in the volume of trading in DreamWorks. On April 26, 2016, 645,400 DreamWorks shares were traded. On April 27, the volume increased to 11,670,900, a 1,708.3% increase. On April 28, the trading volume increased further to 44,817,000 shares traded. This was a 284.0% increase over the prior day, and a 6,844.0% increase over the trading volume on April 26.

### 3.     The Confidential, Nonpublic Nature of the DreamWorks Discussions

66.     DreamWorks, PAG, and Comcast all made efforts to keep their discussions confidential and non-public.

67.     On February 7, 2016, at the outset of the confidential discussions between DreamWorks and PAG, the two parties executed a confidentiality agreement covering their discussions.

68.     Similarly, as soon as Comcast began confidential negotiations with DreamWorks, the two companies entered into a confidentiality agreement on April 15, 2016 covering their discussions.

69.     In addition to executing confidentiality agreements with both PAG and Comcast, DreamWorks also has policies and procedures in place to maintain the confidentiality of non-public information.

70.     DreamWorks' Code of Business Conduct and Ethics contains procedures that DreamWorks used to insure the confidentiality of material, non-public information regarding its discussions with PAG and Comcast prior to the public dissemination of that information.

71.     Among other things, it requires all employees to maintain the confidentiality of any confidential information entrusted to them by DreamWorks, except when authorized to disclose it by DreamWorks' legal department or required to disclose it by law.

72.     Similarly, PAG took steps to protect the non-public information it obtained during the negotiations.  It limited information about the deal to a small group of employees at the company, and often used a code name, "Project Dragon," to refer to the potential acquisition.

73.     PAG only shared information about the potential DreamWorks deal with O'Melveny & Myers LLP (its legal advisor), its financial due diligence advisor (Ernst & Young), and two potential financing sources (Bank of America Merrill Lynch and Zhonghong Group).

74.     Likewise, Comcast has a number of policies in place to protect the confidentiality of material non-public information in its possession.

75.     Among other things, Comcast has a Corporation Code of Conduct, which includes an insider trading policy that directs personnel to maintain the confidentiality of non-public information, whether about Comcast or third parties, they may learn of in the course of their work for Comcast.  It also has a Fair Disclosure Policy, which prohibits any employees other than authorized spokespersons from sharing material, non-public information with the financial community, shareholders, and debt holders.

76.     The advisors to the participants in these negotiations were equally bound to maintain the confidentiality of the negotiations, both through the confidentiality agreements signed by the key participants and by the advisors' own internal policies.

77.     For example, Centerview Partners LLC ("Centerview") advised DreamWorks on both the PAG Asia Capital offer and the Comcast offer starting February 29, 2016.

78.     Centerview has a compliance manual that includes a detailed section on the protection of confidential information.  Among other things, the compliance manual reminds employees that they are in a fiduciary relationship with Centerview and are therefore obligated to maintain in the strictest confidence all confidential information, such as information about a client's proposed merger or acquisition, and to use such information only as necessary in the ordinary course of performing their duties as an employee of Centerview and in furtherance of Centerview's business.  It specifically prohibits employees from using confidential information for their own purposes, such as trading, or disclosing it to anyone outside Centerview except as necessary in the performance of their duties in furtherance of Centerview's business.

79.     Centerview has also adopted a number of practices to ensure the protection of confidential information.  They instruct employees to store confidential information electronically in network drives that are password protected, for example.  Paper documents are kept in locked filing cabinets and shredded when no longer needed.  They also limit dissemination of confidential information, even within the same department at Centerview, to those with a need to know.  They instruct employees to take care to avoid inadvertent disclosures, prohibiting them from discussing confidential information on mobile phones, public telephones or conversations in elevators, taxis, planes, restaurants, or in other public spaces.

80.     PJT Partners Inc. ("PJT Partners") is an investment advisory firm that advised

Comcast on the DreamWorks acquisition.  PJT Partners first became aware of the deal on April 22, 2016.

81.     PJT Partners has a number of policies and procedures to ensure the confidentiality of material, non-public information it receives.  Among other things, PJT Partners (a) prohibits employees from discussing confidential information in public places where there is a risk of being overheard; (b) imposes requirements regarding the protection and treatment of confidential materials taken outside its office; (c) restricts access to information and documents in its office through use of locked filing cabinets, restrictions on access to areas where confidential information is stored, and passwords on electronic documents and databases; (d) instructs employees to only disclose confidential information to other employees with a "need to know"; and (e) places securities about which PJT has confidential information on a restricted list, which prohibits employees and related persons from trading in the stock without approval.

**4.     Insider Trading in DreamWorks**

82.     Starting April 4, 2016, when the DreamWorks board approved the confidential term sheet with PAG, the five accounts at Interactive Brokers held by relief defendants Su, Z. Yin, Qin, Zhou and Xie began accumulating shares of DreamWorks.

