# EXHIBIT 1

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/BT-CO-20160426-717428

DOW JONES NEWSWIRES

# Comcast in Talks to Buy DreamWorks Animation for More Than $3 Billion -- Update

Updated April 26, 2016 11:48 p.m. ET

By Ben Fritz, Dana Mattioli and Erich Schwartzel

Comcast Corp. is in talks to buy DreamWorks Animation SKG Inc. for more than $3 billion, according to people familiar with the matter, in a deal that could make the cable giant a rival to Walt Disney Co. in the lucrative family-entertainment business.

Comcast's Universal Pictures studio has enjoyed success in recent years with its animated "Despicable Me" and "Minions" movies but is still a relatively small player.

But its parent company has been moving aggressively to mimic Disney by using its animation properties to build out its consumer products and theme parks businesses, a strategy that could be accelerated by the addition of DreamWorks, which makes the "Shrek," "Kung Fu Panda," and "Madagascar" movies, among others.

As with all such talks, a deal may not be reached. The tentative purchase price represents a healthy premium over DreamWorks' current $2.3 billion market value.

Comcast is set to report its financial results on Wednesday.

It wasn't immediately clear what the deal will mean for DreamWorks' chief executive, the veteran Hollywood mogul Jeffrey Katzenberg, who might struggle to find a role at the studio. One person with knowledge of the talks said that DreamWorks and Illumination Entertainment, Universal's animation studio, would remain separate brands.

Exhibit 1

Mr. Katzenberg would receive a total payout of about $21.9 million if the company is sold and he leaves DreamWorks, according to the company's most recent proxy statement. Additionally, he controls about 60% of the company's common voting stock, according to the proxy.

He has been seeking a buyer for his studio, one of the last in Hollywood not part of a larger conglomerate, for several years.

In 2014, DreamWorks held talks with Japan's SoftBank Corp. and toy maker Hasbro Inc. More recently it has held discussions with potential buyers in China, said people close to the company.

At the same time, Mr. Katzenberg has been seeking to diversify his company into new business such as television, online video, and consumer products, in hopes of stabilizing the inconsistent returns from movie releases.

Several box-office flops between 2012 and 2014 forced the company in early 2015 to lay off 500 employees, close a Northern California operation and cut its feature-film output to two movies a year, from three.

DreamWorks is in the midst of a multiyear deal to produce thousands of hours of television for Netflix Inc. and has recently enjoyed success with digital video company AwesomenessTV, which it acquired in 2013.

Verizon Communications Inc. this month bought a 24.5% stake in AwesomenessTV that valued the online video studio at $650 million.

Some of DreamWorks Animation's challenges have come from nimbler new competitors such as Illumination, which rather than building a large studio infrastructure such as DreamWorks', produces its movies with foreign animators at significantly lower cost.

That has led investors to pressure DreamWorks to lower its costs of production, which typically range between $130 million and $145 million, compared with about $80 million for Illumination.

As brand-name franchises have become the most important markers of success in the movie business, family entertainment has become arguably the industry's most valuable assets -- capable of crossing cultural boundaries at the box office and driving spending on everything from DVDs to toys to vacation destinations.

Exhibit 1

Since it acquired the NBCUniversal media conglomerate in 2011, Comcast has invested billions in its theme-parks business and built up consumer-products licensing, both of which should allow it to better profit from DreamWorks' brands and characters than that studio has been able to do independently.

DreamWorks Animation movies are marketed and distributed by 21st Century Fox's Twentieth Century Fox, though that deal will expire in 2017. 21st Century Fox and News Corp, owner of The Wall Street Journal, were until mid-2013 part of the same company.

DreamWorks Animation spun off in 2004 from DreamWorks SKG, an entertainment company founded in 1994 by Mr. Katzenberg and fellow moguls Steven Spielberg and David Geffen.

DreamWorks SKG's ambitions to become a seventh major Hollywood studio never came to fruition, but its animation division had some early success with hits like "The Prince of Egypt" and "Shrek" before its public stock offering in 2004.

The live-action movie business, run by Mr. Spielberg, has relaunched twice after near-death experiences and recently signed a distribution deal with Universal, meaning an acquisition of the animation company by Comcast would, in a way, bring the two units back together.

DreamWorks Animation shares closed Tuesday at $27.12, down three cents. Comcast stock closed at $61.05, up 5 cents.

Write to Ben Fritz at ben.fritz@wsj.com, Dana Mattioli at dana.mattioli@wsj.com and Erich Schwartzel at erich.schwartzel@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

Exhibit 1

# EXHIBIT 2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): April 28, 2016**

# DreamWorks Animation SKG, Inc.

**(Exact name of registrant as specified in its charter)**

**Commission File Number: 001-32337**

| | |
|---|---|
| **Delaware** | **68-0589190** |
| (State or other jurisdiction of incorporation) | (IRS Employer Identification No.) |

**1000 Flower Street**
**Glendale, CA 91201**
**(Address of principal executive offices, including zip code)**

**(818) 695-5000**
**(Registrant's telephone number, including area code)**

**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

Exhibit 2

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Exhibit 2

**Item 1.01. Entry into a Material Definitive Agreement**

On April 28, 2016, DreamWorks Animation SKG, Inc. ("DreamWorks Animation" or the "Company"), Comcast Corporation ("Comcast") and Comcast Paris Newco, Inc., a wholly-owned subsidiary of Comcast ("Merger Sub"), entered into an Agreement and Plan of Merger (the "Merger Agreement"). Upon the terms and subject to the conditions set forth in the Merger Agreement, Merger Sub will merge with and into DreamWorks Animation, with DreamWorks Animation continuing as the surviving corporation and a wholly-owned subsidiary of Comcast (the "Merger").

Pursuant to the Merger Agreement, upon the closing of the Merger (the "Closing"), each share of the Company's Class A common stock, par value $0.01 per share ("Class A common stock") and Class B common stock, par value $0.01 per share ("Class B common stock" and, together with the Class A common stock, "Company common stock"), issued and outstanding immediately prior to the effective time of the Merger (other than shares owned by the Company, Comcast, Merger Sub or any other subsidiary of Comcast or shares with respect to which appraisal rights have been properly exercised in accordance with the General Corporation Law of the State of Delaware) will be converted into the right to receive $41.00 in cash, without interest and less any applicable withholding taxes (the "Merger Consideration"). Each company option and each company stock appreciation right outstanding immediately prior to the effective time of the Merger, whether or not then vested and exercisable, will be cancelled and converted into the right to receive, for each share of Company common stock subject to such stock option or stock appreciation right, an amount in cash, without interest, equal to the excess, if any, of the Merger Consideration over the per share exercise price of such option or stock appreciation right. Each company restricted stock unit and each company performance restricted stock unit outstanding immediately prior to the effective time of the Merger will be cancelled and converted into the right to receive an amount in cash, without interest, equal to the Merger Consideration multiplied by the number of shares of Company common stock subject to such restricted stock unit or performance restricted stock unit (assuming in the case of performance restricted stock units, that applicable performance conditions are deemed to be achieved at the greater of target and actual performance). Each company restricted share outstanding immediately prior to the effective time of the Merger will be cancelled and converted into the right to receive an amount in cash, without interest, equal to the Merger Consideration.

The consummation of the Merger is subject to customary closing conditions, including (i) receiving the approval of holders of a majority of the voting power of the outstanding Company common stock, which approval was effected after execution of the Merger Agreement, by written consent of the Principal Stockholders (defined below) (the "Written Consent"), (ii) the absence of legal restraints preventing the consummation of the Merger and (iii) the expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and receipt of specified other regulatory consents and approvals.

The Merger Agreement contains certain customary covenants, including covenants providing (i) for each of the parties to use reasonable best efforts to cause the transaction to be consummated and (ii) for DreamWorks Animation to carry on its business in the ordinary course during the interim period between the execution of the Merger Agreement and completion of the Merger.

The Merger Agreement contains specified termination rights for the parties and provides that, in connection with the termination of the Merger Agreement under specified antitrust related circumstances, Comcast will be required to pay to DreamWorks Animation a "reverse termination fee" equal to $200 million.

---

Exhibit 2

The foregoing description of the Merger Agreement does not purport to be a complete description and is qualified in its entirety by reference to such agreement. A copy of the Merger Agreement is attached hereto as Exhibit 2.1 and is incorporated herein by reference.

The Merger Agreement has been included to provide investors and security holders with information regarding its terms. It is not intended to provide any other factual information about DreamWorks Animation, Comcast or any of their respective subsidiaries or affiliates. The representations and warranties of DreamWorks Animation contained in the Merger Agreement have been made solely for the benefit of Comcast and Merger Sub. In addition, such representations and warranties (a) have been made only for purposes of the Merger Agreement, (b) may be subject to limits or exceptions agreed upon by the contracting parties, (c) are subject to materiality qualifications contained in the Merger Agreement which may differ from what may be viewed as material by investors, (d) were made only as of the date of the Merger Agreement or other specific dates and (e) have been included in the Merger Agreement for the purpose of allocating risk between the contracting parties rather than establishing matters as facts. Investors should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or condition of DreamWorks Animation or Comcast or any of their respective subsidiaries or affiliates. Additionally, the representations, warranties, covenants, conditions and other terms of the Merger Agreement may be subject to subsequent waiver or modification. Moreover, information concerning the subject matter of the representations, warranties and covenants may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in DreamWorks Animation's public disclosures.

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

(b) Upon consummation of the Merger, Jeffrey Katzenberg will no longer serve as our Chief Executive Officer and will become a consultant to Comcast.

**Item 5.03. Amendments to Articles of Incorporation or By-laws; Change in Fiscal Year.**

On April 28, 2016, the Board of Directors of the Company adopted an amendment (the "Amendment") to Article VIII of the Company's By-laws (the "By-laws"), which became effective immediately. The Amendment added a new Section 7 to Article VIII of the By-laws which provides that, unless the Company consents in writing to the selection of an alternative forum, the sole and exclusive forum for certain legal actions involving the Company will be a state or federal court located within the State of Delaware.

The foregoing summary of the Amendment is qualified in its entirety by reference to the text of the Amendment, which is attached as Exhibit 3.1 to this report and incorporated herein by reference.

