UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------

SECURITIES AND EXCHANGE
COMMISSION,
                      Plaintiff,

        -v-

SHAOHUA (MICHAEL) YIN, *et al.*,
                      Defendants.

17-CV-972 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

    This is an insider trading action brought by the Securities and Exchange Commission. Defendant Michael Yin moves to dismiss, arguing that the Complaint does not adequately allege the elements of tippee liability. The Court concludes that it does. Accordingly, the motion is denied.

**I.    Background**

    The following facts are taken from the First Amended Complaint ("Complaint" or "Compl."), and are presumed true for the purposes of this motion. (*See* Dkt. No. 32.)

    Shaohua Yin—also known as Michael Yin[1]—is a hedge fund manager. The SEC alleges that Yin used insider information to buy large stakes in two companies, DreamWorks Animation SKG, Inc. and Lattice Semiconductor Corporation. In an attempt to avoid detection, Yin made the trades using five brokerage accounts nominally held by the other defendants in this case, all of whom live in Beijing. These five account holders are relief defendants in this case. (Compl. ¶¶ 16–49.) The sixth relief defendant, Chaofeng Ji, is a beneficiary of one of the accounts. (Compl. ¶ 50.)

---

        [1]      There are two defendants with the surname Yin. "Yin" refers to Michael Yin, the main defendant.

### A. The DreamWorks Trades

The DreamWorks trades took place in April of 2016. Using the five brokerage accounts, Yin bought nearly 2.15 million DreamWorks shares at an average price of $26.25 per share. (Compl. ¶ 105.) Shortly thereafter, news broke that DreamWorks was to be acquired by Comcast, and DreamWorks stock surged by 47.3%. (Compl. ¶ 83.) The five brokerage accounts made over $29 million in profits from their DreamWorks trades. (Compl. ¶ 129.)

The SEC alleges that Yin made these trades based on inside information received from an asset manager with ties to PAG Asia Capital. PAG had made a competing bid for DreamWorks, but was ultimately outbid by Comcast. (Compl. ¶¶ 76–79.) The SEC posits that Defendant Ji—Yin's friend and the beneficial owner of one of the five accounts—was a potential source of the DreamWorks information. (Compl. ¶ 152.) Ji was managing director at Legend Capital, which was exploring an unrelated acquisition in partnership with PAG and was somehow privy to information about the DreamWorks deal. (Compl. ¶ 152, 283.)

### B. The Lattice Trades

The Lattice trades took place several months later. Beginning in July of 2016, Yin—through the five brokerage accounts—bought 7,042,714 shares of Lattice at an average price of $6.35 per share. (Compl. ¶ 153.) On November 3, 2016, one day after Yin's last round of Lattice stock purchases, news broke that Lattice would be acquired by Canyon Bridge Capital Partners, Inc., and Lattice's stock price rose by 18%. (Compl. ¶ 3.) The five accounts made a total profit of over $7.1 million. (Compl. ¶ 3.)

The SEC alleges that Yin made these trades based on information received from an insider at Canyon Bridge. This unnamed insider had worked for China Reform Fund Management Co. Ltd., which had previously tried to acquire Lattice. This insider left China Reform Fund and created Canyon Bridge, which then acquired Lattice. (Compl. ¶ 172.) The

Complaint alleges that this insider and Yin were in constant communication throughout the bidding process up to the finalization of the sale to Canyon Bridge. For example, one day after Yin and the insider exchanged text messages on the issue of regulatory compliance in connection with the deal, the brokerage account held by Yin's father bought $1.67 million worth of Lattice stock. (Compl. ¶ 163–65.) Yin also told third parties to invest in Lattice. (Compl. ¶ 210.)

C. **Other Allegations**

In February of 2017, Yin was stopped by the FBI when he tried to board a flight to China. (Compl. ¶¶ 255–61.) Yin admitted to the FBI that he controlled the five brokerage accounts, and asked the FBI if they would be frozen. (*Id.*) Yin was allowed to return to China, and, in the week that followed, the five brokerage accounts began to sell much of their stock holdings and withdrew over $35 million. (Compl. ¶¶ 263–81.) After the SEC filed suit, this Court imposed an emergency asset freeze. (*See* Dkt. No. 27.)