83.     Before that time, those five accounts had never traded in DreamWorks.

84.     All of the purchases were made before news regarding rumors of a potential Comcast acquisition of DreamWorks was reported on April 26, 2016 and before DreamWorks issued its official announcement of the Comcast deal on April 28, 2016.

85.     By the time the news of the DreamWorks acquisition broke, their five accounts held nearly 2.15 million shares of DreamWorks, which had been purchased for more than $56.3 million. After the news broke, they began selling their DreamWorks shares, realizing profits of over $29 million.

86.     Altogether, the five accounts purchased at least 2,145,986 shares of DreamWorks in the span of three weeks, from Monday April 4, 2016, through Monday, April 25, 2016.  In total, the accounts spent $56,331,378 to make these purchases.  The purchase prices ranged from $24.01 to $27.71 per share, with a weighted average purchase price of $26.25 per share.  Those prices were significantly below the $35 per share initial purchase price offered confidentially by PAG Asia Capital on April 4, 2016, and offered by Comcast on April 19, 2016.

      **a.     Su's Interactive Brokers account**

87.     Su's Interactive Brokers account purchased nearly 850,000 shares of DreamWorks from April 4, 2016 through April 21, 2016, using margin to cover the cost of over $21.8 million. Specifically:

     (a)     On April 4, 2016—the very day the DreamWorks board approved further discussions on the confidential term sheet with PAG Asia Capital with a purchase price of $35 per share—Su's Interactive Brokers began to accumulate a significant stake in DreamWorks.  On that Monday, her account purchased 50,000 shares of DreamWorks stock at a price of $24.98 per share, for a total cost of $1,249,169.

     (b)     Three days later, on Thursday, April 7, 2016, Su's account purchased another 25,000 shares at $24.74 per share, for a total cost of $618,580.  The next day, Friday, April 8th, Su purchased an additional 18,780 shares at $24.36 per share for a total cost of $457,431.  By the end of that week, she had purchased a total of 93,780 shares of DreamWorks stock for a total cost of $2,325,180.

     (c)     As alleged above, on Monday, April 11, 2016 of the following week, DreamWorks circulated a draft, confidential definitive merger agreement for the deal with PAG Asia Capital.  Beginning on that day, and for every trading day that week except Friday, Su's Interactive Brokers account purchased over 615,000 shares of DreamWorks stock: 39,539 shares at

$24.07 per share for a total cost of $951,846 on April 11th; 178,256 shares at $24.88 per share for a total cost of $4,435,253 on April 12th; 152,279 shares at $25.68 per share for a total cost of $3,911,248 on April 13th; and 245,102 shares at $26.54 per share for a total cost of $6,503,910 on April 14th.

(d)   So, within eight trading days from the time PAG Asia Capital had made a nonpublic offer to purchase DreamWorks at $35 per share, Su's Interactive Brokers account had purchased a total of 708,956 shares for a total cost of $18,127,437 and at a weighted average of $25.57 per share.

(e)   Su's account made two more large purchases the following week, purchasing an additional 138,544 shares for a total cost of $3,755,136. On Monday, April 18th, her account purchased 88,544 shares at $27.16 per share for a total cost of $2,404,673. Then, on Thursday, April 21st, Su's account made her final purchase of DreamWorks stock while the confidential $35 per share offer (from PAG Asia Capital and Comcast) was still nonpublic. The account acquired 50,000 shares at $27.01 per share for a total cost of $1,350,463.

88.   All of these purchases by Su's account of DreamWorks stock were made, in whole or in part, on margin.

89.   Upon information and belief, these were the first purchases that Su's account had made of DreamWorks stock.

**b.   Z. Yin's Interactive Brokers account**

90.   Z. Yin's Interactive Brokers account purchased nearly 1 million shares of DreamWorks from April 5, 2016, through April 25, 2016, using margin to cover the cost of over $26.5 million. Specifically:

(a)   On Tuesday, April 5, 2016, a day after DreamWorks' board authorized further discussions on PAG's confidential $35 per-share offer, the Interactive Brokers account held

by Z. Yin purchased 75,000 shares of DreamWorks stock at $24.45 per share, for a total cost of $1,833,676.

      (b)    The next day, Wednesday, April 6, Z. Yin's account purchased 86,700 shares of DreamWorks stock at a price of $25.19 per share and a total cost of $2,183,748.

      (c)    His account's next purchase was the largest made in that account, and took place on Friday, April 15—the only day that his wife, co-defendant Su, did not purchase during that week. On that day, Z. Yin's account purchased 249,948 shares for $6,662,630 at a price of $26.66 per share.

      (d)    The following week, when Comcast first made its own confidential $35 per-share offer, Z. Yin's Interactive Brokers account purchased every trading day, except on April 21st: on Monday, April 18th, his account purchased 72,492 shares at $27.21 per share for a total cost of $1,972,281; on Tuesday, April 19th—the day of the Comcast offer—the account made its largest purchase of 264,805 shares for $7,213,086 at a price of $27.24 per share; on Wednesday, April 20th, Z. Yin's account purchased 155,250 shares at $27.04 per share for a total cost of $4,197,512; and on Friday, April 22nd, the account purchased 42,637 shares for $1,153,266 at a price of $27.05 per share.