**Item 5.07. Submission of Matters to a Vote of Security Holders.**

On April 28, 2016, Jeffrey Katzenberg, M&J K Dream LLC, M&J K B Limited Partnership and M&J K Dream Corp., the holders of 1,050,427 shares of Class A common stock and 7,838,731 shares of Class B common stock (collectively, the "Principal Stockholders"), which constitute approximately 60.4% of the voting power of the outstanding shares of the Company common stock, executed a Written Consent approving and adopting the Merger Agreement.

The foregoing description of the Written Consent does not purport to be a complete description and is qualified in its entirety by reference to the Written Consent, the form of which is attached to the Merger Agreement as Exhibit A, and is incorporated herein by reference.

On April 28, 2016, DreamWorks Animation issued a press release announcing that it had entered into the Merger Agreement. A copy of DreamWorks Animation's press release is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

Exhibit 2

**Safe Harbor Statement under U.S. Private Securities Litigation Reform Act of 1995.**

This Current Report on Form 8-K and Exhibit 99.1 hereto contain forward-looking statements that involve substantial risks and uncertainties. You can identify forward-looking statements by words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "should," "would" or similar words. You should consider these statements carefully because they discuss our plans, targets, strategies, prospects and expectations concerning our business, operating results, financial condition and other similar matters. These statements are subject to certain risks, uncertainties, and assumptions, including, but not limited to, the requirement to satisfy closing conditions to the Merger as set forth in the Merger Agreement, including expiration of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976; the outcome of any legal proceedings that may be instituted against DreamWorks Animation and others related to the transaction; the ability to retain certain key employees of DreamWorks Animation; and the risks identified and discussed under the caption "Risk Factors" in DreamWorks Animation's Annual Report on Form 10-K for the fiscal year ended December 31, 2015, filed with the Securities and Exchange Commission (the "SEC") on February 25, 2015 and the other documents DreamWorks Animation files with the SEC from time to time. There will be events in the future, however, that DreamWorks Animation is not able to predict accurately or control. DreamWorks Animation's actual results may differ materially from the expectations that DreamWorks Animation describes in its forward-looking statements. Factors or events that could cause DreamWorks Animation's actual results to materially differ may emerge from time to time, and it is not possible for DreamWorks Animation to accurately predict all of them. Any forward-looking statement made by DreamWorks Animation in this Current Report on Form 8-K and Exhibit 99.1 hereto speaks only as of the date on which DreamWorks Animation makes it. DreamWorks Animation undertakes no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

**Additional Information and Where to Find It**

This communication is being made in respect of the proposed Merger involving DreamWorks Animation and Comcast. DreamWorks Animation will prepare an information statement for its stockholders containing the information with respect to the Merger specified in Schedule 14C promulgated under the Securities Exchange Act of 1934, as amended, and describing the proposed Merger. When completed, a definitive information statement will be mailed to DreamWorks Animation's stockholders. Investors are urged to carefully read the information statement regarding the proposed Merger and any other relevant documents in their entirety when they become available because they will contain important information about the proposed Merger. You may obtain copies of all documents filed with the SEC regarding this transaction, free of charge, at the SEC's website, http://www.sec.gov or from DreamWorks Animation by directing a request by mail or telephone to DreamWorks Animation at 1000 Flower Street, Glendale, California 91201, telephone (818) 695-5000, Attention: General Counsel.

**Item 9.01. Financial Statements and Exhibits.**

(d)      Exhibits:

2.1   Agreement and Plan of Merger, dated as of April 28, 2016, by and among DreamWorks Animation SKG, Inc., Comcast Corporation and Comcast Paris Newco, Inc.*
3.1   Amendment to the By-laws of DreamWorks Animation SKG, Inc.
99.1  Press Release, dated April 28, 2016

* The Company hereby undertakes to furnish supplementally a copy of any omitted schedule or exhibit to such agreement to the U.S. Securities and Exchange Commission upon request.

Exhibit 2

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

DreamWorks Animation SKG, Inc.

Date: April 28, 2016

By: /s/ Andrew Chang
Andrew Chang
General Counsel

Exhibit 2

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| EX-2.1 | Agreement and Plan of Merger, dated as of April 28, 2016, by and among DreamWorks Animation SKG, Inc., Comcast Corporation and Comcast Paris Newco, Inc.* |
| EX-3.1 | Amendment to the By-laws of DreamWorks Animation SKG, Inc. |
| EX-99.1 | Press Release, dated April 28, 2016 |

* The Company hereby undertakes to furnish supplementally a copy of any omitted schedule or exhibit to such agreement to the U.S. Securities and Exchange Commission upon request.

Exhibit 2

# EXHIBIT 3

Exhibit 99.1

# NBCUniversal



**NBCUniversal Announces DreamWorks Animation Acquisition**

**Acquisition Builds on NBCUniversal's Presence in Family and Animation Space**

**DreamWorks Animation to Become Unit of Universal Filmed Entertainment Group**

**New York, April 28, 2016** – NBCUniversal, a division of Comcast Corporation (NASDAQ: CMCSA), today announced the acquisition of DreamWorks Animation (NASDAQ: DWA).  One of the world's most admired family brands, DreamWorks Animation creates animated feature films, television series and specials, live entertainment and related consumer products.  The studio will become part of the Universal Filmed Entertainment Group, which includes Universal Pictures, Fandango, and NBCUniversal Brand Development.

"DreamWorks Animation is a great addition to NBCUniversal," said Steve Burke, CEO of NBCUniversal.  "Jeffrey Katzenberg and the DreamWorks organization have created a dynamic film brand and a deep library of intellectual property.  DreamWorks will help us grow our film, television, theme parks and consumer products businesses for years to come.  We have enjoyed extraordinary success over the last six years in animation with the emergence of Illumination Entertainment and its brilliant team at Illumination Mac Guff studio.  The prospects for our future together are tremendous. We are fortunate to have Illumination founder Chris Meledandri to help guide the growth of the DreamWorks Animation business in the future."

Under the terms of the agreement, DreamWorks Animation has an equity value of approximately $3.8 billion.  DreamWorks Animation stockholders will receive $41 in cash for each share of DreamWorks Animation common stock.  The agreement has been approved by the boards of directors of DreamWorks Animation and Comcast, and the controlling shareholder of DreamWorks Animation has approved the agreement by written consent.

The transaction is expected to close by the end of 2016, subject to antitrust approvals in the U.S. and abroad, as well as the satisfaction of other customary closing conditions.

Following the completion of the transaction, DreamWorks Animation CEO and co-founder Jeffrey Katzenberg will become Chairman of DreamWorks New Media, which will be comprised

Exhibit 3

of the company's ownership interests in Awesomeness TV and NOVA. Katzenberg will also serve as a consultant to NBCUniversal.

"Having spent the past two decades working together with our team to build DreamWorks Animation into one of the world's most beloved brands, I am proud to say that NBCUniversal is the perfect home for our company; a home that will embrace the legacy of our storytelling and grow our businesses to their fullest potential," said Katzenberg. "This agreement not only delivers significant value for our shareholders, but also supports NBCUniversal's growing family entertainment business. As for my role, I am incredibly excited to continue exploring the potential of AwesomenessTV, NOVA and other new media opportunities, and can't wait to get started."

The acquisition gives NBCUniversal broader reach to a host of new audiences in the highly competitive kids and family entertainment space, in both TV and film. It includes popular DreamWorks Animation film franchise properties, such as *Shrek, Madagascar, Kung Fu Panda* and *How to Train Your Dragon*. It also includes a thriving TV operation that is a significant supplier of family programming, with hundreds of hours of original, animated content distributed across linear and SVOD platforms in more than 130 countries. Additionally, DreamWorks Classics, a large library of classic characters, including *Where's Waldo*, and *Rudolph the Red-Nosed Reindeer*, will become part of the NBCUniversal portfolio, along with a successful consumer products business.

Comcast was advised by Davis Polk & Wardwell LLP on legal matters. DreamWorks Animation was advised on financial matters by Centerview Partners and on legal matters by Cravath, Swaine & Moore LLP. DreamWorks Animation's Board of Directors was advised on legal matters by Munger Tolles & Olson LLP.

**About NBCUniversal**
NBCUniversal is one of the world's leading media and entertainment companies in the development, production, and marketing of entertainment, news and information to a global audience. NBCUniversal owns and operates a valuable portfolio of news and entertainment television networks, a premier motion picture company, significant television production operations, a leading television stations group, world-renowned theme parks, and a suite of leading Internet-based businesses. NBCUniversal is a division of Comcast Corporation.

Exhibit 3

**About DreamWorks Animation**
DreamWorks Animation (Nasdaq: DWA) is a global family entertainment company with business interests that span feature film and television production; licensing and consumer products; location-based entertainment; and new media properties, including the Company's controlling interest in AwesomenessTV. The Company's feature film heritage includes many of the world's most-beloved characters and franchises, including *Shrek*, *Madagascar*, *Kung Fu Panda* and *How to Train Your Dragon*, while its 32 feature film releases have amassed more than $13 billion in global box office receipts. DWA's television business has quickly become one of the world's leading suppliers of high-quality family programming, reaching consumers on linear and on-demand platforms in more than 130 countries and winning a total of 25 Emmy™ Awards to date. The Company's deep portfolio of intellectual property is supported by a robust, worldwide consumer products practice, which includes licensing, and location-based entertainment venues around the world. The Company is also the majority owner of AwesomenessTV, a leading video destination for Generation Z and Millennial audiences, and also owns 45% of Oriental DreamWorks, a world-class animation studio in China that produces family entertainment for both Chinese and global audiences.

NOTE: This press release contains forward-looking statements. Readers are cautioned that such forward-looking statements involve risks and uncertainties that could cause actual events or our actual results to differ materially from those expressed in any such forward-looking statements. Such forward-looking statements include the possible benefits of the proposed DreamWorks Animation acquisition to the NBCUniversal business. Readers are directed to Comcast's and DreamWorks Animation's periodic and other reports filed with the Securities and Exchange Commission (SEC) for a description of such risks and uncertainties. Neither Comcast nor DreamWorks Animation undertakes any obligation to update any forward-looking statements.