The Complaint asserts a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), as well as a claim for unjust enrichment. The SEC seeks a permanent injunction against Yin, disgorgement of all gains made from the alleged insider trading, as well as prejudgment interest and civil penalties. The SEC also seeks disgorgement, along with prejudgment interest, from the holders of the five brokerage accounts—relief defendants Lizhao Su, Zhiqing Yin, Jun Qin, Yan Zhou, Bei Xie, and Chaofeng Ji.

II. **Legal Standard**

To survive a motion to dismiss for failure to state a claim, plaintiffs must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when plaintiffs plead facts that would allow "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Courts must accept as true all well-pleaded factual

allegations in the complaint, and 'draw [ ] all inferences in the plaintiff's favor.'" *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 478 (S.D.N.Y. 2013) (quoting *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir. 2006)).

## III. Discussion

### A. Overview of Insider-Trading Law

There are two ways one can be liable for insider trading: the classical theory and the misappropriation theory. The classical theory covers corporate insiders who trade using material non-public information about the company, in violation of the duty of trust and confidence owed to the company's shareholders. *See Chiarella v. United States*, 445 U.S. 222, 230 (1980). The misappropriation theory is somewhat broader, and includes outsiders who misappropriate confidential information, for trading purposes, in breach of a duty to the source of the information. *See United States v. O'Hagan*, 521 U.S. 642, 652–53 (1997). The core difference between the two theories is the source of the duty: Under the classical theory, the duty is owed to the corporation; under the misappropriation theory, the duty is owed to the source of the information.

Both theories extend liability to "tippees": a person who did not themselves owe a duty to anyone but traded based on an insider tip from someone else. *See Dirks v. S.E.C.*, 463 U.S. 646, 660 (1983). A tippee is liable only if (1) the tipper themselves breached a duty by tipping, and (2) the tippee knew or should have known of that breach. *Id.* at 660 & n.19. The test for whether the tipper breached a duty by tipping "is whether the [tipper] personally will benefit, directly or indirectly, from his disclosure" to the tippee. *Id.* at 662; *see also United States v. Martoma*, 869 F.3d 58, 63–64 (2d Cir. 2017).

4

### B. Pleading Standard for Insider Trading

"The pleading standard for an insider trading claim is not straightforward." *S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, 296 F.R.D. 241, 247 (S.D.N.Y. 2013). Insider trading claims are subject to Rule 9(b) of the Federal Rules of Civil Procedure, which requires that circumstances constituting fraud be stated "with particularity." But because insider tips are typically passed on in secret, Rule 9(b) is somewhat relaxed, allowing plaintiff to plead certain facts on information and belief. Specifically, plaintiffs may plead facts that imply the content and circumstances of an insider tip if those facts are peculiarly within the knowledge of defendant or the tipper. *Id.* at 248 (collecting cases). Still, "[w]hile the rule is relaxed as to matters peculiarly within the adverse parties' knowledge, [ ] allegations [on information and belief] must then be accompanied by a statement of the facts upon which the belief is founded." *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972).

In sum, to state an insider trading claim, the SEC must make particular factual allegations supporting a reasonable inference that the defendants violated Section 10(b) and Rule 10b–5. If facts about the content or circumstances of an insider tip are known only to the defendant and the insider, the SEC may plead a belief about the tip coupled with particular facts supporting that belief. The SEC's allegations must strongly support an inference that the defendant acted with intent to defraud. *Onyx*, 296 F.R.D. at 248–49.

### C. The DreamWorks Allegations

Yin's key argument on the DreamWorks allegations is that the Complaint does not adequately allege the beginning of the tipping chain.