      (e)    Z. Yin's Interactive Brokers account made its final purchase of 50,000 shares on Monday, April 25, 2016 (two days before news of the deal broke) for a total cost of $1,349,243 at a price of $26.98 per share.

      91.    All of these purchases of DreamWorks stock by Z. Yin's account were made, in whole or in part, on margin.

      92.    Upon information and belief, these were the first purchases of DreamWorks stock that Z. Yin's account had made.

### c.   Qin's Interactive Brokers account

93.     Qin's Interactive Brokers account purchased over 200,000 shares of DreamWorks from April 12 to April 19, 2016, using margin to cover the cost of over $5.2 million.  Specifically:

(a)     Qin's account first started accumulating DreamWorks stock on Tuesday, April 12, 2016, when his account purchased 48,551 shares of DreamWorks stock for $1,206,281 at a price of $24.85 per share.  The next day, Wednesday, April 13, his account purchased 23,103 shares at $25.69 per share for a total cost of $593,460.  Then, on Thursday, April 14, Qin's account purchased 90,000 shares of DreamWorks stock at $26.58 per share for a total cost of $2,391,978.

(b)     The next week, on Tuesday, April 19, 2016, Qin's Interactive Brokers account made its last purchase of DreamWorks stock acquiring 40,000 shares for $1,095,782 at a price of $27.39 per share.

94.     All of the purchases of DreamWorks stock by Qin's account were made, in whole or in part, on margin.

95.     Upon information and belief, these purchases of DreamWorks stock were the first purchases of that company's stock by Qin's account.

### d.   Zhou's Interactive Brokers account

96.     Between April 11 and April 21, 2016, Zhou's Interactive Brokers account purchased a net of 50,000 shares of DreamWorks at a net cost of more than $1.3 million.  Specifically:

(a)     During the week of Monday, April 11, 2016, seven days after a confidential $35 per-share offer was made to purchase DreamWorks, Zhou's Interactive Brokers account made four purchases of DreamWorks stock:  On April 11th, her account purchased 10,000 shares of DreamWorks stock for $241,572 at a price of $24.16 per share; on April 12th, her account purchased another 20,000 shares at $24.85 per share and a total cost of $496,997; on April 13th, the account purchased 5,400 shares at $25.67 per share for a total cost of $138,600; and on April 14th,

her account purchased 20,000 shares at $26.32 per share for a total cost of $526,383.

      (b)      The next week, on Wednesday, April 20, 2016, Zhou's account sold 15,400 DreamWorks shares for $415,807. The very next day, Thursday, April 21, purchased 10,000 shares of DreamWorks stock for a total cost of $271,493 and at a price of $27.15 per share. This left her account with exactly 50,000 shares of DreamWorks stock.

97.     All of the purchases of DreamWorks stock by Zhou's account were made, in whole or in part, on margin.

98.     Upon information and belief, these purchases of DreamWorks stock were the first purchases of that company's stock by Zhou's account.

      **e.**     **Xie's Interactive Brokers account**

99.     Xie's Interactive Brokers account purchased, net, 50,000 shares of DreamWorks from April 5, 2016 to April 14, 2016 at a net cost of more than $1.29 million. Specifically:

      (a)      Xie's account's first purchase of DreamWorks stock was on Tuesday, April 5, 2016, a day after the $35 per-share confidential offer was made. On that day, the account purchased 15,000 shares for $365,569 and at a price of $24.37 per share.

      (b)      Her account's next purchase was a week later, on Tuesday, April 12, 2016, when it purchased 25,549 shares at $24.92 per share for a total cost of $636,739. Her account then purchased another 20,000 shares on Wednesday, April 13, for $519,310 and at a price of $25.97 per share, and 20,000 more shares on Thursday, April 14, for $526,399 and at a price of $26.32 per share.

      (c)      On April 20, 2016, her account sold 30,549 shares for $827,878, leaving her account with exactly 50,000 shares of DreamWorks stock.

100.    All of the purchases of DreamWorks stock by Zhou's account were made, in whole or in part, on margin.

101.   Upon information and belief, these purchases of DreamWorks stock were the first purchases of that company's stock by Zhou's account.

### f.   M. Yin's control over all of the DreamWorks trading

102.   Upon information and belief, M. Yin had access to and controlled all of the trading in DreamWorks stock from April 4 to April 25, 2016 by Su, Z. Yin, Qin, Zhou and Xie in their five Interactive Broker accounts.

103.   Each of the DreamWorks trades by the relief defendants' Interactive Brokers accounts during the April 4-25, 2016 period was placed through Interactive Brokers' electronic trading system.  To place a trade through this system, a trader must first log into the system using a unique login name and password associated with the account in which the trade will be placed.  The five accounts each had a separate login name for accessing the trading system.