# # #

**Press Contacts:**

Hilary Smith: NBCUniversal, Hilary.Smith@nbcuni.com , 212-664-2617

Teri Everett: Universal Filmed Entertainment, Teri.Everett@nbcuni.com , 818-777-7216

Dan Berger: DreamWorks Animation, Dan.Berger@dreamworks.com, 818-695-4747

**Investor Contacts:**

Jason Armstrong: Comcast, Jason_Armstrong@Comcast.com, 215-286-7972

Jennifer DiGrazia: DreamWorks Animation, Jennifer.DiGrazia@dreamworks.com, 818-695-3384

Exhibit 3

# EXHIBIT 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## SCHEDULE 14C INFORMATION

### INFORMATION STATEMENT PURSUANT TO SECTION 14(c) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Check the appropriate box:

☒  Preliminary Information Statement

☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14c-5(d)(2))**

☐  Definitive Information Statement

# DREAMWORKS ANIMATION SKG, INC.
### (Name of Registrant As Specified In Its Charter)

Payment of Filing Fee (Check the appropriate box):

☐  No fee required

☒  Fee computed on table below per Exchange Act Rules 14c-5(g) and 0-11

    (1)  Title of each class of securities to which transaction applies:

        Class A common stock, par value $0.01 per share, of DreamWorks Animation SKG, Inc.

        Class B common stock, par value $0.01 per share, of DreamWorks Animation SKG, Inc.

    (2)  Aggregate number of securities to which transaction applies:

        (a) (i) 78,827,721 shares of Class A common stock, (ii) 3,389,897 shares of Class A common stock subject to restricted stock unit awards, (iii) 1,307,188 shares of Class A common stock subject to performance restricted stock unit awards (assuming achievement of all applicable performance goals at the maximum level) and (iv) 3,765,027 shares of Class A common stock subject to stock appreciation rights (assuming each stock appreciation right represents one share of Class A common stock).

        (b) 7,838,731 shares of Class B common stock.

    (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

        Solely for purposes of calculating the filing fee, the underlying value of the transaction was determined based upon the sum of (A) (i) 78,827,721 shares of Class A common stock issued and outstanding and 7,838,731 shares of Class B common stock issued and outstanding, in each case multiplied by $41.00 per share; (ii) 3,389,897 shares of Class A common stock underlying restricted stock unit awards outstanding, multiplied by $41.00; (iii) 1,307,188 shares of Class A common stock underlying performance restricted stock unit awards outstanding (assuming achievement of all applicable performance goals at the maximum level), multiplied by $41.00; and (iv) 3,765,027 shares of Class A common stock underlying stock appreciation rights (assuming each stock appreciation right represents one share of Class A common stock) multiplied by $11.47 (which is the difference between $41.00 and the weighted average exercise price of $29.53 per share).

        In accordance with Section 14(g) of the Securities Exchange Act of 1934, as amended, the filing fee was determined by multiplying 0.0001007 by the sum of the preceding sentence.

    (4)  Proposed maximum aggregate value of transaction:

        $3,789,089,877

    (5)  Total fee paid:

        $381,561.35

☐  Fee paid previously with preliminary materials.

Exhibit 4

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

(1) Amount Previously Paid: _____

(2) Form, Schedule or Registration Statement No.: _____

(3) Filing party: _____

(4) Date Filed: _____

Exhibit 4

**THE MERGER**

**Overview**

Under the terms of the merger agreement, subject to the satisfaction or waiver (if permissible under applicable law) of specified conditions, Merger Sub will be merged with and into the Company, with the Company surviving the merger as a wholly owned subsidiary of Comcast. The Board approved the merger agreement and recommended that the Company's stockholders vote to adopt the merger agreement.

Upon the consummation of the merger, each share of Company common stock issued and outstanding immediately prior to the effective time of the merger (other than shares owned by the Company, any subsidiary of the Company, Comcast, Merger Sub or any other subsidiary of Comcast or shares with respect to which appraisal rights have been properly exercised in accordance with the DGCL) will be converted into the right to receive $41.00 in cash, without interest and less any applicable withholding taxes.

**Background of the Merger**

The Board and the Company's senior management periodically review the Company's long-term strategic plan and prospects in light of the Company's business and developments in the media sector. On a number of occasions since the Company's initial public offering in 2004, the Board has received indications of interest and explored potential strategic transactions, including possible acquisitions, investments in the Company and sale transactions, to enhance stockholder value.

In July 2014, the Company was approached by Company A to consider a potential acquisition by Company A of a controlling interest in the Company. The Company entered into a confidentiality agreement with Company A and the parties engaged in preliminary due diligence and negotiations. In the course of such discussions, the Company engaged its regular outside counsel, Cravath, Swaine & Moore LLP ("Cravath"), and the Board engaged Munger, Tolles & Olson LLP ("MTO") to provide legal advice. Additionally, in connection with such discussions, Centerview and another bank provided preliminary financial advice. The transaction ultimately proposed by Company A contemplated an acquisition by Company A of 65% of the outstanding Company common stock for $34 per share in cash, resulting in Company A having voting control of the Company and the remaining 35% of equity in the Company continuing to be publicly traded. During the course of the discussions with Company A, representatives of the Company had preliminary discussions with several large U.S. media companies, including Company C, to assess the potential interest of such companies in a strategic transaction with the Company. None of those discussions resulted in engagement regarding a potential transaction. In September 2014, various publications reported rumors of discussions involving a sale of the Company. The discussions with Company A terminated following such news reports without any agreement having been reached.

In October 2014, the Company was approached by Company B to consider a potential business combination transaction. The Company entered into a confidentiality agreement with Company B and the parties engaged in preliminary due diligence and negotiations, which contemplated an acquisition of 100% of the outstanding Company common stock without a specific discussion of price but an indication in the range of $35 per share. Various publications again reported rumors of discussions involving a sale of the Company. The discussions with Company B terminated following such news reports without any agreement having been reached.

Periodically during the remainder of 2014 through early 2016, the Company was contacted by various U.S.-based and foreign entities with a potential interest in exploring a strategic investment in or other business relationship with the Company. The Board authorized preliminary engagement with those parties that management considered credible, including providing confidential information to determine interest in an investment or broader transaction. The Company's management provided periodic updates to the Board regarding such inquiries, none of which led to further significant engagement with the counterparties.

16

Exhibit 4

On February 9, 2016, a representative of a private equity investment firm based outside the U.S. (the "PE Firm") met with Fazal Merchant, the Company's Chief Financial Officer, and other members of the Company's senior management at the Company's headquarters in Glendale, California to receive a presentation about the Company's business using publicly available information. Following this meeting, the Company and the PE Firm entered into a confidentiality agreement to facilitate the exchange of confidential information between the Company and the PE Firm.

On February 10, 2016, Jeffrey Katzenberg, the Company's Chief Executive Officer, and Mr. Merchant had further meetings with a representative of the PE Firm. Following these meetings, Mr. Merchant briefed Mellody Hobson, the Chair of the Board, regarding the discussions with the PE Firm.

During the period from February 11, 2016, to February 28, 2016, representatives of the Company and the PE Firm engaged in due diligence discussions, the PE Firm was provided with access to a virtual data room and discussions regarding valuation occurred, culminating in an offer by the PE Firm of $33 in cash per share of common stock, contingent upon Mr. Katzenberg's willingness to remain with the Company as its Chief Executive Officer and the retention of other key management (the "February 28 Proposal").

On March 2, 2016, a telephonic meeting of the Board was held with representatives of the Company's counsel, Cravath, the independent directors' counsel, MTO, and Centerview, participating, to discuss the February 28 Proposal. Mr. Merchant provided an update on the meetings and discussions with representatives of the PE Firm. Mr. Merchant noted that the PE Firm had stated that retaining Mr. Katzenberg and key management was a condition to its interest in pursuing the proposed transaction, and that the PE Firm had requested an opportunity to discuss the terms on which Mr. Katzenberg would remain. Mr. Katzenberg noted that he had not engaged in such discussions. He stated that, until the Board came to a determination as to whether the proposed transaction was in the best interests of the Company's stockholders and authorized him to engage in discussions with the PE Firm regarding his personal situation, he would not engage in such discussions. Representatives of Cravath and MTO reviewed with the Board their duties in connection with their evaluation of the February 28 Proposal, as well as other legal matters. Representatives of Centerview discussed their preliminary financial analysis of the proposed price of $33 per share. The independent directors then met in executive session with representatives of MTO and without members of management, Cravath or Centerview participating. The independent directors participating in the executive session unanimously authorized management to engage in further discussions with the PE Firm to seek to improve the price offered and understand other deal terms and certainty of funding.

On March 5, 2016, Mr. Merchant and other members of the Company's senior management had a conference call with representatives of the PE Firm to discuss the PE Firm's analysis and perspective on value and to answer further questions about the Company and its financial projections in order to enable the PE Firm to improve its price.

On March 8, 2016, the PE Firm submitted a nonbinding proposal for an acquisition of the Company at a price of $35 per share, subject to due diligence and negotiation of definitive agreements (the "March 8 Proposal"). The letter conditioned the offer on, among other things, a rollover of substantially all shares held by certain founders and members of the Company's senior management, the completion of certain processes by one or more of the PE Firm's co-investors, and the negotiation of satisfactory employment arrangements with Mr. Katzenberg and other key members of management. The proposal also indicated that the purchase price would be funded with equity from the PE Firm and certain co-investors.

On March 9, 2016, a telephonic meeting of the Board was held, with representatives of Cravath, MTO and Centerview participating, to discuss the March 8 Proposal. Mr. Merchant provided an update on the discussions with the representatives of the PE Firm as well as an update on the Company's business. Representatives of Cravath and MTO again reviewed with the Board their duties in connection with their evaluation of the March 8 Proposal and a potential determination to pursue a sale of the Company, as well as other legal matters.

Exhibit 4

Representatives of Centerview discussed its preliminary financial analyses that had been done to date. Mr. Katzenberg noted that he was prepared to consider either cashing out or rolling over his shares if the Board determined such transaction was in the best interests of the Company's stockholders. He further noted that he had not engaged in discussions with the PE Firm about employment matters and would not until the Board determined that it would be appropriate for him to do so. The independent directors then met in executive session with representatives of MTO and without any members of management, Cravath or Centerview participating. The independent directors participating in the executive session unanimously authorized further discussions with the PE Firm to evaluate, among other things, deal terms and certainty of funding, and also seek a transaction where all shares, including those held by Mr. Katzenberg and other members of management, would receive the same consideration.