The Complaint's DreamWorks narrative is as follows: PAG and DreamWorks discuss a potential deal, and sign a confidentiality agreement. PAG and Legend—Ji's employer—discuss an unrelated deal. Someone at PAG, who owes a duty to DreamWorks, tips Ji about the potential

PAG-DreamWorks deal (or tips someone at Legend who then tips Ji). Ji then tips Yin, who buys DreamWorks stock. Alternatively, the Complaint suggests that Ji may have misappropriated the information from PAG after finding out about the DreamWorks deal through his colleagues.

Yin's strongest argument is that the Complaint does not allege that the original tipper—i.e., the unidentified person who tipped Ji—acted for personal benefit. If the original tipper did not act for personal benefit, the tippees—Ji and Yin—did not commit insider trading. Yin concedes that the SEC does not have to identify the tipper or plead the precise facts and circumstances of the tip. (Dkt. No. 42 at 3.) But Yin argues that the SEC's tipping chain is too attenuated to be plausible.

The Court disagrees. A good starting point here is this Court's *Onyx* trilogy. *See S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharm.*, Inc., 296 F.R.D. 241 (S.D.N.Y. 2013) ("*Onyx I*"); S.*E.C. v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, No. 13 Civ. 4645, 2014 WL 5026153 (S.D.N.Y. Sept. 29, 2014) ("*Onyx II*"); *S.E.C. v. Jafar*, No. 13 Civ. 4645, 2015 WL 3604228 (S.D.N.Y. June 8, 2015) ("*Onyx III*").

In *Onyx I*, this Court dismissed an insider-trading complaint because it insufficiently pleaded tipper-tippee liability. The SEC had alleged that the defendants bought many call options in the days leading up to an important company announcement. The defendants were traders, and not insiders of the company, and therefore could be liable only through a tipper-tippee relationship. The Court noted that (1) the requirements for tipper-tippee liability were pleaded only on information and belief, rather than on concrete facts, (2) the trades themselves were only mildly suspicious, (3) the complaint did not identify a tipper, and did not allege a preexisting relationship between the defendants and corporate insiders such that it could be inferred that a tip had been passed on; (4) the complaint did not identify records of any

6

communication between a potential tipper and the defendants; (5) the complaint did not identify a pattern of trading behavior that belied defendants' knowledge about specific steps in the negotiation process; and (6) the complaint did not create a reasonable inference that the tipper violated a fiduciary duty or that defendants knew or should have known that the tipper violated a fiduciary duty. *Onyx I*, 296 F.R.D. at 252–53. The Court noted that:

> [w]hile it is not strictly necessary that a complaint specify [the identity of the tipper or the contents of the tip], it is necessary that the allegations as a whole support a reasonable inference as to each element of tippee liability. The complaint must sketch the outlines of an unlawful trade. Although the SEC need not paint in fine detail, the allegations must provide enough information such that, stepping back, the Court can see a comprehensible picture of insider trading.

*Id.* at 253–54.

In *Onyx II*, the court evaluated an amended complaint, and denied a motion to dismiss. The court held that, unlike the original complaint, the amended complaint created an inference that the trades were risky and suspicious because (1) neither defendant had previously bought these securities before; (2) the defendants suddenly made large purchases of the securities; (3) the trades were remarkably well-timed and highly profitable; (4) the amended complaint alleged that the subject companies had strict confidentiality agreements in place, which plausibly implied that any tips were in violation of a fiduciary duty, and plausibly implied that any tipper should have known so; and (5) the SEC identified a limited class of potential tippers. *Onyx II*, 2014 WL 5026153, at *6–7. Thus, even though the SEC did not allege the identity of the tipper or the specific content of the tip, the overall circumstances of the trades plausibly alleged that there was an illegal tip involved.