104.   When a trader logs into an account through Interactive Brokers' electronic trading system, Interactive Broker's computer server records the "internet protocol address" ("IP address") used by the trader.  An IP address is a unique number required for online activity conducted by a computer, phone, or other device connected to the internet.  With just an IP address, it is possible to identify both what internet service provider is in charge of that address and the approximate location of the subscriber to whom it is assigned.

105.   In addition, when a trader logs into an account through Interactive Brokers' electronic system, Interactive Brokers' computer server records the Media Access Control ("MAC") address used by the trader.  A MAC address is a unique value associated with the computer, smartphone, or other hardware device used by the trader to access Interactive Broker's trading system.

106.   When the same IP address and/or MAC address registers on a system like Interactive Broker's trading system multiple times on the same day, it is likely that each login from that IP or

MAC address is coming from the same computer or device.

107.    This is precisely what occurred when the DreamWorks trades were placed in the defendants' five Interactive Brokers accounts from April 5 to April 25, 2016:

(a)    When trading in DreamWorks, the five Interactive Brokers accounts were accessed using many of the same IP addresses.

(b)    When trading in DreamWorks, the five Interactive Brokers accounts were accessed using the same set of four MAC addresses.

108.    Interactive Brokers' log-in data for relief defendants' five Interactive Brokers accounts also connects their trading to defendant M. Yin:

(a)    From January to April 2016, the majority of logins to the five Interactive Brokers accounts were made from IP addresses located in Beijing, China, but with one important exception.

(b)    During a two-week time period – specifically, January 28 to February 12, 2016 – most of the log-ins to the five Interactive Brokers accounts were from an IP address corresponding to an AT&T customer, Shuhuan Wang, located at 663 Georgia Avenue, Palo Alto, California (the "Palo Alto IP address").

(c)    M. Yin's accounts at Fidelity list his address as 663 Georgia Ave., Palo Alto, California.

(d)    On information and belief, Shuhuan Wang is the parent of Jing Wang, who is M. Yin's wife.

(e)    On information and belief, M. Yin traveled to Palo Alto on January 28, 2016, and only returned to Beijing, China, on or about February 12, 2016.

(f)    Between January 29 and February 12, 2016, the Palo Alto IP address was

used to repeatedly login to the Interactive Brokers accounts held by Su, Z. Yin, Qin, and Zhou.

Moreover, the MAC addresses for these log-ins corresponded to three of the four hardware devices

later used to place DreamWorks trades in the five Interactive Brokers accounts from April 4 to

April 25, 2016.

      (g)    In addition, the Fidelity accounts held by M. Yin and his wife, Jing Wang,

were accessed, on several occasions, using the same IP addresses used to log-in to the five

Interactive Brokers accounts held by Su, Z. Yin, Qin, Zhou, and Xie.

      (h)    And finally, seventeen of the IP addresses – including the Palo Alto IP

address – used to log-in to the Su, Z. Yin, Qin, Zhou, and Xie Interactive Brokers accounts, were

also used to access M. Yin's e-mail accounts at yinmic@gmail.com and shaohua.yin@gmail.com.

These same IP addresses were used to access Su's email account at lizhao.su@gmail.com during the

same time period.

      (i)    More recently, from January 21 to 29, 2017, the five Interactive Brokers

accounts were accessed 99 times using the Palo Alto IP address.  On information and belief, M. Yin

had traveled to Palo Alto during that timeframe, and returned to Beijing, China, on February 3,

2017.

    **5.**    **M. Yin and the relief defendants' substantial profits from well-timed insider trading**

    109.    By the close of trading on April 25, 2016, the five Interactive Brokers accounts of

Su, Z. Yin, Qin, Zhou and Xie held 2,145,986 shares of DreamWorks stock, which they had started

buying right after PAG Asia Capital offered to buy DreamWorks for $35 per share.  In total, they

collectively had spent $56,331,378 to purchase these shares for a weighted average purchase price

of $26.25 per share.

    110.    Starting on April 27, 2016 (when rumors of the DreamWorks acquisition by Comcast

were published) and April 28, 2016 (when the deal was officially announced), the defendants' accounts began to sell their massive positions in DreamWorks. By the time they were finished selling their shares, the defendants' five accounts had realized a net profit of $29,049,300.

     111.    Beginning on April 28, 2016, Su's Interactive Brokers account sold its nearly 850,000 shares, resulting in a gain of $11,990,100. Her account's return on its DreamWorks trades was 54.8% of the notional amount invested.

     112.    Beginning on April 28, 2016, Z. Yin's Interactive Brokers account sold its 996,832 DreamWorks shares, resulting in a gain of $13,287,438. His account's return was 50.0% of the notional amount invested.

     113.    Beginning on April 28, 2016, Qin's Interactive Brokers account sold its 201,654 DreamWorks shares, resulting in a gain of $2,766,318. His account's return was 52.3% of the notional amount invested.

     114.    Beginning on April 27, 2016, Zhou's Interactive Brokers account sold its 50,000 DreamWorks shares, resulting in a gain of $399,867. Zhou's account's return was 30.8% of the notional amount invested.