During the period from March 11, 2016, to March 15, 2016, representatives of the Company, Centerview, Cravath and MTO engaged in discussions with representatives of the PE Firm and its counsel, O'Melveny & Myers LLP ("OMM") regarding financing and potential deal terms, including the desire of the independent directors to secure a transaction where all shares would receive the same consideration without any rollover. The representatives of the PE Firm and OMM noted that a rollover by Mr. Katzenberg and other members of management was a condition to the PE Firm's interest in a transaction.

In the evening of March 16, 2016, the PE Firm submitted a revised proposal letter dated March 17, 2016 (the "March 17 Proposal"). The material terms of the proposed transaction, including the price of $35 per share in cash conditioned on a rollover of shares held by certain founders and members of the Company's senior management, remained unchanged from the March 8 Proposal. The letter also asked that the Company enter into exclusive discussions with the PE Firm regarding a proposed transaction.

On March 18, 2016, Ms. Hobson met with a representative of the PE Firm to discuss various aspects of the proposed transaction, including with respect to the identity of the potential co-investors with the PE Firm. Ms. Hobson noted that the Company would not consider exclusivity without further comfort as to certainty of funding, and Mr. Merchant subsequently reiterated this to the representative of the PE Firm, and a representative of the PE Firm subsequently confirmed to Mr. Merchant that they understood that the request for exclusivity would likely not be granted by the Company.

On March 25, 2016, a telephonic meeting of the Board was held, with representatives of Cravath, MTO and Centerview participating, to discuss the March 17 Proposal. Representatives of Cravath and MTO again reviewed with the Board their duties in connection with their evaluation of the March 17 Proposal and a potential determination to pursue a sale of the Company, as well as other legal matters. Among the matters discussed were the request for exclusivity, the insistence of the PE Firm on a rollover of equity by Mr. Katzenberg and whether to solicit interest from other potential counterparties at that time. The Board determined not to solicit interest from additional parties at that time because of, among other factors, the significant concern of the negative impact of a leak on the Company's business and employees, the prior experience of the Company with leaks in connection with earlier acquisition discussions and the detrimental impact of such leaks on such discussions, as well as the expectation that, if a transaction with the PE Firm was entered into on the terms proposed, it would require approval of the Class A stockholders of the Company and the Board would retain a "fiduciary out" to pursue a transaction proposal received after signing and prior to obtaining such approval that offered superior value. The Board also discussed the key terms in addition to price that needed to be agreed in principle as part of the next round of transaction discussions, including the rollover of equity by Mr. Katzenberg. The Board unanimously adopted resolutions confirming that the independent directors (i.e., the entire Board other than Mr. Katzenberg) would have the power and authority to take any action otherwise available to the Board in connection with a proposed transaction. An executive session of the independent directors was then held. During this session, MTO presented disclosure regarding its prior representations of the Company, the Board and various Company executive officers. Representatives of Centerview also presented disclosure regarding Centerview's relationship with and previous work for the Company. Both firms noted they had no material relationships with the PE Firm. After considering these disclosures, the independent directors participating voted unanimously to

18

Exhibit 4

formally engage MTO as legal counsel to the independent directors of the Board and Centerview as financial advisor to the independent directors of the Board. The independent directors also appointed Ms. Hobson, Harry "Skip" Brittenham and Jason Kilar as a transaction committee to negotiate or direct the negotiations regarding the proposed transaction and any alternatives on behalf of the independent directors, with the independent directors retaining ultimate decision-making authority. Ms. Hobson subsequently confirmed with Mr. Merchant that he would continue as the Company's primary contact with the PE Fund, and that he and other members of management engaged in discussions with the PE Firm would report to, and take directions from, the transaction committee with respect to any acquisition proposals. Thereafter, Ms. Hobson and Mr. Merchant had nearly daily update calls. The independent directors determined that, if the price and other key terms of a transaction could be agreed in principle, they would then authorize discussions between Mr. Katzenberg and the PE Firm to ascertain whether a rollover and employment terms could be agreed between them.

During the week of March 28, 2016, the PE Firm and its representatives conducted a series of meetings with the Company's senior management at the Company's headquarters as part of the PE Firm's due diligence.

On March 29, 2016, Mr. Merchant sent the PE Firm an initial draft of a non-binding term sheet prepared by Cravath, MTO and Centerview, based on the guidance received from the independent directors and the transaction committee, regarding a proposed transaction, which included, among other things, a proposed price of $35 per share in cash for all shares other than shares of Mr. Katzenberg to be rolled over, closing conditions including approval of the Class A stockholders of the Company, the right of the independent directors to terminate the merger agreement with the PE Firm to pursue a superior proposal upon payment of a termination fee of $32.5 million (approximately 1% of the total transaction equity value), as well as a requirement that funds sufficient to finance the transaction be deposited in escrow with a United States bank at the time of signing. The PE Firm responded that the termination fee should be 10% of the transaction value and that it would not be possible to comply with the escrow requirement proposed in the term sheet. Over the next two days, Mr. Merchant had a series of conversations and email exchanges with the PE Firm regarding the terms of a proposed transaction, including regarding the termination fee and issues related to certainty of funding. After several discussions, Mr. Merchant and the PE Firm reached a non-binding agreement in principle regarding a termination fee of 3.5% of the transaction value, subject to the approval of the transaction committee. Mr. Merchant communicated this agreement in principle to the members of the transaction committee, each of whom approved it.

On March 31, 2016, OMM sent a revised non-binding term sheet to Mr. Merchant. The revised draft term sheet provided for a price of $35 per share, a rollover of shares held by certain founders and key members of management, a termination fee of 3.5% of transaction value (calculated on enterprise value plus the fees incurred by the PE Firm in connection with the transaction) and that the PE Firm would provide proof of funding to the reasonable satisfaction of the Company prior to signing a definitive agreement. Also on March 31, a representative of the PE Firm circulated to Mr. Merchant a draft form of equity commitment letter, which provided that funding was contingent upon, among other things, concurrent funding by other investors.

On April 2, 2016, Cravath sent a revised non-binding term sheet to the PE Firm and OMM that, among other things, provided further detail regarding the funding certainty that would be required by the Company prior to signing a definitive agreement and proposed a termination fee of 3.5% of transaction equity value of the Company.

On April 3, 2016, representatives of Cravath and Centerview met with a representative of the PE Firm in New York to discuss various issues, including funding certainty.

On April 4, 2016, a telephonic meeting of the Board was held with representatives of Cravath, MTO and Centerview participating. The Board members were provided with an update on the various discussions occurring over the prior several days as well as the current draft of the non-binding term sheet. An executive session of the independent directors was then held with representatives of MTO participating, during which the independent

Exhibit 4

directors voted unanimously to authorize continued discussions with the PE Firm on the terms outlined in the term sheet and, if such terms were agreed in principle by the PE Firm, to allow Mr. Katzenberg and his advisors to begin discussions with the PE Firm regarding the terms of the rollover of certain of Mr. Katzenberg's shares and the terms of his employment with the Company following consummation of the transaction, which the PE Firm required as conditions to its proposal. The independent directors also discussed the issue of achieving satisfactory assurance of funding and alternative approaches to addressing this issue. Following this meeting, Mr. Merchant sent a revised draft of the non-binding term sheet to the PE Firm and OMM.

On April 5 and April 6, 2016, representatives from OMM, Cravath and MTO held discussions and exchanged drafts of the non-binding term sheet. With the approval of the transaction committee, the parties finalized the non-binding term sheet on April 6, 2016, which included a proposed termination fee of $121 million (3.5% of transaction enterprise value).

From April 6, 2016 through April 11, 2016, the Company, Cravath, MTO, Centerview and Ms. Hobson continued to conduct due diligence regarding funding certainty.

On April 11, 2016, Cravath distributed a draft merger agreement to OMM.

On April 13, 2016, an investment firm based outside the U.S. sent a letter to Centerview offering to acquire the Company for a purchase price of $30 per share in cash. The Board ultimately determined not to pursue this potential transaction because of the price offered and because the solicitation was not considered a credible offer.

On April 13, 2016, Brian Roberts, the Chairman and Chief Executive Officer of Comcast, contacted Mr. Katzenberg to express interest in a possible acquisition of the Company. Mr. Katzenberg directed Mr. Roberts to discuss the matter with Ms. Hobson and immediately alerted Ms. Hobson and Mr. Merchant of this development.

On April 14, 2016, Ms. Hobson had a telephone call with Mr. Roberts. Ms. Hobson indicated that the Company was engaged in negotiations with an unnamed potential financial buyer. Ms. Hobson told Mr. Roberts that any offer made by Comcast would have to meaningfully exceed $35 per share in order for the Company to pursue discussions with Comcast. Ms. Hobson called Mr. Brittenham to inform him of her discussions with Mr. Roberts. Mr. Brittenham told Ms. Hobson that, as a result of his legal representation of a senior creative executive of NBCUniversal, he would recuse himself from any consideration of a possible transaction with Comcast. Also on April 14, representatives of Cravath, Centerview and the Company engaged with representatives of the PE Firm regarding progress on financing.

On April 15, 2016, the Company and Comcast entered into a confidentiality agreement.

On April 16, 2016, Mr. Roberts, Stephen Burke, the Chief Executive Officer of NBCUniversal, Jeff Shell, Chairman, Universal Filmed Entertainment Group of NBCUniversal, other members of senior management of Comcast and representatives of Davis Polk & Wardwell LLP ("Davis Polk"), Comcast's legal advisor, met with Mr. Katzenberg, Mr. Merchant, Ms. Hobson and other members of the Company's senior management and representatives of MTO in Los Angeles. At these meetings, the Company provided, among other things, a presentation to Comcast regarding the Company's business and financial outlook. In discussions with Ms. Hobson and a representative of MTO, Mr. Roberts and Mr. Burke conveyed that they wanted to enter into an agreement quickly and further conveyed an interest in a transaction that would enable an immediate and full integration of the Company into Comcast's businesses. Mr. Roberts and Mr. Burke also noted that Comcast would like Mr. Katzenberg's role at the Company to be to oversee the Company's Awesomeness TV and DWA Nova, LLC joint ventures (the "JVs") on behalf of Comcast, potentially as a non-executive chair of a newly formed interactive media subsidiary of Comcast that would hold the Company's interests in such JVs. Later in the evening on April 16, Ms. Hobson and Mr. Katzenberg agreed to meet with Mr. Roberts, Mr. Burke and Mr. Shell the following morning, as requested by Mr. Roberts and Mr. Burke, to determine whether there was a basis for further engagement between the parties.