Finally, in *Onyx III*, the court denied a motion for reconsideration of *Onyx II* in light of the Second Circuit's opinion in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014). The

Court noted that although *Newman* might make it more difficult for the SEC to ultimately prevail at trial, it did not render those claims implausible at the motion-to-dismiss stage.[2]

The Court concludes that the Complaint here is more similar to *Onyx II* than *Onyx I*. It identifies a potential tipper, Ji, who had preexisting relationships with PAG and with Yin. It also identifies suspicious behavior by Ji in close proximity to the deal events, namely opening a trading account using his money but in a relative's name—relief defendant Xie. (Compl. ¶145.) It also alleges that this account traded in sums that exceeded Xie's stated net worth. (Compl. ¶ 48.) Yin, too, acted suspiciously. The Complaint alleges that he opened various trading accounts using the names of relatives—Yin's elderly mother and father, an electrical company employee, a teacher, and a natural resources manager—and proceeded to make millions of dollars in trades. And when the FBI started asking questions, someone began withdrawing large sums of money from those accounts.

Finally, the Complaint adequately alleges that the timing of the trades was suspicious and not merely a lucky hunch. Yin began buying DreamWorks stock the same day that the DreamWorks board voted to proceed with the PAG proposal. (Compl. ¶¶ 69–71, 101.) And the week after that, Yin bought more stock on the day that DreamWorks's outside counsel sent a draft of the merger agreement. (Compl. ¶¶ 72, 106.) And Yin's alleged trades comprised a large percentage of total trading volume in DreamWorks stock, reaching as high as 34.8%. (Compl. ¶ 134.)

In sum, the Complaint adequately alleges facts that point to insider trading liability. Although key facts are missing, "the allegations [] provide enough information such that,

---

[2] *Newman* was abrogated in part by *Salman v. United States*, 137 S. Ct. 420 (2016), but neither *Newman* nor *Salman* is particularly relevant at this juncture.

stepping back, the Court can see a comprehensible picture of insider trading." *Onyx I*, 296 F.R.D. at 253. Of course, the SEC will have to prove more concrete facts to prevail in this case, but dismissal at this stage is not warranted.

### D. The Lattice Allegations

The Complaint's allegations as to Lattice are somewhat more detailed than its DreamWorks allegations. The Complaint identifies a person, referred to as "the Canyon Bridge insider," who was the source of the information. The Complaint alleges either that the Canyon Bridge Insider tipped Yin or, alternatively, that Yin misappropriated the information from the Canyon Bridge insider.

As to the first theory, Yin argues that the Complaint does not adequately allege that the Canyon Bridge insider tipped for personal benefit because it does not allege a close, familiar relationship between the two. However, as counsel for Yin recognized at oral argument, this line of reasoning was undermined by the Second Circuit's opinion in *United States v. Martoma*, 869 F.3d 58 (2d Cir. 2017), which held that Supreme Court's opinion in *Salman v. United States*, 137 S. Ct. 420 (2016) abrogated the "meaningfully close personal relationship" requirement. For now, consistent with *Onyx*, it is enough that the Complaint (1) identifies a potential tipper, (2) plausibly alleges that the potential tipper had access to material, non-public information which the insider was duty-bound to protect, (3) plausibly alleges a pre-existing relationship between Yin and the tipper, and (4) alleges that Yin was in frequent contact with the tipper, including discussion of the Lattice deal. Moreover, the SEC points to text messages between Yin and the Canyon Bridge insider that, while not mentioning Lattice by name, quite obviously seem to be about the Lattice transaction. (Dkt. No. 38-1.) Coupled with the Yin's perfectly timed trading activity under family accounts, the Complaint adequately alleges insider trading.

As to the second theory, Yin argues that the Complaint does not allege facts showing that Yin owed a duty to the Canyon Bridge insider. However, at this stage of the litigation, it is permissible to plead alternative claims, and the Complaint plausibly alleges that since the Canyon Bridge insider had a duty to protect the inside information, the only two ways Yin could have gotten a hold of the information was either through a tip by the Canyon Bridge insider or if Yin misappropriated the information from the Canyon Bridge insider. The fact that these two theories are inconsistent with one another is not a problem at the pleading stage.

### IV. Conclusion

For the foregoing reasons, Defendants' motion dismiss is DENIED.

Defendants shall file an answer within 14 days of the date of this order. The Clerk of Court is directed to close the motion at Docket Number 37.

SO ORDERED.

Dated: March 26, 2018
       New York, New York

_____
J. PAUL OETKEN
United States District Judge