     115.    Beginning on April 27, 2016, Xie's Interactive Brokers account sold its 50,000 DreamWorks shares, resulting in a gain of $605,577. Her account's return was 46.7% of the notional amount invested.

     116.    The five Interactive Brokers accounts' net profit from the DreamWorks purchases in April 2016 was at least $29,049,300. This total profit, and the profits for each account, are summarized in the following table:

| Relief Defendant | Net Profits from DreamWorks Trading |
|---|---|
| Lizhao Su | $11,990,100 |
| Zhiqing Yin | $13,287,438 |
| Jun Qin | $2,766,318 |
| Yan Zhou | $399,867 |
| Bei Xie | $605,577 |
| **TOTAL** | $29,049,300 |

**B.     The Highly Suspicious Nature of the April 2016 DreamWorks Trading**

117.    By the time the accounts of Su, Z. Yin, Qin, Zhou and Xie had amassed more than the nearly 2.15 million shares of DreamWorks stock, their collective share holdings represented 2.7% of the outstanding common stock of the company.

118.    Of the 142 institutional investors (having over $100 million in assets) who reported owning DreamWorks stock as of December 31, 2015, only 8 firms reported owning a larger position in DreamWorks than the approximate 2.15 million shares held by the relief defendants' Interactive Brokers accounts.

119.    The relief defendants' five accounts had purchased DreamWorks stock on every single trading day between April 4, 2016 (the day the $35 per-share confidential offer was made) and April 25, 2016 (the day before rumors of a merger were made public).

120.    The trading in DreamWorks stock by the relief defendants' five Interactive Brokers accounts from April 4 to April 25, 2016 represented 16.9% of all market trading in that stock during that time.  In other words, about $1 of every $6 invested in DreamWorks stock during that period came from accounts controlled by M. Yin and held in name by the relief defendants.

121.    On a daily basis, trading by these five accounts amounted to a significant percentage of the total volume of DreamWorks shares traded, on some days accounting for as much as 34.8%

COMPLAINT                                                    26

of all trading volume in DreamWorks.

122.    Su's Interactive Brokers account was opened in October 2013, and the other accounts – held by Z. Yin, Qin, Zhou and Xie – were opened in 2015 or 2016.  During the time these accounts were held by the relief defendants, none of the accounts, on information and belief, had ever traded in DreamWorks stock until the three-week period from April 5 to April 25, 2016.

123.    All of the purchases of DreamWorks stock by the relief defendants' accounts during the April 4-25, 2016 period were made, in whole or in part, on margin.

124.    On information and belief, and as alleged above, all of the purchases of DreamWorks stock by the defendants' accounts during this period were made by M. Yin.

125.    Also, these purchases cannot be explained by any publicly available news about DreamWorks in April.  DreamWorks had filed its annual report (on Form 10K) on February 25, 2016.  No new earnings or quarterly reports were released until May 2016, after the relief defendants' trading in DreamWorks.  The only SEC filing by DreamWorks in March 2016 was a report on Form 8-K providing additional details about the employment terms of its chief financial officer, Fazal Merchant, who assumed the title of chief accounting officer on March 4, 2016.  On April 6, 2016, it was announced that Verizon was acquiring a stake in Awesomeness TV, a company acquired by DreamWorks in 2013 and in which DreamWorks retained a controlling interest after Verizon's purchase of a 25% stake.  On April 11, 2016, DreamWorks announced that it would be holding a conference call on May 5, 2016 to announce its first quarter earnings.

126.    None of these news events had an appreciable impact on the stock price.  From March 1 through April 26, 2016, DreamWorks' share price hovered between a high of $27.71 on April 19, 2016 and a low of $23.78 on April 5, 2016.

127.    The defendants' five Interactive Brokers accounts traded on each of the 16 trading

days preceding the news leak. On six of those days, the five accounts represented more than 20% of the DreamWorks trading volume. On all but two of those days they accounted for at least 5% of the total volume of trades.

128.   The following table shows each day the relief defendants' five accounts purchased DreamWorks shares, the total amount purchased across the five accounts, the total volume of DreamWorks shares traded on that day, and the percentage of trading represented by just the five accounts.

| Date | Total Shares Purchased by the Five Accounts | Total Market Trading Volume | Percentage of Trading Volume |
|---|---|---|---|
| April 4, 2016 | 50,000 | 534,400 | 9.4% |
| April 5, 2016 | 75,000 | 785,034 | 9.6% |
| April 6, 2016 | 86,700 | 1,064,065 | 8.1% |
| April 7, 2016 | 25,000 | 852,576 | 2.9% |
| April 8, 2016 | 18,780 | 424,967 | 4.4% |
| April 11, 2016 | 39,539 | 354,683 | 11.1% |
| April 12, 2016 | 251,407 | 913,259 | 27.5% |
| April 13, 2016 | 200,782 | 1036,115 | 19.4% |
| April 14, 2016 | 375,102 | 1076,412 | 34.8% |
| April 15, 2016 | 249,948 | 1,181,991 | 21.1% |
| April 18, 2016 | 161,036 | 892,849 | 18.0% |
| April 19, 2016 | 304,805 | 1,128,098 | 27.0% |
| April 20, 2016 | 155,250 | 702,193 | 22.1% |
| April 21, 2016 | 60,000 | 678,688 | 8.8% |