20

Exhibit 4

On the morning of April 17, 2016, Mr. Katzenberg, Ms. Hobson, Mr. Roberts, Mr. Burke and Mr. Shell met for breakfast in Los Angeles. At such meeting, Mr. Roberts suggested that, as an alternative to an immediate and full integration of the Company into Comcast's businesses, Comcast would be open to considering a transaction with substantially the same structure as the Company was negotiating with its private equity counterparty, with senior management of the Company continuing in their current roles. Following such meeting, several representatives of Comcast visited the Company for a site tour. Thereafter, Mr. Roberts and other members of senior management of Comcast and representatives of Davis Polk reconvened at the offices of MTO with Mr. Katzenberg, Mr. Merchant, Ms. Hobson and other members of the Company's senior management and representatives of MTO, with a representative of Cravath participating by phone. Mr. Roberts noted that they would need to quickly complete their due diligence to come to a formal offer for the Company along the terms discussed at the breakfast meeting. Later that day, Cravath circulated to Davis Polk for purposes of discussion a non-binding term sheet reflecting terms generally consistent with those in the non-binding term sheet with the PE Firm (but with the price per share left blank). Comcast and Davis Polk were granted access to a virtual data room in order to begin due diligence.

On April 18, 2016, Cravath sent Davis Polk a draft merger agreement reflecting terms generally consistent with those included in the draft agreement sent to the PE Firm but with changes to reflect a strategic rather than a financial buyer. Ms. Hobson also had a call with Mr. Kilar in order to update him with respect to Comcast's interest and the meetings that took place on April 16 and 17. During the call, Mr. Kilar confirmed his agreement that negotiations with Comcast should proceed.

On April 19, 2016, Ms. Hobson received a letter from Comcast (the "April 19 Proposal") offering $35 per share in cash, or a mix of cash and Comcast stock, for each share of Company common stock, pending completion of due diligence and satisfactory resolution of certain employment matters related to the ongoing leadership of the Company. Following discussion with Ms. Hobson, it was decided that Mr. Merchant would call Michael Cavanagh, Comcast's Chief Financial Officer, and Robert Eatroff, Comcast's Executive Vice President of Global Corporate Development and Strategy, to discuss Comcast's offer and to indicate that the Company's independent directors were seeking a price meaningfully higher than $35 per share. Mr. Merchant conveyed that message to Mr. Eatroff. Also on April 19, 2016, the PE Firm sent Mr. Merchant and Cravath a draft of a form of funding commitment letter to be issued by an unnamed bank for an unspecified portion of the funding of its offer.

On April 20, 2016, Mr. Katzenberg conveyed to Ms. Hobson and Mr. Merchant that he would be willing to support a transaction involving an acquisition of all shares of Company common stock and the full integration of the Company into Comcast immediately following the closing, including a substantial reduction in his role in the Company, if Comcast were to offer the Company's stockholders a significantly higher price per share than previously offered.

On a subsequent call with Mr. Roberts, Ms. Hobson conveyed that she was disappointed in the price offered by Comcast in the April 19 Proposal, and that Mr. Katzenberg would consider supporting a transaction that offered Comcast an immediate and full integration of the Company if Comcast were to offer the Company's stockholders a significantly higher price. She indicated that Comcast should respond with a revised offer before a Board dinner scheduled for that evening and a Board meeting scheduled for the following day, and that such offer should be in the $40s per share in order for engagement to continue. Ms. Hobson discussed the developments on a call with Mr. Kilar, who agreed that Ms. Hobson should continue to push for a price in the $40s per share. In a conference call among representatives of Davis Polk, Cravath and MTO, representatives of Davis Polk indicated that Comcast would insist upon a transaction structure pursuant to which Mr. Katzenberg, in his capacity as the controlling stockholder, would approve the transaction by delivering a written consent with respect to his shares immediately following the signing of the definitive merger agreement. Representatives of Cravath and MTO responded that the Board would expect to retain a "fiduciary out" to pursue a superior proposal received after signing.

On a call with Ms. Hobson on the morning of April 21, 2016, Mr. Roberts conveyed Comcast's offer, which was confirmed in a revised letter (the "April 21 Proposal"), to acquire all of the Company's equity securities for

Exhibit 4

$38.50 per share in cash, subject to satisfactory completion of due diligence and negotiation of a definitive agreement. The offer was also contingent upon, among other things, Mr. Katzenberg agreeing to deliver a written consent immediately following signing of the merger agreement. On the call with Mr. Roberts, Ms. Hobson reiterated that Comcast would need to improve its offer to a price in the $40s per share to achieve the support of the independent directors, and that Comcast's demand that Mr. Katzenberg deliver an immediate written consent required discussion by the independent directors. Mr. Roberts noted the significant movement in price from the initial $35 per share offer and he also noted that he and Mr. Katzenberg would need to agree to the scope of Mr. Katzenberg's role and transition support following the closing of the transaction.

During a meeting of the Board at the Company's headquarters on April 21, 2016, the potential transactions with Comcast and the PE Firm were discussed by the Board. Representatives of Cravath and MTO reviewed with the Board their duties in connection with their evaluation of the two proposals and a potential determination to pursue a sale of the Company, the request from Comcast that Mr. Katzenberg deliver a written consent to the transaction with Comcast and other legal matters. With respect to the two proposals, the directors and the advisors discussed, among other things, a comparison of the proposals, including as to price and conditionality. The independent directors then met in executive session. Representatives of MTO and Centerview advised the independent directors of their prior relationships and representations of Comcast and its affiliated entities. Representatives of Richards, Layton & Finger, P.A., special Delaware counsel to the Company, joined the meeting by conference telephone to advise the independent directors with respect to the disclosures provided by MTO. Following this discussion, the independent directors resolved to continue the engagements of MTO and Centerview. The independent directors discussed Mr. Brittenham's recusal and, after discussing whether another independent director should fill Mr. Brittenham's role on the transaction committee, resolved to proceed with a transaction committee consisting of Ms. Hobson and Mr. Kilar. Following further discussions of the potential transactions, the Board reconvened and representatives of Centerview reviewed Centerview's preliminary financial analysis of the Company and the proposals and discussed their perspective on other potential acquirors for the Company, including whether any could be expected to offer a price higher than that offered by Comcast. Representatives of Centerview also reviewed the Company's prior sale discussions, the price levels offered in such discussions and the ultimately public nature of such prior discussions. The independent directors discussed Comcast's insistence that its proposal was conditioned upon Mr. Katzenberg delivering a written consent to the transaction, including whether they should solicit interest from other potential counterparties. The independent directors decided not to solicit interest from additional parties because of, among other factors, their significant knowledge of the universe of other potential acquirers and prices achievable based on the prior sale discussions, the advice from Centerview that, based upon and subject to the information made available to Centerview by the Company, Comcast could likely achieve more synergies than other potential strategic acquirers and therefore could potentially be willing to pay more than other strategic acquirers, and the concern that a leak could jeopardize the current transaction discussions with Comcast. The independent directors then considered Mr. Roberts' request that Comcast be permitted to engage in discussions with Mr. Katzenberg regarding his post-closing services and support arrangement, which Mr. Roberts had noted was a material element of Comcast's consideration of the transaction. The independent directors authorized Mr. Katzenberg to begin negotiating such arrangement with Comcast. Finally, the independent directors authorized Mr. Merchant and the representatives of Centerview to respond to Comcast's April 21 Proposal with a counterproposal of a price of $42 in cash per share, a full "fiduciary out" to pursue a superior proposal following signing without the delivery by Mr. Katzenberg of a written consent, and a significant regulatory commitment. That counterproposal was conveyed to Messrs. Cavanagh and Eatroff following the end of the board meeting.

On the evening of April 21, 2016, Davis Polk circulated a revised draft of the merger agreement to Cravath, reflecting the written consent structure in the April 21 Proposal and Comcast's position as to regulatory matters.

On April 22, 2016, representatives of Cravath and Davis Polk met at Cravath's New York offices, with representatives of MTO and the Company participating by phone, to discuss the draft merger agreement circulated by Davis Polk. Also on that day, a representative of each of Centerview and Cravath spoke with Messrs. Cavanagh, Eatroff and a representative of Davis Polk to reiterate the counterproposal conveyed the

22

Exhibit 4

previous day, and the representative of Cravath also summarized the proposed terms of Mr. Katzenberg's post-closing consulting arrangement, noting that a draft term sheet reflecting the same would follow. The representative of Cravath once again noted the expectation of the independent directors that they would retain a "fiduciary out" to pursue a superior proposal following signing and that Mr. Katzenberg would not deliver a written consent. A draft term sheet was circulated by Cravath to Davis Polk later that day, providing that Mr. Katzenberg would provide certain consulting services to Comcast, including as to integration and transition matters and overseeing the JVs on behalf of Comcast, for which he would receive compensation comprised of a mix of cash and a profits interest in each of the JVs. That afternoon, the Board held a telephonic meeting to receive an update regarding the transaction and the discussion between the advisors and Comcast. Certain members of the Board indicated that they had received press inquiries regarding rumors of a potential transaction involving the Company.

On April 23, 2016, the Board held a telephonic meeting during which members of management, Centerview, Cravath and MTO provided updates on the progress of Comcast's due diligence and the status of discussions. Mr. Roberts telephoned Ms. Hobson to request clarification as to the process the independent directors expected Comcast to follow in negotiating Mr. Katzenberg's post-closing consulting arrangement, and to provide his reaction and suggested approach to compensation under such arrangement. Ms. Hobson told Mr. Roberts that she would not be involved in negotiating the terms of such arrangement and he should negotiate through the representative of Cravath who had conveyed the proposed consulting arrangement terms to Messrs. Cavanagh and Eatroff and a representative of Davis Polk, and Ms. Hobson again urged Mr. Roberts to raise his price per share. On a subsequent call between Mr. Roberts and Ms. Hobson, Mr. Roberts indicated that Comcast may be willing to raise its offer to $40 per share, reiterating that that was subject to Mr. Katzenberg delivering a written consent to the transaction immediately following signing of the merger agreement and subject to reaching agreement with Mr. Katzenberg on his post-closing consulting arrangement. During that call, Ms. Hobson noted that Cravath would be providing a revised term sheet responsive to the suggested approach Mr. Roberts had conveyed earlier, and she reiterated to Mr. Roberts that Comcast would have to increase its offer to $42 per share to achieve the support of Mr. Katzenberg as well as the independent directors. Ms. Hobson further noted that the Company needed a strong commitment from Comcast to pursue required regulatory approvals. Later that evening, Cravath provided a revised draft term sheet to Davis Polk relating to Mr. Katzenberg's consulting services that eliminated the cash compensation element from the prior draft.