| Date | Total Shares Purchased by the Five Accounts | Total Market Trading Volume | Percentage of Trading Volume |
|---|---|---|---|
| April 22, 2016 | 42,637 | 496,119 | 8.6% |
| April 25, 2016 | 50,000 | 610,844 | 8.20% |
| **TOTAL** | **2,145,986** | **12,732,307** | **16.9%** |

**C.    M. Yin and the Interactive Brokers Accounts Engaged in Other Profitable, Well-Timed Trading Prior to Merger and Acquisition News**

129.    The Interactive Brokers accounts' large purchases of DreamWorks stock right before its acquisition was announced was not the only time their accounts engaged in profitable, well-timed trading before news of a merger or an acquisition involving a public company. These accounts have engaged in similar patterns of suspicious trading in other companies' stock.

130.    In fact, while the defendants' Interactive Brokers accounts have bought and sold large amounts of stock in certain companies over the past couple of years, only a handful of purchases, including their April 2016 DreamWorks trading, stand out as the most profitable. In particular, before insider trading in DreamWorks, the relief defendants' Interactive Brokers accounts made suspiciously well-timed and profitable trades in profits three China-based companies – Giant Interactive (in November 2013), 58.com (in April 2015), CTrip (in May and October 2015) – and a U.S.-based company called Lattice Semiconductors (in November 2016). As alleged below, all of these trades preceded announcements that had a material impact on the price of the stock of these companies.

131.    During the period between October 2013 (when Su first opened her account) and the present, all five of the defendants' Interactive Brokers accounts made a total net profit of $49.19 million on their well-timed trades in DreamWorks, Giant Interactive, 58.com, CTrip, and Lattice

Semiconductors.  Despite being active traders in more than 200 other issuers, these accounts performed markedly worse in all of their other trading during this period, making only $1.08 million.  In short, just 3.2% of the Interactive Brokers accounts' trading (in DreamWorks, Giant Interactive, 58.com, CTrip, Jinpan, and Lattice Semiconductors) resulted in more than 97% of all trading profits.

132.     In addition, M. Yin, through one of his Fidelity accounts, has repeatedly traded similarly to one or more of the five Interactive Brokers accounts.  In particular, he also made well-timed, profitable trades in Giant Interactive and another China-based company, Jinpan, at the same time as the Interactive Brokers accounts.

### 1.     Giant Interactive

133.     On November 21 and 22, 2013, the Su Interactive Brokers account bought a total of 758,751 shares of Giant Interactive stock at a cost of $7,318,438.

134.     Just days later, on November 24, 2013, Giant Interactive announced that it had received a non-binding proposal from a consortium of private equity investors to take the company private at a price of $11.75 per share.  Giant Interactive stock closed at $11.41 on November 25, 2013, up 1.28 or 12.64% from its prior close of $10.13.

135.     Beginning on November 25, 2013, the Su Interactive Brokers account sold all of its Giant shares, resulting in a gain of $1,275,857.

### 2.     58.com

136.     On April 14, 2015, the *Financial Times* reported that 58.com and Falcon View Technology Limited, a China-based company that operates the website Ganji.com ("Ganji"), had signed a memorandum of understanding on March 14, 2015.

137.     On April 17, the news of the deal was officially and publicly confirmed by both companies.  In a joint press release, 58.com and Ganji announced that they had signed a definitive

agreement, that 58.com had acquired a strategic stake in Ganji and that Tencent.com, one of

58.com's largest shareholders had also invested in Ganji. 58.com's share price increased 38.7%

from the close on April 13, 2015 (before the Financial Times report), closing at $70.50 per share on

April 17th.

138.    On April 14, the Su Interactive Brokers account purchased 350,000 shares of 58.com

stock, at a cost of $20,541,435, and 600 option contracts in 58.com, at a cost of $245,000. On April

14 and 17, the Su Interactive Brokers account sold all of its 58.com shares and options, resulting in

a gain of $3,882,095.

139.    On April 14, prior to the release of the *Financial Times* report, the Zhou Interactive

Brokers account purchased 50 option contracts in 58.com stock, at a cost of $25,200. After

publication of the *Financial Times* report that day, the Zhou Interactive Brokers account began to

sell its options, resulting in a gain of $44,800.

**3.    CTrip**

140.    From April 24, 2015, the Su Interactive Brokers account purchased 168,098 shares

of CTrip, a China-based international travel company, at a cost of $10,926,897.