Also on April 23, 2016, OMM distributed to Cravath a revised draft of the merger agreement with the PE Firm.

On April 24, 2016, representatives of Davis Polk and Cravath engaged in discussions regarding the revised draft term sheet relating to Mr. Katzenberg's consulting services, resulting in an agreement in principle as to the key terms of his post-closing duties and compensation. The representative of Davis Polk also noted Comcast's expectation that Mr. Katzenberg would agree to noncompetition and employee non-solicitation obligations following closing of a transaction as well as commitments relating to securing regulatory approvals. That evening, Davis Polk sent drafts of a consulting agreement and a support agreement for Mr. Katzenberg containing such provisions to Cravath and to Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), counsel to Mr. Katzenberg.

Between April 24 and April 27, 2016, representatives of Davis Polk and Paul Weiss negotiated the terms of the consulting agreement and the support agreement.

On April 25, 2016, the Board held a telephonic meeting with representatives of Cravath, MTO and Centerview participating, during which the Board was provided an update on the status of negotiations with Comcast. The independent directors then held an executive session with representatives of MTO participating, during which the independent directors approved the terms and conditions of a written engagement letter with Centerview.

On April 25, 2016, Mr. Roberts and Ms. Hobson had several discussions relating to the status of negotiations, highlighting as key issues price, Comcast's regulatory commitment, Comcast's requirement that

23

Exhibit 4

Mr. Katzenberg deliver a written consent to the transaction immediately following signing of the merger agreement and the status of certain issues with respect to Mr. Katzenberg's post-closing consulting agreement and support agreement. During such discussions, Mr. Roberts conveyed that Comcast may be willing to raise its offer from that contained in the April 21 Proposal if Comcast's proposal on the latter issues were accepted. Ms. Hobson reiterated that she could not speak for Mr. Katzenberg, and that the independent directors would require a significant movement on price for the transaction discussions not to reach an impasse. Later that evening, Comcast sent a revised letter of interest (the "April 25 Proposal") reflecting an increase in price to $40 per share, which was contingent upon Mr. Katzenberg agreeing to provide a written consent to the transaction immediately following signing of the merger agreement and proposing a $140 million reverse termination fee payable by Comcast in the event the regulatory approvals required to consummate the merger were not obtained.

On April 26, 2016, representatives of Company C, which had previously engaged in limited due diligence and preliminary discussions in connection with a potential acquisition of the Company, and which representatives of Centerview had identified as a potential strategic acquirer with the financial capability to consummate an acquisition of the Company, contacted Mr. Katzenberg to express interest in discussing a potential acquisition of the Company. After consulting with Ms. Hobson, Mr. Katzenberg and a representative of Centerview had follow-up conversations with such representatives that day and, at the request of Company C, arranged meetings between the representative of Centerview and representatives of Company C for the morning of April 27, 2016.

On the same day, representatives of Centerview and Cravath had a call with Messrs. Cavanagh and Eatroff and a representative of Davis Polk in which they communicated the response to the April 25 Proposal, noting the independent directors' position on price remained at $42 per share, with a full "fiduciary out" to pursue a superior proposal following signing and no delivery of a written consent by Mr. Katzenberg, and a requirement for a significant regulatory commitment, but noting a willingness to increase the termination fee payable by the Company in order to terminate the merger agreement in connection with a superior proposal, as well as reduce the scope of the regulatory commitment subject to increasing the reverse termination fee payable by Comcast for failure to obtain regulatory approvals to $300 million. Cravath circulated to Davis Polk a revised draft of the merger agreement reflecting these terms in the evening of April 26, 2016.

On the evening of April 26, 2016, various publications reported rumors that Comcast was in discussions to acquire the Company for over $3 billion. Numerous articles reporting a potential acquisition of the Company were published on the morning of April 27, 2016.

Following discussion between representatives of MTO, Centerview and Cravath and representatives of Comcast and Davis Polk, Mr. Roberts contacted Ms. Hobson several times during the evening of April 26, 2016 and into the early morning of April 27, 2016 to reiterate that Comcast would not pay the $40 per share reflected in the April 25 Proposal if Mr. Katzenberg did not agree to provide a written consent to the transaction immediately following signing of the merger agreement and that, without such immediate written consent, Comcast would drop its price to $38.50 per share if the independent directors wanted a "fiduciary out" for a period of five days following signing, or to $35 per share for a "fiduciary out" period of 30 days following signing, or Comcast may abandon the negotiations entirely. Mr. Roberts reiterated to a representative of Centerview that the written consent to the transaction from Mr. Katzenberg was an absolute requirement for Comcast, and representatives of Davis Polk communicated the same to representatives of Cravath and MTO.

On the morning of April 27, 2016, a representative of Centerview met with representatives of Company C in order to ascertain Company C's interest in an acquisition of the Company and its price expectations. Shortly following that meeting, a senior executive of Company C called Mr. Katzenberg and conveyed that they would not pursue an acquisition of the Company in the $40 per share price range. On the same morning, a representative of Centerview spoke with a senior executive officer of Company D, another potential strategic acquirer, who informed the representative of Centerview that Company D would not be interested in pursuing an acquisition of the Company.

Exhibit 4

Also on April 27, 2016, Mr. Merchant received an email communication from the PE Firm indicating that the PE Firm's proposal was fully financed for a transaction at $35 per share. OMM then circulated a revised merger agreement, along with forms of equity commitment and bank commitment letters.

Later on April 27, 2016, Ms. Hobson spoke with Mr. Roberts and noted that he needed to improve the $40 per share offer price contained in the April 25 Proposal. He responded that Comcast was willing to increase its offer to $41 per share, but only if Mr. Katzenberg delivered a written consent immediately following signing of the merger agreement. Ms. Hobson countered that the independent directors would consider Comcast's insistence on the written consent, but with a more significant regulatory commitment from Comcast. Ms. Hobson also asked Mr. Roberts to raise the price to $41.50 per share. Mr. Roberts later responded that $41 per share was Comcast's maximum offer.

Later that day, representatives from Cravath spoke with representatives from Comcast and Davis Polk to discuss the regulatory commitment and Comcast agreed to increase the size of the reverse termination fee to $200 million. Following such conversation, a representative of Davis Polk contacted a representative of Cravath to offer an additional element of regulatory commitment that would include certain conduct remedies.

On April 27, 2016, the Board held a telephonic meeting to discuss the status of negotiations with Comcast. Representatives of Cravath and MTO reviewed with the Board their duties in connection with their evaluation of the Comcast offer and a determination to pursue a sale of the Company, the requirement from Comcast that Mr. Katzenberg deliver a written consent to the transaction with Comcast immediately following the signing and other legal matters. Representatives of Centerview reviewed the conversations with Company C and Company D which had occurred earlier that day and again discussed their perspective on other potential acquirors for the Company, including whether any could be expected to offer a price higher than the $41 per share offered by Comcast. Representatives of Centerview also updated its preliminary financial analysis. The Board discussed these matters with participation from representatives of Cravath, MTO and Centerview. The independent directors then held an executive session with representatives of MTO during which they continued to discuss the proposed terms. Following discussion, the independent directors instructed Cravath and MTO to proceed to negotiate the final terms of the merger agreement.

Following the meeting, from the evening of April 27, 2016 through the morning of April 28, 2016, Davis Polk and Cravath and MTO exchanged drafts of and negotiated the terms of the merger agreement, and Davis Polk and Paul Weiss finalized the terms of the consulting agreement and support agreement.

On April 28, 2016, the Board, together with representatives of Cravath, MTO and Centerview, convened a telephonic meeting. All of the members of the Board, with the exception of Mr. Brittenham, who had recused himself from the meeting, were in attendance. Cravath updated the Board on the course of final negotiations relating to the merger agreement and representatives of Centerview then reviewed with the Board Centerview's financial analysis of the merger consideration. A representative of Centerview then rendered to the independent directors Centerview's oral opinion, which was subsequently confirmed by delivery of Centerview's written opinion dated that same date that, as of such date and based upon and subject to the various assumptions made, procedures followed, matters considered, and qualifications and limitations upon the review undertaken in preparing its opinion, the merger consideration to be paid to the holders of shares of Class A common stock (other than as specified in such opinion) pursuant to the merger agreement was fair, from a financial point of view, to such holders. For a detailed discussion of Centerview's opinion, please see below under "—*Opinion of Centerview Partners LLC*". The independent directors then held an executive session during which the independent directors, with the exception of Mr. Brittenham, voted unanimously to recommend approval of the merger agreement and the merger by the Board. The Board meeting was reconvened immediately thereafter, and the independent directors unanimously, with the exception of Mr. Brittenham, voted to approve the merger agreement and the transaction. Mr. Katzenberg did not participate in the vote.

Exhibit 4

The parties thereafter finalized and executed the merger agreement and the agreements with Mr. Katzenberg. The written consent of Mr. Katzenberg was delivered to the corporate secretary of the Company shortly thereafter. The parties announced the transaction at approximately 6 a.m., Pacific Time on April 28, 2016.

**Required Approval of the Merger; Record Date; Action by Stockholder Consent**

Under Delaware law and the Company's Restated Certificate of Incorporation and Amended and Restated By-laws, the adoption of the merger agreement by the Company's stockholders required the affirmative vote or written consent of the holders of a majority of the voting power of all outstanding shares of Company common stock. Holders of Class A common stock are entitled to cast one (1) vote in person or by proxy for each share of Class A common stock held. Holders of Class B common stock are entitled to cast fifteen (15) votes in person or by proxy for each share of Class B common stock held.

On April 28, 2016, the record date, there were (i) 78,701,188 shares of Class A common stock outstanding and entitled to vote, held by 17,212 stockholders of record and (ii) 7,838,731 shares of Class B common stock outstanding and entitled to vote, held by two stockholders of record.