141.    On May 22, 2015, CTrip announced that it had acquired a stake in eLong, Inc., an

online travel site (NASDAQ: LONG) by acquiring those shares from Expedia, Inc. and other

companies. It also announced a cooperation agreement with Expedia, Inc. CTrip's stock closed at a

price of $84.63 per share, increasing 17.6% from its prior close of $71.99.

142.    Beginning on May 22, 2015, the Su Interactive Brokers account sold all 158,098 of

its shares, resulting in a gain of $2,409.822.

143.    Later, between October 20 and 23, 2015, Su's Interactive Brokers account, along

with the accounts of Z. Yin, Qin and Zhou, collectively purchased 411,511 shares of CTrip, at a

cost of $30,699,813.

144.    On October 26, 2015, there was an announcement by CTrip, Qunar Cayman Islands

Limited (NASDAQ: QUNR), a China-based online travel commerce platform company, and Baidu,

Inc., a Chinese language Internet search provider (NASDAQ: BIDU), reporting that Baidu, in a

three-way agreement, sold its stake in Qunar to CTrip.  In return, Baidu received shares of CTrip.

On the day of the announcement, CTrip's stock price increased about 22.1%, from $74.34 to

$90.78.

145.    Beginning on October 26, 2015, the accounts of Z. Yin, Su, Qin, and Zhou sold their

CTrip positions, realizing combined profits of $6,453,344.

**4.    Jinpan**

146.    In a press release issued by Jinpan on January 25, 2016, the company announced that

it had entered into a definitive Agreement and Plan of Merger with FNOF E&M Investment Limited

and Silkwings Limited, pursuant to which FNOF E&M Investment Limited would acquire Jinpan

for $6.00 per share.  On January 25, 2016, Jinpan's stock price closed at $5.24, up $1.02 or 24.2%

from its prior close of $4.22.

147.    M. Yin's Fidelity trading account purchased 120,000 shares of Jinpan in advance of

the January 25, 2016 press release at a cost of $478,547. Following the announcement, all the shares

were sold out of the accounts, resulting in a gain of $147,261.  Similarly, the Interactive Brokers

account of M. Yin's father, Z. Yin, purchased 30,255 shares of Jinpan in advance of the January 25,

2016 press release at a cost of $114,322.  Following the announcement, all the shares were sold out

of the Z. Yin Interactive Brokers account, resulting in a gain of $54,259.

**5.    Lattice Semiconductors**

148.    From September 13 to November 2, 2016, Su's Interactive Brokers account

purchased approximately 2.5 million shares of Lattice Semiconductors at a cost of $16,073,220.09.

149.    From September 9 to November 2, 2016, Z. Yin's Interactive Brokers account

purchased approximately 2.74 million shares of Lattice Semiconductors at a cost of $12,252,777.

150.    From September 13 to November 2, 2016, Qin's Interactive Brokers account purchased approximately 1.46 million shares of Lattice Semiconductors at a cost of $9,365,470.

151.    From October 11-21, 2016, Zhou's Interactive Brokers account purchased 210,000 shares of Lattice Semiconductors at a cost of $1,351,930.

152.    From October 11-19, 2016, Xie's Interactive Brokers account purchased 125,000 shares of Lattice Semiconductors at a cost of $805,290.

153.    On November 3, 2016, Lattice Semiconductor announced that it was being bought by Canyon Bridge Capital Partners, a Chinese private equity firm, for $8.30 per share.  After the news, shares of Lattice Semiconductors closed at $7.55 per share, up 18.5% from the prior trading day.

154.    The five Interactive Brokers accounts sold their Lattice positions from November 3, 2016, realizing profits of $3,425,424, along with unrealized gains, as of January 30, 2017, of $2,654,782.

**D.    Attempted Cash Transfers Out of the IB Accounts**

155.    On Friday, February 3, 2017, the FBI executed a search warrant upon M. Yin at the San Jose International Airport, titled *In the Matter of the Search of IN RE FEDERAL CRIMINAL INVESTIGATION*, Case. No. 17 70135 NC (N.D. Cal.).

156.    The warrant authorized a search of M. Yin's mobile phone for evidence of insider trading.

157.    Before boarding a flight to Beijing, China, M. Yin asked an FBI agent whether his accounts would be frozen.

158.    Within 48 hours of the FBI's execution of the search warrant upon M. Yin, all of the Interactive Brokers accounts reflected active efforts to withdraw monies and sell holdings, as well

as calls made on behalf of those accounts into the brokerage firm's customer service line.

159.   On Sunday, February 5, 2017, Interactive Brokers received a request to withdraw approximately $3.2 million from Su's account.  That same day, Interactive Brokers customer service received a telephone inquiry on behalf of the account inquiring about the status of the withdrawal request.

160.   On Tuesday, February 7, 2017, Interactive Brokers received another request, this one to withdraw approximately $3.86 million from Su's account.

161.   On Sunday, February 5, 2017, Interactive Brokers received a request to withdraw approximately $4.6 million from Z. Yin's account.  That same day, Interactive Brokers customer service received two telephone inquiries on behalf of the account, concerning both the status of the cash withdrawal, and how to request an "exceptional withdrawal."