On April 28, 2016, the Principal Stockholders delivered to the corporate secretary of the Company the stockholder consent in respect of shares of Company common stock representing approximately 60% of the voting power of all outstanding shares of Company common stock. Such written consent constituted adoption of the merger agreement by the holders of the requisite number of shares of Company common stock in accordance with the DGCL and, accordingly, the adoption of the merger agreement by the Company's stockholders was effected in accordance with Section 251 of the DGCL on April 28, 2016. No further approval of the stockholders of the Company is required to adopt the merger agreement. As a result, the Company has not solicited and will not be soliciting your vote for the adoption of the merger agreement and does not intend to call a meeting of stockholders for purposes of voting on the adoption of the merger agreement.

Federal securities laws state that the merger may not be completed until 20 days after the date of mailing of this Information Statement to the Company's stockholders. Therefore, notwithstanding the execution and delivery of the stockholder consent (which was obtained shortly after the execution of the merger agreement), the merger will not occur until that time has elapsed. We currently expect the merger to be completed by the end of 2016, subject to certain government regulatory reviews and approvals and the satisfaction of the other conditions to closing in the merger agreement. However, there can be no assurance that the merger will be completed on or prior to that time, or at all.

**Recommendation of the Board**

At the special meeting of the Board on April 28, 2016, after careful consideration, including detailed discussions with the Company's management and its legal and financial advisors, the Board:

- determined that the merger and the other transactions contemplated by the merger agreement, on the terms and subject to the conditions set forth in the merger agreement, are fair to, and in the best interests of, the Company and its stockholders;

- approved and declared advisable the merger agreement, the merger and the other transactions contemplated by the merger agreement, on the terms and subject to the conditions set forth in the merger agreement;

- subject to certain provisions of the merger agreement described below under "*The Merger Agreement—No Solicitation; Board Recommendation*", recommended that the holders of Company common stock vote in favor of adopting the merger agreement; and

- directed that the merger agreement be submitted to the holders of the Company common stock for their adoption.

Exhibit 4

# EXHIBIT 5

February 7, 2016

PAG Asia Capital (HK) Limited.
c/o 15/F & 32/F, AIA Central
1 Connaught Road Central
Hong Kong

**CONFIDENTIAL**

Ladies and Gentlemen:

We understand that PAG Asia Capital, together with its designated entities ("PAG") ("you"), desires to engage in certain discussions with DreamWorks Animation SKG, Inc., a Delaware corporation (the "Company"), in connection with your consideration of a possible negotiated transaction involving you and the Company (a "Transaction"). The Company is prepared to furnish you with certain confidential and proprietary information concerning the Company on the terms set forth herein. The Company and you are only exploring the feasibility of a Transaction at this stage and no decision has been made to pursue a Transaction. The Company or you may terminate discussions hereunder at any time in either party's sole discretion.

1.      As a condition to your being furnished information by or on behalf of the Company, you agree that you will, and you will direct your Representatives (as defined below) to, treat as confidential in accordance with this letter agreement any information (including, without limitation, oral, written and electronic information) concerning the Company or its affiliates that has been or may be furnished to you by or on behalf of the Company or any of its Representatives, and all analyses, compilations, forecasts, studies, notes, other materials and portions thereof prepared by you or any of your Representatives, or otherwise on your behalf, that contain, reflect or are based, in whole or in part, on such information, including, without limitation, those stored in electronic format (herein collectively referred to as the "Evaluation Material"). The term "Evaluation Material" does not include information that (a) is, at the time of disclosure, already in your or your Representatives' possession; provided that such information is reasonably believed by you not to be subject to an obligation of confidentiality (whether by agreement or otherwise) to the Company or another person, (b) is or becomes generally available to the public other than as a result of a disclosure by you or any of your Representatives in breach of this letter agreement or other obligation of confidentiality (whether by agreement or otherwise) to the Company or another person, (c) becomes available to you or your Representatives on a non-confidential basis from a source other than the Company or its Representatives; provided that such source is reasonably believed by you after due inquiry not to be bound by an obligation of confidentiality (whether by agreement or otherwise) to the Company or another person,

Exhibit 5

or (d) was independently developed by you without reference to, incorporation of, or other use of any Evaluation Material or information from any source known by you to be bound by an obligation of confidentiality (whether by agreement or otherwise) to the Company or another person. As used in this letter agreement, the term "Representatives" shall mean (i) when used in relation to the Company, the Company's affiliates and its and their respective directors, officers, employees, agents, advisors (including, without limitation, financial and legal advisors, consultants and accountants) and controlling persons and (ii) when used in relation to you, your affiliates and your related management companies and investment funds and your and their respective partners, members, directors, officers, employees, agents, advisors (including, without limitation, financial and legal advisors, consultants and accountants) and controlling persons. As used in this letter agreement, the term "person" shall be broadly interpreted to include, without limitation, the media and any corporation, partnership, group, individual or other entity. As used in this letter agreement, the term "affiliate" has the meaning set forth in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "1934 Act").

2.    In consideration of your being furnished Evaluation Material, you agree to keep such Evaluation Material confidential in accordance with the terms of this letter agreement. You acknowledge and agree that the Evaluation Material will be used by you and your Representatives solely for the purpose of evaluating and potentially negotiating and implementing a Transaction, and that you will, and will direct your Representatives to, keep confidential all Evaluation Material and not disclose Evaluation Material to any other person except as required by applicable law, regulation or legal or judicial process, in each case subject to compliance with paragraph 4 herein, and except that (subject to the succeeding sentences of this paragraph and paragraph 5 herein) you may disclose Evaluation Material to your Representatives who need to know such Evaluation Material for the purpose of evaluating and potentially negotiating and implementing a Transaction on your behalf if prior to providing such Representatives with such Evaluation Material you advise them of the confidential nature thereof and of the terms of this letter agreement, and such Representatives agree to hold such Evaluation Material in accordance with the terms of this letter agreement and otherwise to observe the terms of this letter agreement (unless any such Representative has entered into a written confidentiality agreement directly with the Company, in which case it shall agree to hold such Evaluation Material in accordance with the terms of such agreement and otherwise comply with the terms of such agreement). You shall maintain a record of your Representatives who have been provided with Evaluation Material. You agree to undertake reasonable precautions to safeguard and protect the confidentiality of the Evaluation Material and to prevent your Representatives from prohibited or unauthorized disclosure or uses of the Evaluation Material. You agree that you shall be liable for any breach of the terms of this letter agreement by your Representatives, as if you had committed such breach yourself.

3.    In addition, without the prior written consent of the Company (except as required by applicable law, regulation or legal or judicial process and subject to compliance with paragraph 4), neither you nor any of your Representatives may disclose to any person (except to the extent permitted by paragraph 5(a) (a) that Evaluation Material has been

Exhibit 5

FOIA Confidential Treatment Requested by DreamWorks Animation SKG, Inc.          DWA_SEC_LA00000011

requested by or furnished or made available to you or your Representatives, (b) the fact that this letter agreement exists or the contents hereof, (c) that you are, or the Company is, considering a Transaction, (d) that investigations, discussions or negotiations are taking place concerning a Transaction or (e) any of the terms, conditions or other facts or information with respect to a Transaction or any other potential transaction involving the Company, including, without limitation, the status or termination thereof, or any opinion or view with respect to the Company or the Evaluation Material. The Company agrees that, without your prior written consent, it shall not identify you by name as being involved in discussions or negotiations concerning a potential Transaction to any person other than a Representative of the Company (except as required by applicable law, regulation, stock exchange requirement or legal or judicial process).

4.     In the event that you or any of your Representatives are required by applicable law, regulation or legal or judicial process (including, without limitation, by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any Evaluation Material or any information of the type described in paragraph 3, you will provide the Company with reasonable prior written notice of such requirement to the extent not prohibited by law in order to enable the Company to seek an appropriate protective order or other remedy, and you will (at the Company's sole cost and expense) consult and cooperate with the Company to the extent permitted by law with respect to taking steps to resist or narrow the scope of such requirement or legal process. If a protective order or other remedy is not obtained, the terms of this letter agreement are not waived by the Company and disclosure of Evaluation Material is legally required, you or such of your Representatives (a) may disclose such information only to the extent legally required in the opinion of your counsel and (b) will give notice to the Company of the information to be disclosed as far in advance as is reasonably practicable. In any such event, you and such of your Representatives will (at the Company's sole cost and expense) use reasonable efforts to ensure that all Evaluation Material and other information that is so disclosed will be accorded confidential treatment.

5.     Notwithstanding anything to the contrary set forth herein, you also agree that you will not provide any Evaluation Material, or disclose information of the type described in paragraph 3, to any potential debt or equity financing source without the prior written consent of the Company. In the event that the Company provides such consent with respect to a potential debt or equity financing source, you agree that neither you nor your Representatives shall provide any Evaluation Material to such potential debt or equity financing source unless and until such potential debt or equity financing source shall have executed and delivered to the Company a letter agreement with the Company that is substantially identical to this letter agreement or otherwise acceptable to the Company. You further agree that neither you nor any of your Representatives will enter into any exclusivity, lock-up, dry-up or other agreement, arrangement or understanding, whether written or oral, with any commercial bank, any affiliate of any commercial bank or any other person that could reasonably be expected to limit, restrict, restrain or otherwise impair in any manner, directly or indirectly, the ability of such commercial bank or affiliates thereof or such other person to serve as a financing

3

FOIA Confidential Treatment Requested by DreamWorks Animation SKG, Inc.

Exhibit 5

DWA_SEC_LA00000012

source to any other person considering a transaction involving the Company or to engage in a transaction involving the Company.

6.   In the event that you determine not to proceed with a Transaction, you will promptly inform the Company of that decision and, in that case or at any other time upon the request of the Company in its sole discretion, you and your Representatives shall promptly, at the Company's sole option (which shall be promptly communicated in writing to you by the Company), destroy (and shall certify such destruction in writing to the Company by one of your authorized Representatives) all written, electronic or other tangible Evaluation Material (whether prepared by the Company, its Representatives or otherwise on the Company's behalf or by you, your Representatives or otherwise on your behalf) and will not retain any copies, summaries, analyses, compilations, reports, extracts or other reproductions, in whole or in part, of such written, electronic or other tangible material or any other materials in written, electronic or other tangible format based on, reflecting or containing Evaluation Material, in your possession or in the possession of any of your Representatives or under your or their custody. Notwithstanding such return, destruction, deletion or erasure, all oral Evaluation Materials and the information embodied in all Evaluation Materials will continue to be held confidential pursuant to the terms of this letter agreement. Notwithstanding the foregoing, you and your third-party Representatives that are professional firms or potential debt financing sources may retain solely for compliance purposes copies of the Evaluation Material in accordance with policies and procedures implemented by such persons in order to comply with law, regulation or professional standards; provided, however, that any Evaluation Material so retained will continue to be held confidential pursuant to the terms of this letter agreement. Notwithstanding the foregoing, nothing in this letter agreement shall require the alteration, modification, deletion or destruction of electronic back-up tapes or other back-up media made and retained in the ordinary course of business.