162.   On Tuesday, February 7, 2017, Interactive Brokers received another request, this one to withdraw $5 million from Z. Yin's account.  That same day, Interactive Brokers customer service received yet another telephone inquiry on behalf of the account.

163.   On Monday, February 6, 2017, Interactive Brokers received requests to withdraw $900,000 and $800,000 from Qin's account.  The request to withdraw $900,000 was later cancelled. That same day, customer service received four telephone inquiries on behalf of the account, concerning the status of the withdrawal request and how to request an "exceptional withdrawal."

164.   On Tuesday, February 7, 2017, Interactive Brokers received another request, this one to withdraw $1.6 million from Qin's account.  That same day, customer service received yet another telephone inquiry on behalf of the account.

165.   On Monday February 6, 2017, Interactive Brokers received a request to withdraw approximately $1.2 million from Xie's account.

166.    Between February 5-7, 2017, Interactive Brokers customer service received four telephone inquiries concerning how to make an exceptional withdrawal requests from Zhou's account.

167.    On Monday, February 6, 2017, Interactive Brokers received a request to withdraw $1.7 million from Zhou's account.

168.    From February 5 to February 7, 2017, Interactive Brokers received withdrawal requests exceeding a combined $22 million for the five Interactive Brokers accounts.

**E.    M. Yin's Possession of, and Trading on, Material Nonpublic Information**

169.    M. Yin has worked in the financial industry for over 10 years.  For at least the past five years, he has worked for an investment firm based in Hong Kong and Beijing.  He has numerous contacts in the business world through his employment and education at Wharton School of Business.

170.    Upon information and belief, when each of the relief defendants' Interactive Brokers accounts purchased shares of DreamWorks stock from April 4 to April 25, 2016, as alleged above, M. Yin directed those trades and was in possession of material, nonpublic information about the DreamWorks acquisition.  M. Yin:  (a) knew, recklessly disregarded, or should have known that the Interactive Brokers accounts' trading in DreamWorks was in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, owed to the shareholders of DreamWorks, or to the source from whom M. Yin received or obtained the material, nonpublic information; and/or (b) knew, recklessly disregarded, or should have known, that the material, nonpublic information about the DreamWorks acquisition that had been obtained by M. Yin or conveyed to M. Yin was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

171.    Upon information and belief, any and all material, nonpublic information that M.

Yin received concerning the DreamWorks acquisition that was disclosed to him by any person was tipped by such person with the expectation of receiving a personal benefit, such person did in fact receive a personal benefit, and M. Yin knew of such personal benefit.

## FIRST CLAIM FOR RELIEF

### Fraud in the Connection with the Purchase and Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c)

### (against Defendant M. Yin)

172.   The SEC realleges and incorporates by reference paragraphs 1 through 171 above.

173.   By engaging in the conduct described above, defendant M. Yin, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

174.   Upon information and belief, M. Yin knew, or was reckless in not knowing, that he employed devices, schemes and artifices to defraud; and/or engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

175.   By engaging in the conduct described above, defendant M. Yin, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment

### (against Relief Defendants Su, Z. Yin, Qin, Zhou and Xie)

176.    The SEC realleges and incorporates by reference paragraphs 1 through 171 above.

177.    By engaging in the conduct described above, relief defendants Su, Z. Yin, Qin, Zhou and Xie, and each of them, received ill-gotten gains from trades based on material nonpublic information, over which he has no legitimate claim.

178.    Relief defendants Su, Z. Yin, Qin, Zhou and Xie each obtained the ill-gotten gains described above as part of the securities law violations alleged above, under circumstances in which it is not just, equitable, or conscionable for them to retain the funds.  Relief defendants Su, Z. Yin, Qin, Zhou and Xie each do not have a legitimate claim to these gains.

179.    By engaging in the foregoing conduct, relief defendants Su, Z. Yin, Qin, Zhou and Xie have been unjustly enriched and must disgorge their ill-gotten gains.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

#### I.

Issue findings of fact and conclusions of law that each of defendant M. Yin committed the alleged violations.

#### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining and restraining defendant M. Yin, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

#### III.

Order defendant M. Yin to disgorge all trading profits and other ill-gotten gains from his

illegal conduct, together with prejudgment interest thereon.

## IV.

Order relief defendants Su, Z. Yin, Qin, and Zhou to disgorge all trading profits and other ill-gotten gains to which they do not have a legitimate claim, which they received as a result of the conduct alleged in this Complaint, together with prejudgment interest thereon.

## V.

Order defendant M. Yin to pay civil penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  February 9, 2017

Respectfully submitted,

DAVID STOELTING
Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
Tel: (212) 336-0174 (Stoelting)
stoeltingd@sec.gov

Gary Y. Leung
leungg@sec.gov
Amy J. Longo
longoa@sec.gov
Securities and Exchange Commission
Los Angeles Regional Office
444. South Flower Street
Los Angeles, CA 90071
Tel: (323) 965-3835 (Leung)