7.   You acknowledge that in your and your Representatives' examination of the Evaluation Material you and your Representatives will have access to material, non-public information, and that you are aware, and will advise your Representatives who are informed as to the matters that are the subject of this letter agreement, that state and federal laws, including, without limitation, United States securities laws, impose restrictions on the dissemination of such information and trading in securities when in possession of such information.

8.   For a period of two (2) years from the date hereof, you will not, nor will you permit your affiliates to, directly or indirectly, solicit for employment or hire any officer or employee of the Company or any of its affiliates that you have discussions with, or obtain access to information with respect to, your consideration of a Transaction; provided that the foregoing clause shall not preclude you or such of your affiliates from hiring any such officer or employee (i) who has ceased to be employed by the Company or its affiliates prior to commencement of employment discussions between you or any of your affiliates and such officer or employee; or (ii) who responds to any general solicitation placed by you or any of your affiliates (including, without limitation, any recruitment efforts conducted by any recruitment agency),

4

Exhibit 5

FOIA Confidential Treatment Requested by DreamWorks Animation SKG, Inc.

DWA_SEC_LA00000013

provided that neither you nor any of your affiliates have directed such solicitation (including, without limitation, any such recruitment efforts) at such person or the Company generally.

9.   You agree that none of the Company, its Representatives or any other person makes any representations or warranties, express or implied, with respect to the accuracy or completeness of the Evaluation Material, including, without limitation, any forecasts, projections or other forward-looking information included therein, and that none of the Company, its Representatives or any other person shall assume any responsibility or have any liability to you or any of your Representatives resulting from the selection or use of the Evaluation Material by you or your Representatives. You acknowledge that you are not entitled to rely on the accuracy or completeness of any Evaluation Material and that only such express representations and warranties regarding Evaluation Material as may be made to you in a definitive written agreement relating to a Transaction, if any, shall have any legal effect, subject to the terms and conditions of such agreement.

10.   Each party acknowledges and agrees that no contract or agreement providing for a Transaction shall be deemed to exist, directly or indirectly, between you and the Company or its affiliates unless and until a definitive written agreement with respect to a Transaction has been executed and delivered by both the Company and you. Each party also agrees that unless and until a definitive written agreement with respect to a Transaction has been executed and delivered by the Company and you, neither you nor the Company, nor any affiliate of the Company, will be under any legal obligation of any kind whatsoever with respect to a Transaction by virtue of this letter agreement (except for the matters specifically provided herein) or otherwise or by virtue of any written or oral expression with respect to a Transaction by any of your Representatives or the Representatives of the Company. Nothing contained in this letter agreement nor the furnishing of any Evaluation Material hereunder shall be construed as granting or conferring any rights, by license or otherwise, in any intellectual property. You further acknowledge and agree that the Company reserves the right, in its sole discretion, to reject any and all proposals made by you or your Representatives with respect to a Transaction, to terminate discussions and negotiations with you at any time for any reason, and to conduct any process for a Transaction as it shall, in its sole discretion, determine (including, without limitation, negotiating with any other interested party and entering into a definitive agreement without prior notice to you or any other person).

11.   You acknowledge that the Evaluation Material is being furnished to you in consideration of your agreement, and you hereby agree, that, for a period of two years from the date hereof (the "Restricted Period"), unless you shall have been specifically invited to do so in writing by the Company, neither you nor any of your affiliates will in any manner, directly or indirectly: (a) acquire, offer to acquire, agree to acquire or make a proposal to acquire, by purchase or otherwise, any securities, or direct or indirect rights to acquire any securities, of the Company or any subsidiary of the Company or of any successor to or person in control of the Company, or any cash-settled call options or other derivative securities or contracts or instruments in any way related to the price of shares of common stock of the Company, or any assets or

5

Exhibit 5

FOIA Confidential Treatment Requested by DreamWorks Animation SKG, Inc.   DWA_SEC_LA00000014

property of the Company or any subsidiary of the Company or of any such successor or controlling person; (b) make or in any way participate in any "solicitation" of "proxies" (as such terms are used in the rules of the Securities and Exchange Commission) to vote, or seek to advise or influence any person with respect to the voting of, any voting securities of the Company or any of its subsidiaries, or call or seek to call a meeting of the Company's shareholders or initiate any shareholder proposal for action by the Company's shareholders, or seek election to or to place a representative on the board of directors of the Company or seek the removal of any director from the board of directors of the Company; (c) make any public announcement with respect to, or solicit or submit a proposal for, or offer of (with or without conditions) any merger, consolidation, business combination, tender or exchange offer, recapitalization, reorganization, purchase of a material portion of the assets and properties of or other similar extraordinary transaction involving the Company or any subsidiary of the Company or any of their respective securities or enter into any discussions, negotiations, arrangements, understandings or agreements (whether written or oral) with any other person (other than your Representatives) regarding any of the foregoing; (d) form, join or in any way participate in a "group" (as defined in Section 13(d)(3) of the 1934 Act) with respect to any securities of the Company or otherwise in connection with any of the actions prohibited by this paragraph; (e) otherwise act, alone or in concert with others, to seek to control or influence the management, board of directors or policies of the Company or any of its subsidiaries; (f) disclose any intention, plan or arrangement inconsistent with any of the agreements contained in this paragraph; (g) advise, assist, encourage or direct any person to do any of the foregoing; (h) take any action that could reasonably be expected to require the Company to make a public announcement regarding the possibility of a Transaction or any of the events described in this paragraph; (i) request the Company or any of the Representatives of the Company, directly or indirectly, to amend or waive any provision of this paragraph; or (j) contest the validity of this agreement or seek a release of the restrictions contained herein (whether by legal action or otherwise).

Notwithstanding the foregoing restrictions in this paragraph 11, you and your Representatives may engage in strictly confidential and nonpublic discussions with the holders of Class B common stock of the Company, acting in their capacity as shareholders of the Company, with respect to a potential proposal (whether by you alone or jointly with such holders) for a merger or tender offer involving the Company, however the restrictions in this paragraph 11 shall, among other things, preclude you and your affiliates from taking any further action in respect thereof or participating in or facilitating in any way any such proposal, unless you shall have been specifically invited in writing by the Company to take such further action or participate in or facilitate such proposal. For the avoidance of doubt, any such discussions with the holders of Class B common stock of the Company shall be subject to your confidentiality obligations under paragraph 3.

13.  You acknowledge and agree that the Company and its subsidiaries would be irreparably injured by a breach of this letter agreement by you or your Representatives and that monetary remedies would be inadequate to protect the Company or its subsidiaries against any actual or threatened breach of this letter agreement by you or

6

FOIA Confidential Treatment Requested by DreamWorks Animation SKG, Inc.

Exhibit 5

your Representatives. Accordingly, you agree that the Company shall be entitled to seek an injunction or injunctions (without the proof of actual damages) to prevent breaches or threatened breaches of this letter agreement and/or to compel specific performance of this letter agreement, and that neither you nor your Representatives shall oppose the granting of such relief. You also agree that you and your Representatives shall waive any requirement for the security or posting of any bond in connection with any such remedy. Such remedies shall not be deemed to be the exclusive remedy for actual or threatened breaches of this letter agreement but shall be in addition to all other remedies available at law or in equity to the Company. You further agree that you will, and you will use reasonable efforts to ensure that your Representatives will, reasonably cooperate in any attempt by the Company in obtaining any remedy or relief, at law or in equity, for actual or threated breaches of this letter agreement. You further acknowledge and agree that no failure or delay by the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

14.     If any provision of this letter agreement shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair or invalidate the remainder of this letter agreement but shall be confined in its operation to the provision of this letter agreement directly involved in the controversy in which such judgment shall have been rendered.

15.     This letter agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof. The Recipient irrevocably submits to the jurisdiction of the Chancery Court of the State of Delaware, or if such court does not accept jurisdiction, then any state or federal court in the State of Delaware, for the purposes of any suit, action or other proceeding arising out of this letter agreement or a Transaction. The Recipient irrevocably and unconditionally waives (and agrees not to plead or claim) any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement in the Chancery Court of the State of Delaware, or if such court does not accept jurisdiction, then any state or federal court in the State of Delaware, or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

16.     This letter agreement contains the entire agreement between the parties concerning confidentiality of the Evaluation Material, and no modification of this letter agreement or waiver of the terms and conditions hereof or thereof shall be binding upon either party, unless approved in writing by each party. This letter agreement shall inure to the benefit of the parties hereto, and their successors and permitted assigns. Any purported assignment of this letter agreement or of either party's rights or obligations hereunder without the prior written consent of the other party shall be void.

17.     This letter agreement shall terminate and be of no further force and effect two (2) years from the date hereof; provided that such termination shall not relieve you from

7

your responsibilities in respect of any breach of this letter agreement prior to such termination.

18.     This letter agreement may be executed and delivered (including via facsimile or electronic transmission) in counterparts, each of which shall be deemed to be an original, but both of which shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

[Remainder of page intentionally left blank]

FOIA Confidential Treatment Requested by DreamWorks Animation SKG, Inc.

Exhibit 5

DWA_SEC_LA00000017

If the foregoing correctly sets forth the agreement between you and the Company, please sign and return the enclosed copy of this letter agreement, whereupon it shall become our binding agreement.

Very truly yours,

DREAMWORKS ANIMATION SKG, INC.

By: _____
Name: **Andrew Chang**
Title: General Counsel

AGREED AND ACKNOWLEDGED on this
5th day of February, 2016

PAG ASIA CAPITAL (HK) LIMITED

By: _____
Name: DAVID J. KIM
Title: AUTHORIZED SIGNATORY

9

FOIA Confidential Treatment Requested by DreamWorks Animation SKG, Inc.

Exhibit 5

DWA_SEC_LA00000018