## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>SHAOHUA (MICHAEL) YIN and BENJAMIN BIN CHOW<br><br>　　　　　Defendants, and<br><br>LIZHAO SU, ZHIQING YIN, JUN QIN, YAN ZHOU, BEI XIE, and CHAOFENG JI,<br><br>　　　　　Relief Defendants. | Case No.  1:17-cv-00972-JPO<br><br><br>**SECOND AMENDED COMPLAINT**<br><br>ECF CASE |

## TABLE OF CONTENTS

SUMMARY ............................................................................................................... 1

NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF ................................. 4

JURISDICTION AND VENUE ................................................................................... 5

DEFENDANT ......................................................................................................... 5

RELIEF DEFENDANTS ........................................................................................... 7

RELEVANT ENTITIES ............................................................................................ 13

FACTUAL ALLEGATIONS ...................................................................................... 14

    A.    Insider Trading in DreamWorks ................................................................ 14

        1.    The DreamWorks' Deal and Announcement .................................... 15

        2.    The Price Movement of DreamWorks Stock on the News of the Deal .......... 17

        3.    The Confidential, Nonpublic Nature of the DreamWorks Discussions .......... 18

        4.    Insider Trading in DreamWorks ..................................................... 21

        5.    M. Yin and the relief defendants' substantial profits from well-timed insider trading ............................................................................ 27

        6.    The Highly Suspicious Nature of the April 2016 DreamWorks Trading ....... 28

        7.    PAG's Simultaneous Involvement in the Lexmark Deal ........................... 31

    B.    Insider Trading in Lattice ......................................................................... 33

        1.    The Lattice Deal and Announcement ............................................... 33

        2.    The Price Movement of Lattice Stock on the News of the Deal .................. 38

        3.    The Confidential, Nonpublic Nature of the Lattice Discussions .................. 39

        4.    The Insider Trading in Lattice ....................................................... 41

        5.    M. Yin tells three third-parties to buy Lattice stock**Error! Bookmark not defined.**

        6.    M. Yin and the relief defendants' substantial profits from well-timed insider trading in Lattice ............................................................. 49

        7.    The Highly Suspicious Nature of the Lattice Trading .............................. 51

    C.    M. Yin's Control Over All of the DreamWorks and Lattice Trading ................ 53

    D.    M. Yin and the Interactive Brokers Accounts Engaged in Other Profitable, Well-

Timed Trading Prior to Merger and Acquisition News ................................56

    1.     Giant Interactive ................................................................57

    2.     58.com ................................................................................58

    3.     CTrip… .............................................................................58

    4.     Jinpan.. .............................................................................59

E.     Yin's FBI Interview ....................................................................60

F.     Attempted Withdrawals of Over \$35 million From the Interactive Brokers Accounts ..............................................................................................61

    1.     Attempted withdrawals from Su's account ................................61

    2.     Attempted withdrawals from Z. Yin's account ...........................61

    3.     Attempted withdrawals from Qin's account ...............................62

    4.     Attempted withdrawals from Zhou's account .............................63

    5.     Attempted withdrawals from Xie's account ...............................63

G.     M. Yin's Possession of, and Trading on, Material Nonpublic Information ...............63

FIRST CLAIM FOR RELIEF .........................................................................68

SECOND CLAIM FOR RELIEF ....................................................................69

PRAYER FOR RELIEF .................................................................................70

Plaintiff Securities and Exchange Commission ("SEC") alleges, for its Complaint against defendants SHAOHUA YIN and BENJAMIN BIN CHOW and relief defendants LIZHAO SU, ZHIQING YIN, JUN QIN, YAN ZHOU, BEI XIE, and CHAOFENG JI, as follows:

## SUMMARY

1.      This is an insider trading case.  Defendant Shaohua (Michael) Yin ("M. Yin") was a hedge fund manager with an arsenal of contacts in the Hong Kong and Beijing financial industry. In 2016, he amassed huge positions in two U.S.-based issuers – DreamWorks Animation SKG, Inc. ("DreamWorks") and Lattice Semiconductor Corporation ("Lattice").  He made these trades, however, not in brokerage accounts held in his own name, but in five trading accounts nominally held by a group of relief defendants living Beijing, including his septuagenarian mother and father. M. Yin did so for the apparent purpose of evading regulatory scrutiny.  On paper, he had no immediate connection to the remarkable – both in terms of size and leverage – trading engaged in by those five accounts.  That surreptitious trading in the securities of DreamWorks and Lattice proved profitable.

2.      From April 4 to April 25, 2016, M. Yin meticulously assembled an enormous position in the securities of DreamWorks, collectively buying nearly 2.15 million shares of the company at an average price of $26.25 per share.  Although those accounts had never traded in DreamWorks before April 4, over the next three weeks, purchases by these five individual trading accounts – nominally owned by two elderly retirees, an electrical company employee, a teacher and a natural resources manager – accounted for 16.9% of all market trading in DreamWorks.  M. Yin's timing was impeccable.  After the markets closed on April 26, 2016, rumors of DreamWorks' potential acquisition by Comcast Corporation ("Comcast") were publicly reported for the first time. Two days later, on April 28, Comcast and DreamWorks jointly announced that Comcast would acquire DreamWorks at a price of $41 per share.  The market's reaction to this news was

immediate:  from April 26 to April 28, 2016, DreamWorks' share price rose 47.3%, from $27.12 per share to $39.95 per share.  In all, the five brokerage accounts realized more than $29 million in profits from their trading in DreamWorks.

3.  Not content with this eight-figure windfall, M. Yin then turned his attention to Lattice.  Beginning in July, M. Yin once again compiled a large stake in a U.S.-based issuer over the course of the next several months.  By November 2, 2016, the five nominee accounts held a total of 7,042,714 shares of Lattice, acquired at an average price of $6.35 per share for a total cost of $44,692,934.  These stock purchases by just five individual trading accounts constituted an outsized share of all market trading in Lattice – all told, the five nominee accounts were responsible for 6.3% of all market trading during the four months M. Yin was stockpiling his Lattice position, and on 7 different trading days, M. Yin's trading constituted at least 25% of the daily trading volume.  As with DreamWorks, M. Yin's timing was auspicious.  On November 3, 2016, just one day after M. Yin's last round of Lattice stock purchases, the company announced that it was being acquired by Canyon Bridge Capital Partners, Inc. ("Canyon Bridge") at a price of $8.30 per share.  The market immediately reacted to this new information by driving up the price of Lattice's stock by over 18%, from $6.37 per share to $7.55 per share.  The five accounts promptly started selling their position, realizing gains of more than $6.4 million and retaining a number of shares with unrealized gains of over $620,000, for a total profit of over $7.1 million.

4.  The precision with which these trades were timed, combined with the sheer scale in which they occurred, was not the product of chance.  M. Yin coordinated the five nominee accounts' massive trading in DreamWorks and Lattice securities while in possession of material, nonpublic information concerning the companies' business combinations.

5.  While trading in DreamWorks, M. Yin was in communication with relief defendant

Chaofeng Ji ("Ji"), an asset manager with ties to PAG Asia Capital (which had worked to acquire DreamWorks in spring 2016, only to be out-bid by Comcast).  While trading in Lattice, M. Yin was in steady communication with defendant Benjamin Bin Chow, Canyon Bridge's chief negotiator in its deal to acquire Lattice.  From July to November 2016, as Chow was engaged in his pursuit of Lattice on Canyon Bridge's behalf, he text-messaged, spoke by phone, and met in-person with Yin on more than a dozen occasions.  Through those contacts, Chow conveyed confidential information to M. Yin about Canyon Bridge's negotiations with Lattice, including the timing of key steps in finalizing the deal.  And even after the public announcement of Lattice's merger agreement, Chow continued to tip Yin material non-public information about the deal's odds of securing regulatory approval.  On information and belief, Chow did so with the expectation that M. Yin would trade on that information, as evidenced by M. Yin's consistent pattern of significant Lattice purchases in the wake of his contacts with Chow and/or the occurrence of significant events in the Lattice – Canyon Bridge deal chronology.

6.      DreamWorks and Lattice were not the only block of suspicious trades by M. Yin and the five nominee accounts.  Those same accounts also profitably traded in the securities of three China-based public companies – 58.com Inc. ("58.com"), CTrip.com ("CTrip"), and Giant Interactive Group Inc. ("Giant Interactive") – in advance of market-moving announcements.  Returns from this additional trading constitute another $14 million in highly suspect trading profits.  Significantly, M. Yin's trading profits were not the product of any discernable investing acumen.  Although the five accounts had traded in over 200 different securities from account opening through the end of January 2017, their trading in DreamWorks, 58.com, CTrip, Giant Interactive, and Lattice constituted 97% of the accounts' overall profits, even though those trades comprised just 3.2% of the total dollar amounts invested.

7.      On February 3, 2017, just before he boarded a flight to China, the FBI executed a search warrant on M. Yin at the San Jose International Airport.  M. Yin admitted to the FBI that he controlled the five nominee accounts, and right before leaving the United States, he frankly asked the FBI if his trading accounts would be frozen.  To no surprise then, from February 5 to 9, a flurry of activity – a rash of serial withdrawal requests, stock sales, and communications to the brokerage firm – ensued in connection with the five nominee accounts.  Altogether, M. Yin and/or the relief defendants attempted to withdraw more than $35 million from the five nominee accounts and transfer it to bank accounts in Hong Kong in the week between M. Yin's February 3 FBI interview and this Court's imposition of an emergency asset freeze on February 10, 2017.

8.      Information from M. Yin's phone and other sources identified Chow as the individual who tipped M. Yin about Lattice.  On October 30, 2017, the U.S. Attorney's Office for the Southern District of New York announced the indictment of Chow for 13 counts of securities fraud and one count of conspiring to commit securities fraud arising from his alleged tipping of material nonpublic information relating to the Lattice transaction.  On April 24, 2018, Chow was found guilty on one count of conspiracy to commit securities fraud and seven counts of securities fraud.

9.      Because M. Yin's $35 million in trading profits are a consequence of his insider trading, tipped by Chow, Ji, and possibly others, the SEC brings this enforcement action to put a stop to defendants' illegal conduct.

### NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

10.      The SEC brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

11.      The SEC seeks a permanent injunction against defendants Shaohua (Michael) Yin and Benjamin Bin Chow enjoining them from engaging in the transactions, acts, practices, and

courses of business alleged in this Complaint, defendant M. Yin's disgorgement of all ill-gotten

gains from the unlawful insider trading activity set forth in this Complaint, together with

prejudgment interest, and civil penalties against defendants M. Yin and Chow pursuant to Section

21A of the Exchange Act [15 U.S.C. § 78u-l].  The SEC also seeks disgorgement of all ill-gotten

gains from that illegal trading, along with prejudgment interest, from relief defendants Lizhao Su,

Zhiqing Yin, Jun Qin, Yan Zhou, Bei Xie, and Chaofeng Ji.  The SEC further seeks any other

equitable relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act

[15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27

of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

13.     Venue lies in this Court pursuant to Section 21(d), 21A, and 27 of the Exchange Act

[15 U.S.C. § 78u(d), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of

business alleged in this Complaint occurred within the Southern District of New York and

elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of

transportation or communication in interstate commerce, or the mails, or the facilities of a national

securities exchange.  During the time of the conduct at issue, shares of DreamWorks and Lattice

stock were both traded on the NASDAQ Stock Exchange ("NASDAQ"), which is headquartered in

New York, New York.

## DEFENDANT

14.     **Shaohua (Michael) Yin** ("M. Yin") is 45 years old and a citizen of China.  His

email address is XXXXXX@gmail.com.  He maintains residences in the Shunyi district of Beijing,

China and Palo Alto, California, and is primarily based in Beijing.  He was, until his resignation in

February 2017, a partner and managing director at Summitview Capital Management Limited

("Summitview"), which has its principal office in Hong Kong, China.  At Summitview, M. Yin managed an investment fund called the Summitview China Fund.  He is also a partial owner of Beijing Yuanshan Jingxing Investment Consultancy LLC, which provided investment consultancy services (including research services) to Summitview.

15.     M. Yin has an MBA in Finance from the Wharton School of Business at the University of Pennsylvania.  M. Yin has worked in the financial industry for over 10 years, first with UBS Securities Hong Kong Ltd., an investment bank, and then, for approximately four years, with Warburg Pincus Asia LLC, a private equity firm, before becoming a partner at Summitview Capital in 2011.

16.     M. Yin is the sole owner of three accounts at Fidelity Brokerage Services LLC ("Fidelity") (with account numbers ending in XXX-XX9920, XXX-XX1290, and XXX-XX3404).  He is also the joint owner, with his wife Jing Wang, of a fourth Fidelity account (with an account number ending in XXX-XX2962).

17.     All of M. Yin's accounts at Fidelity list his address as 663 Georgia Ave., Palo Alto, California.  He has never traded in DreamWorks in any of his Fidelity accounts, however, as alleged below, both of M. Yin's parents (each of who is a relief defendant) traded profitably in DreamWorks, realizing profits of over $25 million.

18.     M. Yin has a bank account at HSBC Bank USA, N.A. (with an account number ending in XXX-XXXX77-833).  He also has an account, with his wife Jing Wang, at Wells Fargo (with an account number ending in XXXXXX4648).

19.     **Benjamin Bin Chow** ("Chow") is 45 years old and resides in Palo Alto, California and Beijing, China.  Chow received a Ph.D. in Aeronautics from the California Institute of Technology in 2001 and an MBA from the University of California, Los Angeles in 2003.  From

2004-2007, Chow worked at Warburg Pincus in Hong Kong, the same place that M. Yin worked at from 2007-2011.  Chow has described M. Yin as a former colleague from Warburg Pincus and as a social acquaintance.  After leaving Warburg Pincus, Chow worked for another private equity firm before joining a digital entertainment company based in China.  In February 2016, Chow began working as a Managing Director at China Reform Fund Management Co. Ltd. ("China Reform Fund"), a private equity fund sponsored by entities controlled by the Chinese government.  In October 2016, Chow formed Canyon Bridge Partners, a U.S.-based private equity firm funded in large part by entities associated with the Chinese government, and became the managing partner.

### **RELIEF DEFENDANTS**

20.     **Lizhao Su** ("Su") is 79 years old and resides in Beijing, China.  Her email address is XXXXXX@gmail.com.  Su is the mother of defendant M. Yin and is the wife of co-relief defendant Zhiqing Yin.

21.     On June 4, 2008, Su opened an account at E*Trade Financial Corporation ("E*Trade") (with an account number ending in XXXX-2058) through its Hong Kong office.  On January 19, 2015, E*Trade notified Su that it was exercising its discretion to close her account.

22.     At M. Yin's direction and at least in part with money from M. Yin, on or about October 3, 2013, Su opened a trading account at Interactive Brokers LLC ("Interactive Brokers") (with an account number ending in UXXX9828) that is still active.

23.     As of October 19, 2015, she also had a margin securities trading account at BOCI Securities, Ltd. ("BOCI") (with an account number ending in XXXXXXX-2000).

24.     Su has a bank account at HSBC Hong Kong (with an account number ending in XXX-XXXXX5-833).

25.     Su's Interactive Brokers account purchased nearly 850,000 shares of DreamWorks from April 4, 2016 through April 21, 2016, using margin to cover the cost of over $21.8 million.

On April 28, 2016, her account began selling its DreamWorks positions, which were now worth nearly $34 million, resulting in a net gain of approximately $12 million.

26.     Su's Interactive Brokers Account purchased 2,502,804 shares of Lattice stock from September 13, 2016 through November 2, 2016 at a cost of over $16 million.  On November 3, 2016, over 1.46 million Lattice shares were sold out of the account resulting in a realized gain of approximately $1.75 million.  In the days following the FBI interview on February 3, 2017, the account sold over 700,000 more shares of Lattice, realizing further profits of more than $430,000. The remaining shares were still held in the account as of May 26, 2017 and had an unrealized gain of more than $204,000 based on the closing price of Lattice's stock on that day.  Su's account therefore had a net gain on the Lattice trading of more than $2.3 million.

27.     According to information provided to Interactive Brokers when she opened the account, Su is retired but nonetheless has a net income of $100,000-$150,000.  Her trading in DreamWorks and Lattice was also disproportionate to her stated net worth of $1,000,000-$5,000,000.

28.     A declaration sworn to by Su on February 27, 2017 nonetheless claims that her monthly income is approximately $725, and, that other than her Interactive Brokers account, she has total bank and brokerage assets of less than $47,000.

29.     **Zhiqing Yin** ("Z. Yin") is 80 years old and resides in Beijing, China.  He is the father of defendant M. Yin and the husband of co-relief defendant Su.

30.     At M. Yin's direction and at least in part with money from M. Yin, Z. Yin opened an account at Interactive Brokers (with an account number ending in UXXX9198) on May 28, 2015. This account was initially funded by transfers from a bank account in the name of Z. Yin at HSBC in Hong Kong (with an account number ending in XXX-XXXXX4-888).

31.     Z. Yin's Interactive Brokers account purchased nearly 1 million shares of DreamWorks from April 5, 2016, through April 25, 2016, using margin to cover the cost of over $26.5 million.  On April 28, 2016, his account began selling its DreamWorks shares, which were now worth almost $40 million, resulting in a net gain of more than $13.2 million.

32.     Z. Yin's Interactive Brokers Account purchased over 2.7 million shares of Lattice stock from July 5, 2016 through November 2, 2016 at a cost of over $17 million.  On November 3, 2016, the Z. Yin Interactive Brokers Account sold over 1.2 million shares out of the account, resulting in a realized gain of over $2 million.  Within days after the FBI interview, the Z. Yin account started selling more shares, realizing additional gains of over $450,000.  The account still held approximately 726,000 shares as of May 26, 2017 with an unrealized gain of approximately $416,000 based on the closing price of Lattice's stock on that day.  Thus, Z. Yin's account had a total gain from the Lattice trading of over $2.9 million.

33.     According to information provided to Interactive Brokers when he opened the account, Z. Yin is retired but nonetheless has a net income of $250,000-$500,000.  His trading in DreamWorks and Lattice was also disproportionate to his stated net worth of $5,000,000,000-$10,000,000,000.

34.     A declaration sworn to by Z. Yin on February 27, 2017 nonetheless claims that his monthly income is approximately $1,160, and, that other than his Interactive Brokers account, he has total bank and brokerage assets of less than $130,000.

35.     **Jun Qin** ("Qin") is 47 years old and resides in Beijing, China.  He is a Quality Department Manager at Legrand (Beijing) Electrical Co., Ltd., and is M. Yin's cousin.

36.     At M. Yin's direction and at least in part with money from M. Yin, Qin opened an account at Interactive Brokers on June 16, 2015 (with an account number ending in UXXX8920).

9

This account was initially funded by transfers from a bank account in the name of Jun Qin at HSBC in Hong Kong (with an account number ending in XXX-XXXXX9-833).

37.     Approximately half of the money in the Qin account belongs to M. Yin.  M. Yin traded with his own money through Qin's account solely so that he could avoid reporting his trading to his employer's compliance department.

38.     Qin's Interactive Brokers account purchased over 201,000 shares of DreamWorks from April 12, 2016 to April 19, 2016, using margin to cover the cost of over $5.2 million.  On April 28, 2016, his account began selling its DreamWorks shares, which were now worth over $8 million, resulting in a net gain of nearly $2.8 million.

39.     Qin's Interactive Brokers Account purchased approximately 1.46 million shares of Lattice stock from September 13, 2016 through November 2, 2016 at a cost of over $9.3 million. On November 3, 2016, the Qin Interactive Brokers Account sold almost half of the shares out of the account, resulting in a realized gain of over $800,000.  Shortly after the FBI interview, the remaining 800,000 Lattice shares in the account were sold, resulting in an additional realized gain an unrealized gain of over $560,000.  Combined, Qin's total gain from the Lattice trading was over $1.3 million.

40.     According to information provided to Interactive Brokers when he opened the account, Qin has a net income of $150,000-$250,000.  His trading in DreamWorks and Lattice was also disproportionate to his stated net worth of $1,000,000-$5,000,000.

41.     A declaration sworn to by Qin on February 27, 2017 nonetheless claims that his monthly income is approximately $1,744, and, that other than his Interactive Brokers account, he has total bank and brokerage assets of less than $1,725.

42.     **Yan Zhou** ("Zhou") is 35 years old and resides in Beijing, China.  She is a teacher at

Beijing Menghuanxuanly International Education Advisory Co., Ltd., and also teaches piano to the children of M. Yin.

43.     At M. Yin's direction, Zhou opened an Interactive Brokers account (with an account number ending in UXXX1566) on January 18, 2015.  This account was initially funded by transfers in February 2015 totaling $400,000 from an account in her name at HSBC in Hong Kong (with an account number ending in XXX-XXXXXX-8880).

44.     From April 11-14, 2016, Zhou's Interactive Brokers account purchased 55,400 shares of DreamWorks at a cost of about $1.4 million.  On April 20, her account sold 15,400 DreamWorks shares for about $416,000.  The next day, her account purchased 10,000 DreamWorks shares for about $271,500, resulting in her holding exactly 50,000 shares.  After the news broke, her account sold all 50,000 shares on April 27, 2014, for about $1.7 million.  Her total profits from DreamWorks trading were approximately $400,000.

45.     Zhou's Interactive Brokers Account purchased 210,000 shares of Lattice stock from October 11, 2016 through October 21, 2016 at a cost of around $1.35 million.  On November 3, 2016, all of those shares were sold out of the account, resulting in a gain of over $230,000.

46.     According to information provided to Interactive Brokers when she opened the account, Zhou has a net income of $150,000-$250,000.  Her trading in DreamWorks and Lattice was disproportionate to her stated net worth of $500,000-$1,000,000.

47.     A declaration sworn to by Zhou on February 27, 2017 nonetheless claims that her monthly income is approximately $334, in addition to cash payments from parents of piano students, and, that other than her Interactive Brokers account, she has total bank and brokerage assets of approximately $25,000.

48.     **Bei Xie** ("Xie") is 30 years old and resides in Beijing, China.  She is a section

member at PetroChina Coalbed Methane Co., Ltd.  Xie is a cousin or other relative of relief defendant Chaofeng Ji.

49.     At M. Yin's direction, and with money from relief defendant Chaofeng Ji, Xie opened an Interactive Brokers account (with an account number ending in UXXX3862) on February 17, 2016.  This account was initially funded by transferring HDK$2,000,000 (Hong Kong dollars, worth approximately $257,350) and $341,900 (in U.S. dollars) from an HSBC account in her name (with an account number ending in XXX-XXXXX4-888).

50.     Xie's Interactive Brokers account purchased 80,549 shares of DreamWorks from April 5, 2016 to April 14, 2016 at a cost of over $2 million.  On April 20, 2016, she sold 30,549 shares for $827,878, leaving her with exactly 50,000 shares of DreamWorks.  She held these until after the news broke.  From April 27-29, 2016, Xie sold her remaining 50,000 shares for approximately $1.9 million.  Her total profits from the DreamWorks trades were approximately $600,000.

51.     Xie's Interactive Brokers Account purchased 125,000 shares of Lattice stock from October 11, 2016 through October 19, 2016 at a cost of over $800,000.  On November 3, 2016, all of those shares were sold out of the account, resulting in a gain of almost $150,000.

52.     According to information provided to Interactive Brokers when she opened the account, Xie has a net income of $250,000-$500,000.  Her trading in DreamWorks and Lattice was disproportionate to her stated net worth of $1,000,000-$5,000,000.

53.     A declaration sworn to by Xie on February 27, 2017 nonetheless claims that her monthly income is approximately $1,163, and, that other than her Interactive Brokers account, she has total bank and brokerage assets of less than $58.

54.     **Chaofeng Ji** ("Ji") is 38 years old and resides in Beijing, China.  He is a managing

director in the asset management division of Legend Holdings, a China-based conglomerate.  He previously worked at UBS Securities Hong Kong Limited with M. Yin, and M. Yin described him to the FBI as a friend.  Ji is a relative of relief defendant Bei Xie and according to M. Yin, Xie's Interactive Brokers account is Ji's "family account."

## RELEVANT ENTITIES

55.    **Comcast Corporation** ("Comcast") is a global media and technology company and is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.  Securities in Comcast are publicly traded on NASDAQ under the ticker CMCSA.  NBCUniversal is a division of Comcast with its headquarters in New York, NY.

56.    **DreamWorks Animation SKG, Inc.** ("DreamWorks") is an animation studio that creates features films, television specials and series and live entertainment properties and was a Delaware corporation with its principal place of business in Glendale, California.  Prior to August 22, 2016, when its acquisition by Comcast was completed, securities in DreamWorks were publicly traded on NASDAQ under the ticker DWA.

57.    **PAG Asia Capital** ("PAG") is an Asia-focused private equity fund manager based in Hong Kong and Shanghai, China.

58.    **Giant Interactive Group Inc.** ("Giant Interactive") is a China-based online game developer and operator in China.  Securities (American depositary receipts) in Giant Interactive are publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol GA.

59.    **58.com Inc.** ("58.com) is a China-based company that operates an online marketplace.  Securities (American depositary receipts) in 58.com are publicly traded on the NYSE under the ticker symbol WUBA.

60.    **Jinpan International Limited** ("Jinpan") is a China-based company that designs, manufactures and sells electrical power control and distribution products.  Securities in Jinpan are

publicly traded on NASDAQ under the ticker symbol JST.

61.     **CTrip.com International Ltd.** ("CTrip") is a China-based international travel company.  Securities in CTrip are publicly traded on NASDAQ under the ticker symbol CTRP.

62.     **Lattice Semiconductor Corporation** ("Lattice") is a company that develops semiconductor technologies that it monetizes through products, solutions and licenses.  Lattice is organized under the laws of Delaware with its principal place of business in Portland, Oregon. Securities in Lattice are publicly traded on NASDAQ under the ticker symbol LSCC.

63.     **Lexmark International Inc**. ("Lexmark") is a printing and software company with its principal place of business in Lexington, Kentucky.  Prior to November 29, 2016, its securities had been publicly traded on the New York Stock Exchange under the symbol LXK.

64.     **Legend Holdings Corp.** ("Legend") is a Chinese conglomerate that owns, among other businesses, the Lenovo brand of personal computers and mobile phones and Legend Capital, a venture capital firm.

65.     **Canyon Bridge Partners** ("Canyon Bridge") is a purportedly U.S.-based private-equity fund that was formed in 2016 for the purpose of acquiring Lattice.  In November 2016, Canyon Bridge represented that it had only one limited partner at the time – a wholly-owned subsidiary of China Venture Capital Fund Corporation Limited.  According to news reports issued following the announcement of the Lattice – Canyon Bridge transaction, Canyon Bridge may be financed in part by Chinese state-owned investment funds.

## FACTUAL ALLEGATIONS

### A.     Insider Trading in DreamWorks

66.     The five Interactive Brokers accounts of relief defendants Su, Z. Yin, Qin, Zhou and Xie purchased, in total, over $56 million of DreamWorks stock between April 4 and April 25, 2016, when the company was engaged in confidential merger acquisitions with PAG and Comcast.  On

14

March 31, 2016, PAG made a confidential offer to acquire the company at $35 per share.  That offer was discussed by DreamWorks' board of directors on April 4.  On April 19, Comcast made a confidential offer to acquire DreamWorks of its own.  And then on April 26, rumors of a merger were published.  On every single trading day between that April 4th board meeting to consider PAG's offer and the eve of that April 26th news leak, the relief defendants' accounts, which had never before traded in DreamWorks stock, purchased almost 2.15 million DreamWorks shares at an average price of $26.25 per share.  In so doing, the relief defendants' accounts collectively became one of the ten largest shareholders of the company, based on holdings reported to the SEC by institutional investors.  They then made over $29 million in profit when they ultimately sold their large, accumulated stake in the film studio shortly after the company officially announced the deal on April 28th.  M. Yin controlled and effectuated all of these account purchases, generating over $25 million of profit for the accounts of his mother and father, Su and Z. Yin.

### 1.   The DreamWorks' Deal and Announcement

67.   In early December 2015, PAG discussed with the Zhonghong Group the possibility of exploring a deal involving DreamWorks.  These discussions were preliminary in nature and no specific deal terms were discussed.

68.   In early February 2016, PAG approached DreamWorks about a possible investment deal.  After PAG executed a confidentiality agreement, the CEO and chairman of PAG met with the CEO of DreamWorks on or about February 9, 2016.  Discussions and due diligence carried out pursuant to the confidentiality terms regarding PAG acquiring DreamWorks continued throughout February, March, and April 2016.

69.   On February 28, 2016, PAG made an offer of $33 per share in cash to acquire DreamWorks.

70.   On March 8, 2016, PAG submitted a signed, non-binding letter of interest to

15

DreamWorks' CFO and Board of Directors expressing interest in acquiring DreamWorks at $35 per share.

71.     On March 29, 2016, DreamWorks's CFO sent PAG a confidential, non-binding term sheet regarding the acquisition of DreamWorks by PAG.

72.     On March 31, 2016, PAG sent a revised confidential, non-binding term sheet to DreamWorks' CFO regarding the acquisition of DreamWorks by PAG.

73.     On April 4, 2016, the board of directors of DreamWorks met to consider the revised term sheet for an acquisition by PAG.  Under the terms of that confidential term sheet, the DreamWorks shares would be purchased at a price of $35 per share.  This proposed transaction price represented about a 40% premium over the closing price on April 4 of $24.99 per share.

74.     In a confidential meeting on April 4, 2016, the transaction committee of the board of directors of DreamWorks, composed of the board's independent directors, voted unanimously to authorize continued discussions with PAG on the terms outlined in the term sheet, including the purchase price of $35 per share.

75.     Following this vote, the approved term sheet was sent to PAG and its legal advisors later that day, April 4, 2016.  PAG and DreamWorks then began drafting a merger agreement and continued with due diligence.

76.     On April 11, 2016, after several days of confidential negotiations and due diligence by PAG, DreamWorks's outside counsel sent a draft of the definitive merger agreement for the proposed deal to PAG.

77.     On April 13, 2016, the CEO and chairman of the board of Comcast contacted the CEO of DreamWorks to express interest in a possible acquisition of DreamWorks.

78.     The next day, on April 14, 2016, Comcast commenced confidential negotiations to

acquire DreamWorks.  Meanwhile, DreamWorks continued to move forward with its confidential negotiations with PAG.

79.     On April 19, 2016, Comcast delivered a confidential proposal to DreamWorks proposing that Comcast acquire DreamWorks at a price of $35 per share.

80.     Meanwhile, on April 27, 2016, PAG contacted DreamWorks to reiterate its proposal to acquire DreamWorks at $35 per share and sent confirmation of its ability to fund the deal.

81.     After further confidential discussions between the two companies, Comcast ultimately offered, in a confidential offer on April 27, 2016, to acquire DreamWorks at a price of $41 per share, subject to certain conditions.

82.     On April 28, 2016, the DreamWorks board convened and voted unanimously to approve the merger agreement with Comcast.

83.     The DreamWorks-Comcast agreement was announced the same day, April 28, 2016 at 6:00 a.m. PST.

**2.     The Price Movement of DreamWorks Stock on the News of the Deal**

84.     In April 2016, before news of the acquisition of DreamWorks became public, shares of DreamWorks had traded in a range between $24.08 and $27.35 per share.  The share price closed at $27.15 per share on April 26, 2016.

85.     Late in the evening of April 26, 2016, after the markets had closed, various publications reported rumors that Comcast was in discussions to acquire DreamWorks for over $3 billion.  Additional articles reporting similar rumors were published on April 27, 2016

86.     After the market opened on April 27, 2016, the price of DreamWorks shares went up, closing on April 27, 2016 at $32.20 per share, an increase of about 18.7%.

87.     When the rumors were confirmed with DreamWorks' official announcement of the acquisition and its terms – issued before the markets opened on April 28, 2016 – the stock price rose

further, closing that day at $39.95, about a 24% increase over the prior day.  This also represented

an approximate 47.3% increase over the price the shares were trading at before the rumors of an

acquisition were reported on April 26th.

88.     The news further triggered a large increase in the volume of trading in

DreamWorks.  On April 26, 2016, 645,400 DreamWorks shares were traded.  On April 27, the

volume increased to 11,670,900, a 1,708.3% increase.  On April 28, the trading volume increased

further to 44,817,000 shares traded.  This was a 284.0% increase over the prior day, and a 6,844.0%

increase over the trading volume on April 26.

### 3.     The Confidential, Nonpublic Nature of the DreamWorks Discussions

89.     DreamWorks, PAG, and Comcast all made efforts to keep their discussions

confidential and non-public.

90.     On February 7, 2016, at the outset of the confidential discussions between

DreamWorks and PAG, the two parties executed a confidentiality agreement covering their

discussions.

91.     Similarly, as soon as Comcast began confidential negotiations with DreamWorks,

the two companies entered into a confidentiality agreement on April 15, 2016 covering their

discussions.

92.     In addition to executing confidentiality agreements with both PAG and Comcast,

DreamWorks also has policies and procedures in place to maintain the confidentiality of non-public

information.

93.     DreamWorks' Code of Business Conduct and Ethics contains procedures that

DreamWorks used to insure the confidentiality of material, non-public information regarding its

discussions with PAG and Comcast prior to the public dissemination of that information.

94.     Among other things, it requires all employees to maintain the confidentiality of any

confidential information entrusted to them by DreamWorks, except when authorized to disclose it by DreamWorks' legal department or required to disclose it by law.

95.     Similarly, PAG took steps to protect the non-public information it obtained during the negotiations.  It limited information about the deal to a small group of employees at the company, and often used a code name, "Project Dragon," to refer to the potential acquisition.

96.     PAG only shared information about the potential DreamWorks deal with O'Melveny & Myers LLP (its legal advisor), its financial due diligence advisor (Ernst & Young), and two potential financing sources (Bank of America Merrill Lynch and Zhonghong Group).

97.     Likewise, Comcast has a number of policies in place to protect the confidentiality of material non-public information in its possession.

98.     Among other things, Comcast has a Corporation Code of Conduct, which includes an insider trading policy that directs personnel to maintain the confidentiality of non-public information, whether about Comcast or third parties, they may learn of in the course of their work for Comcast.  It also has a Fair Disclosure Policy, which prohibits any employees other than authorized spokespersons from sharing material, non-public information with the financial community, shareholders, and debt holders.

99.     The advisors to the participants in these negotiations were equally bound to maintain the confidentiality of the negotiations, both through the confidentiality agreements signed by the key participants and by the advisors' own internal policies.

100.    For example, Centerview Partners LLC ("Centerview") advised DreamWorks on both the PAG offer and the Comcast offer starting February 29, 2016.

101.    Centerview has a compliance manual that includes a detailed section on the protection of confidential information.  Among other things, the compliance manual reminds

employees that they are in a fiduciary relationship with Centerview and are therefore obligated to maintain in the strictest confidence all confidential information, such as information about a client's proposed merger or acquisition, and to use such information only as necessary in the ordinary course of performing their duties as an employee of Centerview and in furtherance of Centerview's business.  It specifically prohibits employees from using confidential information for their own purposes, such as trading, or disclosing it to anyone outside Centerview except as necessary in the performance of their duties in furtherance of Centerview's business.

102.     Centerview has also adopted a number of practices to ensure the protection of confidential information.  They instruct employees to store confidential information electronically in network drives that are password protected, for example.  Paper documents are kept in locked filing cabinets and shredded when no longer needed.  They also limit dissemination of confidential information, even within the same department at Centerview, to those with a need to know.  They instruct employees to take care to avoid inadvertent disclosures, prohibiting them from discussing confidential information on mobile phones, public telephones or conversations in elevators, taxis, planes, restaurants, or in other public spaces.

103.     PJT Partners Inc. ("PJT Partners") is an investment advisory firm that advised Comcast on the DreamWorks acquisition.  PJT Partners first became aware of the deal on April 22, 2016.

104.     PJT Partners has a number of policies and procedures to ensure the confidentiality of material, non-public information it receives.  Among other things, PJT Partners (a) prohibits employees from discussing confidential information in public places where there is a risk of being overheard; (b) imposes requirements regarding the protection and treatment of confidential materials taken outside its office; (c) restricts access to information and documents in its office

through use of locked filing cabinets, restrictions on access to areas where confidential information is stored, and passwords on electronic documents and databases; (d) instructs employees to only disclose confidential information to other employees with a "need to know"; and (e) places securities about which PJT has confidential information on a restricted list, which prohibits employees and related persons from trading in the stock without approval.

### 4.    Insider Trading in DreamWorks

105.    Starting April 4, 2016, when the DreamWorks board approved the confidential term sheet with PAG, the five accounts at Interactive Brokers held by relief defendants Su, Z. Yin, Qin, Zhou and Xie began accumulating shares of DreamWorks.

106.    Before that time, those five accounts had never traded in DreamWorks.

107.    All of the purchases were made before news regarding rumors of a potential Comcast acquisition of DreamWorks was reported on April 26, 2016 and before DreamWorks issued its official announcement of the Comcast deal on April 28, 2016.

108.    By the time the news of the DreamWorks acquisition broke, their five accounts held nearly 2.15 million shares of DreamWorks, which had been purchased for more than $56.3 million. After the news broke, they began selling their DreamWorks shares, realizing profits of over $29 million.

109.    Altogether, the five accounts purchased at least 2,145,986 shares of DreamWorks in the span of three weeks, from Monday April 4, 2016, through Monday, April 25, 2016.  In total, the accounts spent $56,331,378 to make these purchases.  The purchase prices ranged from $24.01 to $27.71 per share, with a weighted average purchase price of $26.25 per share.  Those prices were significantly below the $35 per share initial purchase price offered confidentially by PAG on April 4, 2016, and offered by Comcast on April 19, 2016.

### a.    Su's Interactive Brokers account

110.    Su's Interactive Brokers account purchased nearly 850,000 shares of DreamWorks from April 4, 2016 through April 21, 2016, using margin to cover the cost of over $21.8 million. Specifically:

(a)    On April 4, 2016 – the very day the DreamWorks board approved further discussions on the confidential term sheet with PAG with a purchase price of $35 per share – Su's Interactive Brokers began to accumulate a significant stake in DreamWorks.  On that Monday, her account purchased 50,000 shares of DreamWorks stock at a price of $24.98 per share, for a total cost of $1,249,169.

(b)    Three days later, on Thursday, April 7, 2016, Su's account purchased another 25,000 shares at $24.74 per share, for a total cost of $618,580.  The next day, Friday, April 8th, Su purchased an additional 18,780 shares at $24.36 per share for a total cost of $457,431.  By the end of that week, she had purchased a total of 93,780 shares of DreamWorks stock for a total cost of $2,325,180.

(c)    As alleged above, on Monday, April 11, 2016 of the following week, DreamWorks circulated a draft, confidential definitive merger agreement for the deal with PAG. Beginning on that day, and for every trading day that week except Friday, Su's Interactive Brokers account purchased over 615,000 shares of DreamWorks stock:  39,539 shares at $24.07 per share for a total cost of $951,846 on April 11th;  178,256 shares at $24.88 per share for a total cost of $4,435,253 on April 12th; 152,279 shares at $25.68 per share for a total cost of $3,911,248 on April 13th; and 245,102 shares at $26.54 per share for a total cost of $6,503,910 on April 14th.

(d)    So, within eight trading days from the time PAG had made a nonpublic offer to purchase DreamWorks at $35 per share, Su's Interactive Brokers account had purchased a total of 708,956 shares for a total cost of $18,127,437 and at a weighted average of $25.57 per share.

(e)     Su's account made two more large purchases the following week, purchasing an additional 138,544 shares for a total cost of $3,755,136.  On Monday, April 18th, her account purchased 88,544 shares at $27.16 per share for a total cost of $2,404,673.  Then, on Thursday, April 21st, Su's account made her final purchase of DreamWorks stock while the confidential $35 per share offer (from PAG and Comcast) was still nonpublic.  The account acquired 50,000 shares at $27.01 per share for a total cost of $1,350,463.

111.    All of these purchases by Su's account of DreamWorks stock were made, in whole or in part, on margin.

112.    Upon information and belief, these were the first purchases that Su's account had made of DreamWorks stock.

**b.     Z. Yin's Interactive Brokers account**

113.    Z. Yin's Interactive Brokers account purchased nearly 1 million shares of DreamWorks from April 5, 2016, through April 25, 2016, using margin to cover the cost of over $26.5 million.  Specifically:

(a)     On Tuesday, April 5, 2016, a day after DreamWorks' board authorized further discussions on PAG's confidential $35 per-share offer, the Interactive Brokers account held by Z. Yin purchased 75,000 shares of DreamWorks stock at $24.45 per share, for a total cost of $1,833,676.

(b)     The next day, Wednesday, April 6, Z. Yin's account purchased 86,700 shares of DreamWorks stock at a price of $25.19 per share and a total cost of $2,183,748.

(c)     His account's next purchase was the largest made in that account, and took place on Friday, April 15 – the only day that his wife, co-defendant Su, did not purchase during that week.  On that day, Z. Yin's account purchased 249,948 shares for $6,662,630 at a price of $26.66 per share.

(d)     The following week, when Comcast first made its own confidential $35 per-share offer, Z. Yin's Interactive Brokers account purchased every trading day, except on April 21st: on Monday, April 18th, his account purchased 72,492 shares at $27.21 per share for a total cost of $1,972,281; on Tuesday, April 19th – the day of the Comcast offer – the account made its largest purchase of 264,805 shares for $7,213,086 at a price of $27.24 per share; on Wednesday, April 20th, Z. Yin's account purchased 155,250 shares at $27.04 per share for a total cost of $4,197,512; and on Friday, April 22nd, the account purchased 42,637 shares for $1,153,266 at a price of $27.05 per share.

(e)     Z. Yin's Interactive Brokers account made its final purchase of 50,000 shares on Monday, April 25, 2016 (two days before news of the deal broke) for a total cost of $1,349,243 at a price of $26.98 per share.

114.     All of these purchases of DreamWorks stock by Z. Yin's account were made, in whole or in part, on margin.

115.     Upon information and belief, these were the first purchases of DreamWorks stock that Z. Yin's account had made.

### c.     Qin's Interactive Brokers account

116.     Qin's Interactive Brokers account purchased over 200,000 shares of DreamWorks from April 12 to April 19, 2016, using margin to cover the cost of over $5.2 million.  Specifically:

(a)     Qin's account first started accumulating DreamWorks stock on Tuesday, April 12, 2016, when his account purchased 48,551 shares of DreamWorks stock for $1,206,281 at a price of $24.85 per share.  The next day, Wednesday, April 13, his account purchased 23,103 shares at $25.69 per share for a total cost of $593,460.  Then, on Thursday, April 14, Qin's account purchased 90,000 shares of DreamWorks stock at $26.58 per share for a total cost of $2,391,978.

(b)     The next week, on Tuesday, April 19, 2016, Qin's Interactive Brokers

account made its last purchase of DreamWorks stock acquiring 40,000 shares for $1,095,782 at a price of $27.39 per share.

117.    All of the purchases of DreamWorks stock by Qin's account were made, in whole or in part, on margin.

118.    Upon information and belief, these purchases of DreamWorks stock were the first purchases of that company's stock by Qin's account.

### d.    Zhou's Interactive Brokers account

119.    Between April 11 and April 21, 2016, Zhou's Interactive Brokers account purchased a net of 50,000 shares of DreamWorks at a net cost of more than $1.3 million.  Specifically:

(a)    During the week of Monday, April 11, 2016, seven days after a confidential $35 per share offer was made to purchase DreamWorks, Zhou's Interactive Brokers account made four purchases of DreamWorks stock:  On April 11th, her account purchased 10,000 shares of DreamWorks stock for $241,572 at a price of $24.16 per share; on April 12th, her account purchased another 20,000 shares at $24.85 per share and a total cost of $496,997; on April 13th, the account purchased 5,400 shares at $25.67 per share for a total cost of $138,600; and on April 14th, her account purchased 20,000 shares at $26.32 per share for a total cost of $526,383.

(b)    The next week, on Wednesday, April 20, 2016, Zhou's account sold 15,400 DreamWorks shares for $415,807.  The very next day, Thursday, April 21, the Zhou account purchased 10,000 shares of DreamWorks stock for a total cost of $271,493 at a price of $27.15 per share.  This left her account with exactly 50,000 shares of DreamWorks stock.

120.    All of the purchases of DreamWorks stock by Zhou's account were made, in whole or in part, on margin.

121.    Upon information and belief, these purchases of DreamWorks stock were the first purchases of that company's stock by Zhou's account.

e.      **Xie's Interactive Brokers account**

122.    During his FBI interview, M. Yin admitted that relief defendant Ji is the cousin of relief defendant Xie, the nominal owner of the Xie Interactive Brokers trading account.  M. Yin and Ji are friends and were once colleagues at an international investment bank.  According to M. Yin, the Xie account is actually Ji's "family account," which Ji asked M. Yin to manage.  On information and belief, both Ji and Xie have an ownership interest over the funds in the Xie Interactive Brokers account.

123.    Xie's Interactive Brokers account purchased, net, 50,000 shares of DreamWorks from April 5, 2016 to April 14, 2016 at a net cost of more than $1.29 million.  Specifically:

(a)      Xie's account's first purchase of DreamWorks stock was on Tuesday, April 5, 2016, a day after the $35 per-share confidential offer was made.  On that day, the account purchased 15,000 shares for $365,569 and at a price of $24.37 per share.

(b)      Her account's next purchase was a week later, on Tuesday, April 12, 2016, when it purchased 25,549 shares at $24.92 per share for a total cost of $636,739.  Her account then purchased another 20,000 shares on Wednesday, April 13, for $519,310 and at a price of $25.97 per share, and 20,000 more shares on Thursday, April 14, for $526,399 and at a price of $26.32 per share.

(c)      On April 20, 2016, her account sold 30,549 shares for $827,878, leaving her account with exactly 50,000 shares of DreamWorks stock.

124.    All of the purchases of DreamWorks stock by Xie's account were made, in whole or in part, on margin.

125.    Upon information and belief, these purchases of DreamWorks stock were the first purchases of that company's stock by Xie's account.

**5.     M. Yin and the relief defendants' substantial profits from well-timed insider trading**

126.    By the close of trading on April 25, 2016, the five Interactive Brokers accounts of Su, Z. Yin, Qin, Zhou and Xie held 2,145,986 shares of DreamWorks stock, which they had started buying right after PAG offered to buy DreamWorks for $35 per share.  In total, they collectively had spent $56,331,378 to purchase these shares for a weighted average purchase price of $26.25 per share.

127.    Starting on April 27, 2016 (when rumors of the DreamWorks acquisition by Comcast were published) and April 28, 2016 (when the deal was officially announced), the defendants' accounts began to sell their massive positions in DreamWorks.  By the time they were finished selling their shares, the defendants' five accounts had realized a net profit of $29,049,300.

128.    Beginning on April 28, 2016, Su's Interactive Brokers account sold its nearly 850,000 shares, resulting in a gain of $11,990,100.  Her account's return on its DreamWorks trades was 54.8% of the notional amount invested.

129.    Beginning on April 28, 2016, Z. Yin's Interactive Brokers account sold its 996,832 DreamWorks shares, resulting in a gain of $13,287,438.  His account's return was 50.0% of the notional amount invested.

130.    Beginning on April 28, 2016, Qin's Interactive Brokers account sold its 201,654 DreamWorks shares, resulting in a gain of $2,766,318.  His account's return was 52.3% of the notional amount invested.

131.    Beginning on April 27, 2016, Zhou's Interactive Brokers account sold its 50,000 DreamWorks shares, resulting in a gain of $399,867.  Zhou's account's return was 30.8% of the notional amount invested.

132.    Beginning on April 27, 2016, Xie's Interactive Brokers account sold its 50,000

DreamWorks shares, resulting in a gain of $605,577.  Her account's return was 46.7% of the notional amount invested.

133.    The five Interactive Brokers accounts' net profit from the DreamWorks purchases in April 2016 was at least $29,049,300.  This total profit, and the profits for each account, are summarized in the following table:

| Relief Defendant | Net Profits from DreamWorks Trading |
|---|---|
| Lizhao Su | $11,990,100 |
| Zhiqing Yin | $13,287,438 |
| Jun Qin | $2,766,318 |
| Yan Zhou | $399,867 |
| Bei Xie | $605,577 |
| TOTAL | $29,049,300 |

**6.      The Highly Suspicious Nature of the April 2016 DreamWorks Trading**

134.    By the time the accounts of Su, Z. Yin, Qin, Zhou and Xie had amassed more than the nearly 2.15 million shares of DreamWorks stock, their collective holdings represented 2.7% of the outstanding common stock of the company.

135.    Of the 142 institutional investors (having over $100 million in assets) who reported owning DreamWorks stock as of December 31, 2015, only 8 firms reported owning a larger position in DreamWorks than the approximate 2.15 million shares held by the relief defendants' Interactive Brokers accounts.

136.    The relief defendants' five accounts had purchased DreamWorks stock on every single trading day between April 4, 2016 (the day the $35 per-share confidential offer was made) and April 25, 2016 (the day before rumors of a merger were made public).

137.    The trading in DreamWorks stock by the relief defendants' five Interactive Brokers

accounts from April 4 to April 25, 2016 represented 16.9% of all market trading in that stock during that time.  In other words, about $1 of every $6 invested in DreamWorks stock during that period came from accounts controlled by M. Yin and held in name by the relief defendants.

138.    On a daily basis, trading by these five accounts amounted to a significant percentage of the total volume of DreamWorks shares traded, on some days accounting for as much as 34.8% of all trading volume in DreamWorks.

139.    Su's Interactive Brokers account was opened in October 2013, and the other accounts – held by Z. Yin, Qin, Zhou and Xie – were opened in 2015 or 2016.  During the time these accounts were held by the relief defendants, none of the accounts, on information and belief, had ever traded in DreamWorks stock until the three-week period from April 5 to April 25, 2016.

140.    All of the purchases of DreamWorks stock by the relief defendants' accounts during the April 4-25, 2016 period were made, in whole or in part, on margin.

141.    All of the purchases of DreamWorks stock by the defendants' accounts during this period were made by M. Yin.

142.    Also, these purchases cannot be explained by any publicly available news about DreamWorks in April.  DreamWorks had filed its annual report (on Form 10K) on February 25, 2016.  No new earnings or quarterly reports were released until May 2016, after the relief defendants' trading in DreamWorks.  The only SEC filing by DreamWorks in March 2016 was a report on Form 8-K providing additional details about the employment terms of its chief financial officer, Fazal Merchant, who assumed the title of chief accounting officer on March 4, 2016.  On April 6, 2016, it was announced that Verizon was acquiring a stake in Awesomeness TV, a company acquired by DreamWorks in 2013 and in which DreamWorks retained a controlling interest after Verizon's purchase of a 25% stake.  On April 11, 2016, DreamWorks announced that

it would be holding a conference call on May 5, 2016 to announce its first quarter earnings.

143.    None of these news events had an appreciable impact on the stock price.  From March 1 through April 26, 2016, DreamWorks' share price hovered between a high of $27.71 on April 19, 2016 and a low of $23.78 on April 5, 2016.

144.    The defendants' five Interactive Brokers accounts traded on each of the 16 trading days preceding the news leak.  On six of those days, the five accounts represented more than 20% of the DreamWorks trading volume.  On all but two of those days they accounted for at least 5% of the total volume of trades.

145.    The following table shows each day the relief defendants' five accounts purchased DreamWorks shares, the total amount purchased across the five accounts, the total volume of DreamWorks shares traded on that day, and the percentage of trading represented by just the five accounts.

| Date | Total Shares Purchased by the Five Accounts | Total Market Trading Volume | Percentage of Trading Volume |
|---|---|---|---|
| April 4, 2016 | 50,000 | 534,400 | 9.4% |
| April 5, 2016 | 75,000 | 785,034 | 9.6% |
| April 6, 2016 | 86,700 | 1,064,065 | 8.1% |
| April 7, 2016 | 25,000 | 852,576 | 2.9% |
| April 8, 2016 | 18,780 | 424,967 | 4.4% |
| April 11, 2016 | 39,539 | 354,683 | 11.1% |
| April 12, 2016 | 251,407 | 913,259 | 27.5% |
| April 13, 2016 | 200,782 | 1036,115 | 19.4% |
| April 14, 2016 | 375,102 | 1076,412 | 34.8% |

| Date | Total Shares Purchased by the Five Accounts | Total Market Trading Volume | Percentage of Trading Volume |
|---|---|---|---|
| April 15, 2016 | 249,948 | 1,181,991 | 21.1% |
| April 18, 2016 | 161,036 | 892,849 | 18.0% |
| April 19, 2016 | 304,805 | 1,128,098 | 27.0% |
| April 20, 2016 | 155,250 | 702,193 | 22.1% |
| April 21, 2016 | 60,000 | 678,688 | 8.8% |
| April 22, 2016 | 42,637 | 496,119 | 8.6% |
| April 25, 2016 | 50,000 | 610,844 | 8.20% |
| **TOTAL** | **2,145,986** | **12,732,307** | **16.9%** |

7.    **PAG's Simultaneous Involvement in the Lexmark Deal**

146.    At the same time that PAG was pursuing an acquisition of DreamWorks, from December 2015 through April 2016, it was simultaneously pursuing an acquisition of another U.S. company, Lexmark, as part of a buyer's consortium with Legend Capital and Apex Technology ("Apex").  Ji, M. Yin's friend and a beneficial owner of the Xie account, was a managing director at Legend, the parent company of Legend Capital, during that time period.

147.    In early December 2015, at the same time that PAG was first exploring an acquisition of DreamWorks, PAG was contacted by representatives of Apex regarding equity financing for a potential business combination with Lexmark.  Legend Capital was also contacted by Apex about a potential Lexmark deal in this time period.  Both PAG and Legend Capital signed confidentiality agreements with Apex.

148.    And so in February 2016, after it had approached DreamWorks about a possible investment deal, PAG was also working on a potential acquisition of Lexmark in collaboration with

Apex and Legend Capital.

149.     On or about February 17, 2016, an account under the name of Xie was opened at Interactive Brokers.  On information and belief, Ji, a managing director at Legend, caused his cousin, Xie, to open this account.

150.     From February 23-29, 2016, $2 million Hong Kong dollars and $341,900 US dollars were wired into Xie's Interactive Brokers account.  On information and belief, at least a portion of this money came from Ji.

151.     On March 3, 2016, PAG, Legend Capital, and Apex entered into a binding consortium term sheet pursuant to which the parties agreed to bid for Lexmark together.

152.     On March 10, 2016, PAG, Legend Capital, and Apex jointly submitted a final binding offer to acquire Lexmark.

153.     On April 5, 2016, a representative of the PAG/Legend Capital/Apex consortium communicated to Lexmark's senior management a revised offer price of $40 per share.  Starting this same day, representatives of the consortium and their advisors met with representatives of Lexmark and its advisors in New York.  The day before, on April 4, 2016, PAG had also learned that the board of directors of DreamWorks had voted unanimously to continue negotiations with PAG on the basis of the term sheet PAG had sent in March.

154.     From April 5-19, the parties to the Lexmark deal, including PAG and Legend Capital, continued to negotiate and prepare for a closing of the deal.

155.     On April 19, 2016, the merger agreement whereby the buyer consortium including PAG and Legend Capital acquired Lexmark was signed and a press release was issued.

156.     Given these concurrent events, on information and belief, Ji is one potential source of the material nonpublic information about the DreamWorks acquisition that M. Yin possessed

when he executed the trades described above.

**B.      Insider Trading in Lattice**

157.    The five Interactive Brokers accounts of relief defendants Su, Z. Yin, Qin, Zhou and Xie all purchased, in total, 7,042,714 shares of Lattice stock between July 5 and November 2, 2016 – when the company was engaged in confidential merger acquisitions to be acquired by Canyon Bridge – at an average price of $6.35 per share, for a total cost of $44,692,934.  On November 3, 2016, Lattice and Canyon Bridge announced that they had reached an agreement in which Canyon Bridge would acquire all outstanding shares of Lattice for $8.30 per share (a premium of about 30%).

**1.      The Lattice Deal and Announcement**

158.    Prior to April 8, 2016, China Reform Fund retained Lazard Freres & Co. LLC ("Lazard") to advise it on a potential transaction involving Lattice.

159.    Defendant Chow was a managing partner at China Reform Fund at the time.  He has described M. Yin as a social acquaintance and former colleague at Warburg Pincus in Hong Kong.

160.    Chow was aware of nonpublic information about the potential transaction between China Reform Fund and Lattice starting at least by April 2016.

161.    On April 8, 2016, Lazard contacted Morgan Stanley, Lattice's financial advisor, to inform them that China Reform Fund would be interested in acquiring Lattice.

162.    On April 27, 2016, Lattice and China Reform Fund entered into a nondisclosure agreement that imposed a 12-month standstill on China Reform Fund's ability to acquire any Lattice common stock.

163.    On May 5, 2016, the CEO of Lattice met with Chow, who was a representative of China Reform Fund, to discuss a possible strategic transaction.

164.    After further discussions, on May 20, 2016, Lazard advised Morgan Stanley that

China Reform Fund would be preparing a non-binding indication of interest to acquire Lattice.

165.     Also on May 20, 2016, members of Lattice's senior management and its counsel had a meeting with representatives of the Committee on Foreign Investment in the United States ("CFIUS") in Washington, DC.  Lattice and China Reform Fund both were aware that any acquisition of Lattice by a China-based buyer may require approval from CFIUS.

166.     On July 5, 2016, Chow and M. Yin exchanged text messages through the mobile phone-based WeChat application, making arrangements to meet at a coffee shop in the China World Trade Center located in Beijing, China.  Chow also placed a call to M. Yin's cell phone.  Later that same day, M. Yin purchased over 248,000 shares of Lattice costing over $1.3 million through his father's account.

167.     Just two days later, on July 7, 2016, China Reform Fund submitted its first non-binding indication of interest to acquire Lattice at $8.00 per share in a cash transaction.  That proposed price represented a 50% premium over Lattice's closing price on the previous day.

168.     On July 12, 2016, Chow and M. Yin again exchanged text messages. In those messages, M. Yin offered advice and assistance to Chow in connection with the Lattice deal, and M. Yin and Chow discussed matters relating to a potential U.S.-based transaction.  Chow spoke of coming to the U.S. for three weeks at the same time that due diligence for Lattice was taking place.  Also, M. Yin referenced "FPGA reports" that he had sent to Chow by email.  FPGA is a type of integrated circuit marketed by Lattice.  M. Yin also asked if Chow had legal counsel for "CFIUS" issues relating to the deal.  CFIUS had been on ongoing subject of discussion between Lattice and China Reform Fund.  M. Yin offered to help Chow find deal counsel, and Chow replied that he had already retained Jones Day, which was acting as counsel to China Reform Fund and later represented Canyon Bridge on the Lattice transaction.  Finally, Chow and Yin agreed to meet in

person the following day.

169.    In addition to these messages, Chow and M. Yin also spoke on the phone for at least

five minutes on July 12, 2016.

170.    On July 12, 2016, starting at approximately 9:55 pm in Beijing, M. Yin began

buying 53,500 Lattice shares through the Z. Yin Interactive Brokers account.

171.    On July 13, 2016, M. Yin and Chow met in person at approximately 11:00 am in

Beijing.  Later that afternoon, M. Yin texted a friend asking about Lattice.

172.    On July 13, 2016 starting at approximately 9:36pm Beijing time, M. Yin began

buying 116,387 shares of Lattice through the Z. Yin Interactive Brokers account.

173.    From July 13 to July 22, 2016, the Z. Yin Interactive Brokers account purchased a

total of 280,283 shares of Lattice at a cost of more than $1.67 million.

174.    On July 28, 2016, China Reform Fund submitted a revised non-binding indication of

interest to Lattice, increasing its proposed acquisition price to $8.75 to $9.00 per share in an all cash

transaction.

175.     From July 29 to August 1, 2016, the Z. Yin account continued to acquire Lattice,

buying another 150,000 shares at a cost of more than $915,000.

176.    After receiving board authorization, Lattice's management entered into an

exclusivity agreement with China Reform Fund on August 8, 2016.  The agreed-to exclusivity

period covered August 8 through August 21, 2016.

177.    On August 10, 2016, Chow sent a text message to M. Yin stating that he was "in the

middle of a deal" and therefore could not leave the West Coast of the United States, which is where

Lattice is headquartered.

178.    On August 10, 2016, hours after the texts were exchanged, Z. Yin's Interactive

Broker account bought another 120,000 shares at a cost of approximately $705,000.

179.     On August 17, 2016, Lattice informed China Reform Fund that it had received an unsolicited expression of interest from a third-party, but had declined to meet given the exclusivity agreement (set to expire on August 21st).  The Canyon Bridge Insider and M. Yin spoke by phone that day, and also exchanged text messages making plans to meet the same day.  Later that day, the Z. Yin Interactive Brokers account increased its position in Lattice by an additional 35,800 shares at a cost of about $212,000.

180.     Four days later, on August 21, 2016, China Reform Fund revised its non-binding indication of interest to $8.30 per share, contingent on Lattice extending its exclusivity period to September 12, 2016.

181.     On August 22, 2016, Chow met with Lattice and advised them that he was considering leaving China Reform Fund to form a new private equity fund that was interested in acquiring Lattice in place of China Reform Fund.  That new fund would become Canyon Bridge.

182.     In addition, Chow spoke to Yin in August 2016 about the formation of the entity that would become the primary investor in Canyon Bridge (China Venture Capital Fund Corporation Limited) and he also asked Yin to recommend possible limited partners for the fund.

183.     On September 2, 2016, Morgan Stanley reported to Lattice's board that it had communicated to Lazard that Lattice would not consider entering into an exclusivity agreement with Chow's new fund prior to him providing additional clarity on Canyon Bridge's structure and financing.

184.     Chow and Yin placed four phone calls to one another on September 2, 2016.

185.     On September 9, 2016, Lattice and Canyon Bridge entered into a nondisclosure agreement on the same terms as were agreed with China Reform Fund.  That same day, the Z. Yin

Interactive Brokers account purchased another 44,554 shares of Lattice at a cost of approximately $267,000.

186.    On September 10, 2016, Canyon Bridge submitted a non-binding indication of interest at $8.30 per share in an all-cash transaction, contingent on Lattice agreeing to an exclusivity agreement.

187.    On September 13, 2016, Lattice and Canyon Bridge entered into an exclusivity agreement through October 4, 2016.  Lattice's outside counsel, Jones Day, also delivered an initial draft of the merger agreement to Canyon Bridge.  That same day, Chow and M. Yin exchanged text messages agreeing to meet that day at the China World Trade Center in Beijing, China.  Later on the September 13, M. Yin purchased approximately 116,387 shares of Lattice.  The following day, M. Yin purchased another 260,501 shares of Lattice.  And the day after that, September 15, 2016, M. Yin purchased an additional 536,310 shares of Lattice.

188.    On September 16, 2016, Yin sent a text message to another individual stating that a "friend" had told him the Lattice merger was moving forward.  That same day, Yin purchased another 208,300 shares of Lattice.

189.    On September 21, 2016, Yin left a voice message with Chow regarding concerns about whether CFIUS would approve the Lattice transaction.  Chow responded by voice message the same day, saying that "we should be able to sign the contract soon.  Yeah."  Beginning the following day, through October 12, 2016, M. Yin purchased a total of 2,206,760 shares of Lattice.

190.    On October 17, 2016, Chow and M. Yin arranged via text message to meet at the China World Trade Center in Beijing.  Following this meeting, M. Yin advised two other people by text message to purchase shares of Lattice.

191.    M. Yin wrote to one person, instructing him as follows:

> Is the ratio of your actual investment in your actual investment funds high currently? If not, you can purchase 5% to 10% of LSCC shares (around $6). (This is not urgent. You can purchase these shares in three to five days.)

192.    Also on October 17, 2016, M. Yin texted with a different person in the following exchange:

> M. Yin:  Is the ratio of your actual overseas stock investment in your actual investment funds high right now?
>
> Person C:  2/3.  Is that a bit risky?
>
> M. Yin:  It is ok. It depends on what stocks you have. Why don't you purchase 25,000 LSCC shares (you can change the stocks you have or use the remaining 1/3 funds. Either way will work)? The value of the position will be $150,000, and I will take this risk for you.

193.    This person immediately purchased 10,000 shares of Lattice after texting with M. Yin.

194.    From the day of this meeting, October 17, 2016, through October 24, 2016, M. Yin purchased 1,931,102 shares of Lattice.

195.    The Lattice-Canyon Bridge merger agreement was finalized on November 1, 2016. That same day, M. Yin purchased a total of 427,949 shares of Lattice.

196.    Lattice's board met the following day, and voted to approve the transaction.  That same day, November 2, 2016, M. Yin purchased 476,500 shares of Lattice.

197.    On November 3, 2016, prior to the opening of the market, Lattice and Canyon Bridge executed their merger agreement and publicly announced the anticipated transaction.  Chow signed the agreement on behalf of Canyon Bridge.

**2.    The Price Movement of Lattice Stock on the News of the Deal**

198.    Prior to the news of the acquisition of Lattice on November 3, 2016, shares of Lattice had been trading in a range between $5.32 and $6.56 per share since the beginning of July.  The share price closed at $6.37 per share on November 2, 2016.

199.    Following the November 3, 2016 announcement that Lattice and Canyon Bridge had reached an agreement in which Canyon Bridge would acquire all outstanding shares of Lattice for $8.30 per share (a premium of about 30%), Lattice's stock price closed at $7.55, up $1.18 or 18.5% from its prior close of $6.37.

200.    The number of shares traded after the news was released also shot up dramatically. In the four months leading up to the announcement, trading in Lattice always remained below 5 million shares per day, and often was under 1 million.  On November 2, trading was 1,820,778 shares.  On November 3, 2016, 33,890,700 Lattice shares were traded.  This was a 1,761.3% increase over the prior day's volume.

### 3.    The Confidential, Nonpublic Nature of the Lattice Discussions

201.    Lattice, China Reform Fund, and Canyon Bridge all made efforts to keep their discussions confidential and non-public prior to the announcement of the deal on November 3, 2016.

202.    Lattice had an insider trading policy in place during the time it was negotiating the acquisition with China Reform Fund and Canyon Bridge.  The policy prohibits the unauthorized use or disclosure of nonpublic information about the company.  It specifies that when an employee in the course of their employment acquires nonpublic information about Lattice or other companies it is working with, the employee may only use that information for legitimate company business purposes.  The policy further requires personnel to use all reasonable efforts to safeguard any nonpublic information in their possession.

203.    In addition, Lattice's insider trading policy requires all Directors and Officers to pre-clear any trading in Lattice stock with the Company's General Counsel. To enforce this requirement, Lattice maintains a block on the ETrade accounts of company personnel which is removed only with the issuance of a pre-clearance.  Lattice also imposes a blackout on all trading

by Directors and employees beginning at the end of the second month of a fiscal quarter and
continuing until two business days following the release of that quarter's financial results.  The
trading window was closed during much of the period during which due diligence was conducted
and negotiations were ongoing between Lattice and China Reform Fund and Canyon Bridge,
including the period from September 1, 2016 until the announcement of the transaction on
November 3, 2016.

204.    To further protect the sensitive negotiations, Lattice informed only a limited number
of company personnel of the discussions with China Reform and subsequently Canyon Bridge
between the date of the initial contact by China Reform and the disclosure of the transaction on
November 3, 2016.  Specifically, personnel were only informed if they were required to participate
in either due diligence activities or negotiation of topics with the counter party.   Personnel were
only added to the group with the express approval of Lattice's Chief Executive Officer.  A roster of
all personnel in this group was maintained by Lattice's Chief of Staff and General Counsel.

205.    At the time individuals were informed of the matter, they were informed by
personnel from Lattice's Legal group that they were in possession of material, non-public
information and that they could neither share that information with any other party without the
express approval of the CEO or General Counsel, nor engage in any transactions in Lattice's
securities.  They also were expressly notified by email on August 8, 2016 that, notwithstanding the
opening of the window for trading by rank and file employees on August 12, 2016 after the release
of Lattice's Q2 2016 earnings, they were subject to a continuing black out until notified otherwise
and could not trade in the Company's securities.

206.    Lattice also made efforts to ensure that every party it negotiated with would keep the
negotiations confidential and refrain from purchasing Lattice common stock for a set period of time.

Before engaging in substantive discussions with China Reform Fund, Lattice and China Reform Fund entered into a nondisclosure agreement with a 12-month standstill period on April 27, 2016. After Canyon Bridge was formed, it entered into a nondisclosure agreement with Lattice on the same terms as the one entered into by China Reform Fund.

207.    In addition to the nondisclosure agreement with Lattice, on information and belief, China Reform Fund and Canyon Bridge had policies requiring their employees to maintain the confidentiality of nonpublic information and only use such information for company purposes.

208.    Canyon Bridge, since it was newly formed, did not yet have written policies in place regarding insider trading at the time of the Lattice deal.  The firm did, however, have a corporate policy requiring employees to protect confidential information and only use it for company purposes.  This policy was written into the employment agreements between Canyon Bridge and its personnel.

### 4.    The Insider Trading in Lattice

209.    As described above, starting July 5, 2016, two days before China Reform Fund and its affiliates submitted a non-binding indication of interest to acquire Lattice, M. Yin began amassing shares of Lattice in his father's account.  On September 13, 2016, Lattice and Canyon Bridge entered into an exclusivity agreement and began to negotiate the terms of a merger agreement.  During the ensuing months, as Lattice and Canyon Bridge worked to finalize the proposed transaction, the other four M. Yin-controlled accounts likewise began trading in Lattice, as the prospects for the deal going through became more certain.

210.    All of the purchases were made before the announcement of the acquisition on November 3, 2016.

211.    By the time the news of the Lattice acquisition broke, their five accounts held over 7 million shares of Lattice, which had been purchased for more than $44.69 million.  The daily

weighted average purchase prices ranged from $5.37 to $6.56 per share, with an overall average purchase price of $6.35 per share.  After the news broke, they began selling their Lattice shares, realizing profits of over $6.4 million and unrealized gains of over $620,000, for total gains of over $7.1 million.

          **a.**        **Su's Interactive Brokers account**

212.      Su's Interactive Brokers account purchased over 2.5 million shares of Lattice from September 13, 2016 through November 2, 2016, using margin to cover the cost of over $16 million. Specifically:

      (a)      On September 13, 2016, Su's Interactive Brokers account began to accumulate a significant stake in Lattice.  On that Tuesday, her account purchased 69,187 shares of Lattice stock at a weighted average price of $5.95 per share, for a total cost of $411,500.

      (b)      On September 14, 2016, Su's Interactive Brokers account purchased 167,123 shares of Lattice stock at a weighted average price, of $6.22 per share, for a total cost of $1,039,683.

      (c)      On September 15, 2016, Su's Interactive Brokers account purchased 336,310 shares of Lattice stock at a weighted average price of $6.52 per share, for a total cost of $2,192,576.

      (d)      On September 16, 2016, Su's Interactive Brokers account purchased 58,300 shares of Lattice stock at a weighted average price of $6.50 per share, for a total cost of $379,233.

      (e)      On September 22, 2016, Su's Interactive Brokers account purchased 163,775 shares of Lattice stock at a weighted average price of $6.46 per share, for a total cost of $1,057,699.

      (f)      On September 23, 2016, Su's Interactive Brokers account purchased 350,000 shares of Lattice stock at a weighted average price of $6.48 per share, for a total cost of $2,267,261.

      (g)      On September 26, 2016, Su's Interactive Brokers account purchased 273,082 shares of Lattice stock at a weighted average price of $6.52 per share, for a total cost of $1,779,185.

(h)      On October 11, 2016, Su's Interactive Brokers account purchased 100,000 shares of Lattice stock at a weighted average price of $6.33 per share, for a total cost of $633.177.

(i)      On October 18, 2016, Su's Interactive Brokers account purchased 116,400 shares of Lattice stock at a weighted average price of $6.38 per share, for a total cost of $742,764.

(j)      On October 19, 2016, Su's Interactive Brokers account purchased 278,850 shares of Lattice stock at a weighted average price of $6.46 per share, for a total cost of $1,802,338.

(k)      On October 20, 2016, Su's Interactive Brokers account purchased 213,900 shares of Lattice stock at a weighted average price of $6.50 per share, for a total cost of $1,390,316.

(l)      On November 1, 2016, Su's Interactive Brokers account purchased 175,877 shares of Lattice stock at a weighted average price of $6.25 per share, for a total cost of $1,098,525.

(m)      On November 2, 2016, Su's Interactive Brokers account purchased 200,000 shares of Lattice stock at a weighted average price of $6.39 per share, for a total cost of $1,278,963.

213.    All of these purchases by Su's account of Lattice stock were made, in whole or in part, on margin.

214.    Upon information and belief, these were the first purchases that Su's account had made of Lattice stock.

### b.      Z. Yin's Interactive Brokers account

215.    Z. Yin's Interactive Brokers account purchased 2,739,621 shares of Lattice from July 5, 2016, through November 2, 2016, using margin to cover the cost of over $17 million. Specifically:

(a)      On July 5, 2016, Z. Yin's Interactive Brokers account purchased 248,268 shares of Lattice stock at a weighted average price, of $5.37 per share, for a total cost of $1,332,020.

(b)      On July 13, 2016, Z. Yin's Interactive Brokers account purchased 88,400

shares of Lattice stock at a weighted average price, of $5.91 per share, for a total cost of $522,752.

(c)     On July 15, 2016, Z. Yin's Interactive Brokers account purchased 60,900 shares of Lattice stock at a weighted average price of $5.93 per share, for a total cost of $361,009.

(d)     On July 19, 2016, Z. Yin's Interactive Brokers account purchased 37,764 shares of Lattice stock at a weighted average price of $5.87 per share, for a total cost of $221,668.

(e)     On July 21, 2016, Z. Yin's Interactive Brokers account purchased 67,419 shares of Lattice stock at a weighted average price of $6.18 per share, for a total cost of $416,854.

(f)     On July 22, 2016, Z. Yin's Interactive Brokers account purchased 25,800 shares of Lattice stock at a weighted average price of $6.07 per share, for a total cost of $156,643.

(g)     On July 29, 2016, Z. Yin's Interactive Brokers account purchased 50,000 shares of Lattice stock at a weighted average price of $6.09 per share, for a total cost of $304,486.

(h)     On August 1, 2016, Z. Yin's Interactive Brokers account purchased 100,000 shares of Lattice stock at a weighted average price of $6.11 per share, for a total cost of $610,706.

(i)     On August 10, 2016, Z. Yin's Interactive Brokers account purchased 120,000 shares of Lattice stock at a weighted average price of $5.88 per share, for a total cost of $705,883.

(j)     On August 17, 2016, Z. Yin's Interactive Brokers account purchased 35,800 shares of Lattice stock at a weighted average price of $5.93 per share, for a total cost of $212,227.

(k)     On September 9, 2016, Z. Yin's Interactive Brokers account purchased 44,554 shares of Lattice stock at a weighted average price of $6.01 per share, for a total cost of $267,835.

(l)     On September 22, 2016, Z. Yin's Interactive Brokers account purchased 168,350 shares of Lattice stock at a weighted average price of $6.46 per share, for a total cost of $1,087,137.

(m)     On September 26, 2016, Z. Yin's Interactive Brokers account purchased 199,046 shares of Lattice stock at a weighted average price of $6.54 per share, for a total cost of $1,301,846.

(n)     On October 3, 2016, Z. Yin's Interactive Brokers account purchased 200,000 shares of Lattice stock at a weighted average price of $6.39 per share, for a total cost of $1,277,531.

(o)     On October 11, 2016, Z. Yin's Interactive Brokers account purchased 50,000 shares of Lattice stock at a weighted average price of $6.40 per share, for a total cost of $320,115.

(p)     On October 18, 2016, Z. Yin's Interactive Brokers account purchased 139,781 shares of Lattice stock at a weighted average price of $6.38 per share, for a total cost of $891,213.

(q)     On October 19, 2016, Z. Yin's Interactive Brokers account purchased 361,567 shares of Lattice stock at a weighted average price of $6.47 per share, for a total cost of $2,337,729.

(r)     On October 20, 2016, Z. Yin's Interactive Brokers account purchased 112,300 shares of Lattice stock at a weighted average price of $6.50 per share, for a total cost of $729,523.

(s)     On October 21, 2016, Z. Yin's Interactive Brokers account purchased 50,000 shares of Lattice stock at a weighted average price of $6.40 per share, for a total cost of $320,000.

(t)     On October 24, 2016, Z. Yin's Interactive Brokers account purchased 201,100 shares of Lattice stock at a weighted average price of $6.56 per share, for a total cost of $1,319,749.

(u)     On November 1, 2016, Z. Yin's Interactive Brokers account purchased 202,072 shares of Lattice stock at a weighted average price of $6.28 per share, for a total cost of

$1,268,952.

(v)    On November 2, 2016, Z. Yin's Interactive Brokers account purchased 176,500 shares of Lattice stock at a weighted average price of $6.41 per share, for a total cost of $1,131,147.

216.    All of these purchases of Lattice stock by Z. Yin's account were made, in whole or in part, on margin.

c.    **Qin's Interactive Brokers account**

217.    Qin's account purchased more than 1.46 million shares of Lattice from September 13, 2016 to November 2, 2016, using margin to cover the cost of over $9.3 million.  Specifically:

(a)    On September 13, 2016, Qin's Interactive Brokers account purchased 47,200 shares of Lattice stock at a weighted average price of $5.96 per share, for a total cost of $281,447.

(b)    On September 14, 2016, Qin's Interactive Brokers account purchased 93,378 shares of Lattice stock at a weighted average price of $6.22 per share, for a total cost of $581,000.

(c)    On September 15, 2016, Qin's Interactive Brokers account purchased 200,000 shares of Lattice stock at a weighted average price of $6.51 per share, for a total cost of $1,302,865.

(d)    On September 16, 2016, Qin's Interactive Brokers account purchased 150,000 shares of Lattice stock at a weighted average price of $6.46 per share, for a total cost of $969,258.

(e)    On September 22, 2016, Qin's Interactive Brokers account purchased 84,890 shares of Lattice stock at a weighted average price of $6.48 per share, for a total cost of $550,351.

(f)    On September 23, 2016, Qin's Interactive Brokers account purchased 250,000 shares of Lattice stock at a weighted average price of $6.48 per share, for a total cost of $1,620,970.

(g)     On September 27, 2016, Qin's Interactive Brokers account purchased 33,200 shares of Lattice stock at a weighted average price of $6.47 per share, for a total cost of $214,943.

(h)     On September 28, 2016, Qin's Interactive Brokers account purchased 30,119 shares of Lattice stock at a weighted average price of $6.46 per share, for a total cost of $194,714.

(i)     On September 29, 2016, Qin's Interactive Brokers account purchased 81,291 shares of Lattice stock at a weighted average price of $6.49 per share, for a total cost of $527,441.

(j)     On October 3, 2016, Qin's Interactive Brokers account purchased 100,000 shares of Lattice stock at a weighted average price of $6.39 per share, for a total cost of $638,666.

(k)     On October 7, 2016, Qin's Interactive Brokers account purchased 4,800 shares of Lattice stock at a weighted average price of $6.45 per share, for a total cost of $30,952.

(l)     On October 11, 2016, Qin's Interactive Brokers account purchased 55,500 shares of Lattice stock at a weighted average price of $6.28 per share, for a total cost of $348,346.

(m)     On October 12, 2016, Qin's Interactive Brokers account purchased 7,707 shares of Lattice stock at a weighted average price of $6.20 per share, for a total cost of $47,783.

(n)     On October 17, 2016, Qin's Interactive Brokers account purchased 65,916 shares of Lattice stock at a weighted average price of $6.08 per share, for a total cost of $400,467.

(o)     On October 18, 2016, Qin's Interactive Brokers account purchased 111,288 shares of Lattice stock at a weighted average price of $6.37 per share, for a total cost of $708,424.

(p)     On November 1, 2016, Qin's Interactive Brokers account purchased 50,000 shares of Lattice stock at a weighted average price of $6.14 per share, for a total cost of $307,058.

(q)     On November 2, 2016, Qin's Interactive Brokers account purchased 100,000 shares of Lattice stock at a weighted average price of $6.41 per share, for a total cost of $640,783.

218.    All of the purchases of Lattice stock by Qin's account were made, in whole or in

part, on margin.

### d.  Zhou's Interactive Brokers account

219.   Between October 11 and October 21, 2016, Zhou's Interactive Brokers account purchased 210,000 shares of Lattice at a cost of more than $1.3 million.  Specifically:

(a)   On October 11, 2016, Zhou's Interactive Brokers account purchased 30,000 shares of Lattice stock at a weighted average price of $6.28 per share, for a total cost of $188,288.

(b)   On October 19, 2016, Zhou's Interactive Brokers account purchased 100,000 shares of Lattice stock at a weighted average price of $6.49 per share, for a total cost of $648,823.

(c)   On October 21, 2016, Zhou's Interactive Brokers account purchased 80,000 shares of Lattice stock at a weighted average price of $6.44 per share, for a total cost of $514,819.

220.   All of the purchases of Lattice stock by Zhou's account were made, in whole or in part, on margin.

221.   Upon information and belief, these purchases of Lattice stock were the first purchases of that company's stock by Zhou's account.

### e.  Xie's Interactive Brokers account

222.   Xie's account purchased 125,000 shares of Lattice in October 2016, using margin to cover the total cost of over $805,000.  Specifically:

(a)   On October 11, 2016, Xie's Interactive Brokers account purchased 25,000 shares of Lattice stock at a weighted average price of $6.28 per share, for a total cost of $156,876.

(b)   On October 19, 2016, Zhou's Interactive Brokers account purchased 100,000 shares of Lattice stock at a weighted average price of $6.48 per share, for a total cost of $648,414.

223.   All of the purchases of Lattice stock by Xie's account were made, in whole or in part, on margin.

224.   Upon information and belief, these purchases of Lattice stock were the first

purchases of that company's stock by Xie's account.

### 5.     M. Yin and the relief defendants' substantial profits from well-timed insider trading in Lattice

225.     By the close of trading on November 2, 2016, the five Interactive Broker accounts held over 7 million shares of Lattice stock, which they had started buying in July 2016 when M. Yin and Chow began discussing topics related to the deal.  In total, they had spent more than $44.69 million to purchase these shares at an average purchase price of $6.35 per share.

226.     After the news of the deal was announced on November 3, 2016, the defendants' accounts began to sell their large Lattice positions.  Some accounts retained a portion of the shares, which remain in the accounts to this day given the freeze.  Between the realized gains on the sold shares and the unrealized gains on the remaining shares, defendants' five accounts have a total profit of $7,107,426.

227.     On November 3, 2016, Su's account sold 1,462,104 Lattice shares, resulting in a gain of $1,749,334.  On February 6, 2017, after the FBI interview, her account sold 254,217 shares, resulting in a gain of $204,752.  On February 7, 2017, her account sold another 192,736 shares for a gain of $98,150.  On February 8, 2017, her account sold 267,909 shares for a gain of $126,873.  On February 9, 2017, her account sold 8,900 shares for a gain of $6,688.  Her account retains 316,938 of the shares, which have an unrealized gain as of May 26, 2017 of $204,355.  Her account's return on its Lattice trades was 14.9% of the notional amount invested.

228.     On November 3, 2016, Z. Yin's account sold 1,239,621 Lattice shares, resulting in a gain of $2,078,335.  On February 6, 2017, after the FBI interview, he began selling again, offloading 220,411 shares for a realized gain of $168,116.  On February 7, 2017, his account sold 223,974 shares for a gain of $137,600.  On February 8, 2017, his account sold 321,548 shares for a gain of $145,521.  On February 9, 2017, his account sold 8,100 shares for a gain of $3,197.  His

account retains 725,967 of the shares purchased after July 1, 2016, which have an unrealized gain as of May 26, 2017 of $416,784.  His account's return on its Lattice trades was 17.3% of the notional amount invested.

229.    On November 3, 2016, Qin's account sold 665,289 Lattice shares, resulting in a gain of $823,489.  On February 6, 2017, he sold 295,331 for a gain of $201,184.  On February 7, 2017, he sold 230,041 shares for a gain of $175,186.  And on February 8, 2017, he sold his last remaining Lattice shares, 274,628 of them, for a realized gain of $184,763.  Altogether, his account realized $1,384,622 from the Lattice trading, representing a 14.8% return of the notional amount invested.

230.    On November 3, 2016, Zhou's account sold 210,000 Lattice shares, resulting in a gain of $238,388.  This was the entire position.  Her account's return on its Lattice trades was 17.6% of the notional amount invested.

231.    On November 3, 2016, Xie's account sold 125,000 Lattice shares, resulting in a gain of $144,710.  This was the entire position.  Her account's return on its Lattice trades was 18.0% of the notional amount invested.

232.    The five Interactive Brokers accounts' net profits from the Lattice purchases were at least $7,107,426, including realized profits of $6,486,287, along with unrealized gains, as of May 26, 2017, of $621,139.  This total profit, and the profits for each account, are summarized in the following table:

| Relief Defendant | Net Realized and Unrealized Profits from Lattice Trading |
|---|---|
| Lizhao Su | $2,390,152 |
| Zhiqing Yin | $2,949,554 |
| Jun Qin | $1,384,622 |
| Yan Zhou | $238,388 |
| Bei Xie | $144,710 |
| TOTAL | $7,107,426 |

**6.    The Highly Suspicious Nature of the Lattice Trading**

233.   By November 2, 2016, the day before the announcement, the five accounts controlled by M. Yin had purchased a total of 7,042,714 shares of Lattice stock, representing 5.8% of the outstanding common stock of the company.

234.   This position was larger than the individual positions held by nearly all of the large institutional investors who had reported holding Lattice shares in filings with the SEC.  Specifically, of the 134 institutional investors with over $100 million in assets who reported owning LSCC as of September 30, 2016, only 4 reported ownership of a larger position in LSCC than the 7 million shares held by the Interactive Brokers Accounts as of November 2, 2016.

235.   During the period from July 5, 2016 to November 2, 2016, the five accounts' purchases accounted for 6.3% of the overall volume reported for Lattice common stock for that entire period.  If only the 33 days the accounts traded are considered, their purchases account for 13.6% of total volume.  On nine of those 33 trading days, the five accounts constituted more than 20% of Lattice common stock trading volume across the entire market.  On 24 of those 33 trading days, the five accounts constituted at least 5% of all market trading in Lattice common stock.

236.   The following table shows each day the relief defendants' five accounts purchased

Lattice shares between July 5, 2016 and November 2, 2016, the total amount purchased across the five accounts, the total volume of Lattice shares traded on that day, and the percentage of trading represented by just the five accounts.

| Date | Total Shares Purchased by the Five Accounts | Total Market Trading Volume | Percentage of Trading Volume |
|---|---|---|---|
| July 5, 2016 | 248,268 | 886,053 | 28.0% |
| July 13, 2016 | 88,400 | 734,079 | 12.0% |
| July 15, 2016 | 60,900 | 766,177 | 7.9% |
| July 19, 2016 | 37,764 | 733,618 | 5.1% |
| July 21, 2016 | 67,419 | 1,243,526 | 5.4% |
| July 22, 2016 | 25,800 | 748,034 | 3.4% |
| July 29, 2016 | 50,000 | 1,990,051 | 2.5% |
| August 1, 2016 | 100,000 | 1,302,167 | 7.7% |
| August 10, 2016 | 120,000 | 3,876,589 | 3.1% |
| August 17, 2016 | 35,800 | 988,179 | 3.6% |
| September 9, 2016 | 44,554 | 2,048,844 | 2.2% |
| September 13, 2016 | 116,387 | 1,140,724 | 10.2% |
| September 14, 2016 | 260,501 | 1,191,269 | 21.9% |
| September 15, 2016 | 536,310 | 4,074,975 | 13.2% |
| September 16, 2016 | 208,300 | 2,260,398 | 9.2% |
| September 22, 2016 | 417,015 | 1,501,346 | 27.8% |
| September 23, 2016 | 600,000 | 2,733,762 | 21.9% |
| September 26, 2016 | 472,128 | 2,407,476 | 19.6% |

| Date | Total Shares Purchased by the Five Accounts | Total Market Trading Volume | Percentage of Trading Volume |
|------|------|------|------|
| September 27, 2016 | 33,200 | 2,426,392 | 1.4% |
| September 28, 2016 | 30,119 | 1,314,158 | 2.3% |
| September 29, 2016 | 81,291 | 1,117,637 | 7.3% |
| October 3, 2016 | 300,000 | 1,626,228 | 18.4% |
| October 7, 2016 | 4,800 | 1,238,766 | 0.4% |
| October 11, 2016 | 260,500 | 1,315,401 | 19.8% |
| October 12, 2016 | 7,707 | 955,652 | 0.8% |
| October 17, 2016 | 65,916 | 629,873 | 10.5% |
| October 18, 2016 | 367,469 | 1,437,025 | 25.6% |
| October 19, 2016 | 840,417 | 2,565,720 | 32.8% |
| October 20, 2016 | 326,200 | 1,015,012 | 32.1% |
| October 21, 2016 | 130,000 | 950,701 | 13.7% |
| October 24, 2016 | 201,100 | 1,166,275 | 17.2% |
| November 1, 2016 | 427,949 | 1,647,873 | 26.0% |
| November 2, 2016 | 476,500 | 1,820,778 | 26.2% |
| **TOTAL** | **7,042,714** | **51,854,758** | **13.6%** |

**C.   M. Yin's Control Over All of the DreamWorks and Lattice Trading**

237.   M. Yin had access to and controlled all of the trading in DreamWorks stock from April 4 to April 25, 2016, and all of the trading in Lattice stock from July 5 to November 3, 2016, by Su, Z. Yin, Qin, Zhou, and Xie in their five Interactive Broker accounts.

238.    When shown a list of the accounts and trading at issue in this case by the FBI, M. Yin admitted that he "accessed all these accounts and made the trades."

239.    M. Yin was not registered with Interactive Brokers as an authorized user, financial advisor, or other person with authorized access to the five Interactive Brokers accounts.  Yet, M. Yin did leave an electronic footprint in each account, which also shows that it was M. Yin who accessed each account and placed the trades at issue.

240.    Each of the trades by the relief defendants' Interactive Brokers accounts was placed through Interactive Brokers' electronic trading system.  To place a trade through this system, a trader must first log into the system using a unique login name and password associated with the account in which the trade will be placed.  The five accounts each had a separate login name for accessing the trading system.

241.    When a trader logs into an account through Interactive Brokers' electronic trading system, Interactive Broker's computer server records the "internet protocol address" ("IP address") used by the trader.  An IP address is a unique number required for online activity conducted by a computer, phone, or other device connected to the internet.  With just an IP address, it is possible to identify both what internet service provider is in charge of that address and the approximate location of the subscriber to whom it is assigned.

242.    In addition, when a trader logs into an account through Interactive Brokers' electronic system, Interactive Brokers' computer server records the Media Access Control ("MAC") address used by the trader.  A MAC address is a unique value associated with the computer, smartphone, or other hardware device used by the trader to access Interactive Broker's trading system.

243.    When the same IP address and/or MAC address registers on a system like Interactive

Broker's trading system multiple times on the same day, it is likely that each login from that IP or MAC address is coming from the same computer or device.

244.   This is precisely what occurred when the DreamWorks and Lattice trades were placed in the defendants' five Interactive Brokers accounts:

(a)   When trading in DreamWorks and Lattice, the five Interactive Brokers accounts were accessed using many of the same IP addresses.

(b)   When trading in DreamWorks and Lattice, the five Interactive Brokers accounts were accessed using the same set of four MAC addresses.

245.   Interactive Brokers' log-in data for relief defendants' five Interactive Brokers accounts also connects their trading to defendant M. Yin:

(a)   From January to April 2016, the majority of logins to the five Interactive Brokers accounts were made from IP addresses located in Beijing, China, but with one important exception.

(b)   During a two-week time period – specifically, January 28 to February 12, 2016 – most of the log-ins to the five Interactive Brokers accounts were from an IP address corresponding to an AT&T customer, Shuhuan Wang, located at 663 Georgia Avenue, Palo Alto, California (the "Palo Alto IP address").

(c)   M. Yin's accounts at Fidelity list his address as 663 Georgia Ave., Palo Alto, California.

(d)   On information and belief, Shuhuan Wang is the parent of Jing Wang, who is M. Yin's wife.

(e)   On information and belief, M. Yin traveled to Palo Alto on January 28, 2016, and only returned to Beijing, China, on or about February 12, 2016.

(f)      Between January 29 and February 12, 2016, the Palo Alto IP address was used to repeatedly login to the Interactive Brokers accounts held by Su, Z. Yin, Qin, and Zhou. Moreover, the MAC addresses for these log-ins corresponded to three of the four hardware devices later used to place DreamWorks and Lattice trades in the five Interactive Brokers accounts.

(g)      In addition, the Fidelity accounts held by M. Yin and his wife, Jing Wang, were accessed, on several occasions, using the same IP addresses used to log-in to the five Interactive Brokers accounts held by Su, Z. Yin, Qin, Zhou, and Xie.

(h)      And finally, seventeen of the IP addresses – including the Palo Alto IP address – used to log-in to the Su, Z. Yin, Qin, Zhou, and Xie Interactive Brokers accounts, were also used to access M. Yin's e-mail accounts at XXXXXX@gmail.com and XXXXXX@gmail.com.  These same IP addresses were used to access Su's email account at XXXXXX@gmail.com during the same time period.

(i)      More recently, from January 21 to 29, 2017, the five Interactive Brokers accounts were accessed 99 times using the Palo Alto IP address.  On information and belief, M. Yin had traveled to Palo Alto during that timeframe, and returned to Beijing, China, on February 3, 2017.

**D.      M. Yin and the Interactive Brokers Accounts Engaged in Other Profitable, Well-Timed Trading Prior to Merger and Acquisition News**

246.    The Interactive Brokers accounts' large purchases of DreamWorks and Lattice stock right before their acquisitions were announced was not the only time their accounts engaged in profitable, well-timed trading before news of a merger or an acquisition involving a public company.  These accounts have engaged in similar patterns of suspicious trading in other companies' stock.

247.    In fact, while the defendants' Interactive Brokers accounts have bought and sold

large amounts of stock in certain companies over the past couple of years, only a handful of purchases, including their DreamWorks and Lattice trading, stand out as the most profitable. Before insider trading in DreamWorks, the relief defendants' Interactive Brokers accounts made suspiciously well-timed and profitable trades in profits three China-based companies – Giant Interactive (in November 2013), 58.com (in April 2015), and CTrip (in May and October 2015). As alleged below, all of these trades preceded announcements that had a material impact on the price of the stock of these companies.

248.    During the period between October 2013 (when Su first opened her account) and the present, all five of the defendants' Interactive Brokers accounts made a total net profit of $49.19 million on their well-timed trades in DreamWorks, Giant Interactive, 58.com, CTrip, and Lattice Semiconductors.  Despite being active traders in more than 200 other issuers, these accounts performed markedly worse in all of their other trading during this period, making only $1.08 million.  In short, just 3.2% of the Interactive Brokers accounts' trading (in DreamWorks, Giant Interactive, 58.com, CTrip, Jinpan, and Lattice Semiconductors) resulted in more than 97% of all trading profits.

249.    In addition, M. Yin, through one of his Fidelity accounts, has repeatedly traded similarly to one or more of the five Interactive Brokers accounts.  Specifically, he also made well-timed, profitable trades in Giant Interactive and another China-based company, Jinpan, at the same time as the Interactive Brokers accounts.

1.    **Giant Interactive**

250.    On November 21 and 22, 2013, the Su Interactive Brokers account bought a total of 758,751 shares of Giant Interactive stock at a cost of $7,318,438.

251.    Just days later, on November 24, 2013, Giant Interactive announced that it had received a non-binding proposal from a consortium of private equity investors to take the company

private at a price of $11.75 per share.  Giant Interactive stock closed at $11.41 on November 25, 2013, up 1.28 or 12.64% from its prior close of $10.13.

252.    Beginning on November 25, 2013, the Su Interactive Brokers account sold all of its Giant shares, resulting in a gain of $1,275,857.

**2.    58.com**

253.    On April 14, 2015, the *Financial Times* reported that 58.com and Falcon View Technology Limited, a China-based company that operates the website Ganji.com ("Ganji"), had signed a memorandum of understanding on March 14, 2015.

254.    On April 17, the news of the deal was officially and publicly confirmed by both companies.  In a joint press release, 58.com and Ganji announced that they had signed a definitive agreement, that 58.com had acquired a strategic stake in Ganji and that Tencent.com, one of 58.com's largest shareholders had also invested in Ganji.  58.com's share price increased 38.7% from the close on April 13, 2015 (before the Financial Times report), closing at $70.50 per share on April 17th.

255.    On April 14, the Su Interactive Brokers account purchased 350,000 shares of 58.com stock, at a cost of $20,541,435, and 600 option contracts in 58.com, at a cost of $245,000.  On April 14 and 17, the Su Interactive Brokers account sold all of its 58.com shares and options, resulting in a gain of $3,882,095.

256.    On April 14, prior to the release of the *Financial Times* report, the Zhou Interactive Brokers account purchased 50 option contracts in 58.com stock, at a cost of $25,200.  After publication of the *Financial Times* report that day, the Zhou Interactive Brokers account began to sell its options, resulting in a gain of $44,800.

**3.    CTrip**

257.    From April 24, 2015, the Su Interactive Brokers account purchased 168,098 shares

of CTrip, a China-based international travel company, at a cost of $10,926,897.

258.     On May 22, 2015, CTrip announced that it had acquired a stake in eLong, Inc., an online travel site (NASDAQ: LONG) by acquiring those shares from Expedia, Inc. and other companies.  It also announced a cooperation agreement with Expedia, Inc.  CTrip's stock closed at a price of $84.63 per share, increasing 17.6% from its prior close of $71.99.

259.     Beginning on May 22, 2015, the Su Interactive Brokers account sold all 158,098 of its shares, resulting in a gain of $2,409.822.

260.     Later, between October 20 and 23, 2015, Su's Interactive Brokers account, along with the accounts of Z. Yin, Qin and Zhou, collectively purchased 411,511 shares of CTrip, at a cost of $30,699,813.

261.     On October 26, 2015, there was an announcement by CTrip, Qunar Cayman Islands Limited (NASDAQ: QUNR), a China-based online travel commerce platform company, and Baidu, Inc., a Chinese language Internet search provider (NASDAQ: BIDU), reporting that Baidu, in a three-way agreement, sold its stake in Qunar to CTrip.  In return, Baidu received shares of CTrip. On the day of the announcement, CTrip's stock price increased about 22.1%, from $74.34 to $90.78.

262.     Beginning on October 26, 2015, the accounts of Z. Yin, Su, Qin, and Zhou sold their CTrip positions, realizing combined profits of $6,453,344.

### 4.     Jinpan

263.     In a press release issued by Jinpan on January 25, 2016, the company announced that it had entered into a definitive Agreement and Plan of Merger with FNOF E&M Investment Limited and Silkwings Limited, pursuant to which FNOF E&M Investment Limited would acquire Jinpan for $6.00 per share.  On January 25, 2016, Jinpan's stock price closed at $5.24, up $1.02 or 24.2% from its prior close of $4.22.

264.    M. Yin's Fidelity trading account purchased 120,000 shares of Jinpan in advance of the January 25, 2016 press release at a cost of $478,547. Following the announcement, all the shares were sold out of the accounts, resulting in a gain of $147,261.  Similarly, the Interactive Brokers account of M. Yin's father, Z. Yin, purchased 30,255 shares of Jinpan in advance of the January 25, 2016 press release at a cost of $114,322.  Following the announcement, all the shares were sold out of the Z. Yin Interactive Brokers account, resulting in a gain of $54,259.

**E.      Yin's FBI Interview**

265.    On Friday, February 3, 2017, the FBI executed a search warrant upon M. Yin at the San Jose International Airport, titled *In the Matter of the Search of IN RE FEDERAL CRIMINAL INVESTIGATION*, Case. No. 17 70135 NC (N.D. Cal.).  M. Yin was traveling to Beijing, China.

266.    The warrant authorized a search of M. Yin's mobile phone for evidence of insider trading.

267.    The FBI interviewed M. Yin, who admitted that he controls the trading in the five nominee accounts.  He also indicated that at least part of the money in the accounts nominally held by Z. Yin (his father), Su (his mother), and Qin (his cousin) belongs to him.  He explained that he traded through his relative's accounts rather than his own so that he would not have to report the trades to his company's compliance department.

268.    M. Yin further admitted that HSBC had become so suspicious of the large money transfers between Su's HSBC bank account and her Interactive Brokers trading account that HSBC closed Su's bank account.  M. Yin then opened a bank account for his father at HSBC and a new one for his mother at Standard Chartered so that he could continue to fund and withdraw money from their Interactive Brokers accounts.

269.    M. Yin also admitted to the FBI that the Xie account was actually a "family account," belonging at least in part to his friend and former colleague, Ji.  The Zhou account M. Yin

claimed belonged to his children's piano teacher and her husband, whom he did not name.

270.    Before boarding his flight, M. Yin asked an FBI agent whether his accounts would be frozen.

271.    Within days of the FBI interview, M. Yin resigned from Summitview Capital.

**F.    Attempted Withdrawals of Over $35 million From the Interactive Brokers Accounts**

272.    Within 48 hours of the FBI's execution of the search warrant upon M. Yin, all of the Interactive Brokers accounts reflected active efforts to withdraw monies and sell holdings totaling over $35 million, as well as calls made on behalf of those accounts into the brokerage firm's customer service line.

**1.    Attempted withdrawals from Su's account**

273.    On Sunday, February 5, 2017, Interactive Brokers received a request to withdraw approximately $3.2 million from Su's account.  That same day, Interactive Brokers customer service received a telephone inquiry on behalf of the account inquiring about the status of the withdrawal request.

274.    On Tuesday, February 7, 2017, Interactive Brokers received another request, this one to withdraw approximately $3.86 million from Su's account.

275.    On Wednesday, February 8, 2017, Interactive Brokers received another request, this one to withdraw approximately $6.4 million from Su's account.

276.    The combined withdrawal requests from the Su account in the week following the FBI's execution of the search warrant on M. Yin total $13.46 million.

**2.    Attempted withdrawals from Z. Yin's account**

277.    On Sunday, February 5, 2017, Interactive Brokers received a request to withdraw approximately $4.6 million from Z. Yin's account.  That same day, Interactive Brokers customer service received two telephone inquiries on behalf of the account, concerning both the status of the

cash withdrawal, and how to request an "exceptional withdrawal."

278.    On Tuesday, February 7, 2017, Interactive Brokers received another request, this one to withdraw $5 million from Z. Yin's account.  That same day, Interactive Brokers customer service received yet another telephone inquiry on behalf of the account.

279.    On Thursday, February 9, 2017, Interactive Brokers received a request to withdraw $3 million from Z. Yin's account.  The same day, customer service received a telephone inquiry regarding withdrawing assets.

280.    The combined withdrawal requests from the Z. Yin account in the week following the FBI's execution of the search warrant on M. Yin total $12.6 million.

**3.    Attempted withdrawals from Qin's account**

281.    On Monday, February 6, 2017, Interactive Brokers received requests to withdraw $900,000 and $800,000 from Qin's account.  The request to withdraw $900,000 was later cancelled. That same day, customer service received four telephone inquiries on behalf of the account, concerning the status of the withdrawal request and how to request an "exceptional withdrawal."

282.    On Tuesday, February 7, 2017, Interactive Brokers received another request, this one to withdraw $1.6 million from Qin's account.  That same day, customer service received yet another telephone inquiry on behalf of the account.

283.    On Wednesday, February 8, 2017, Interactive Brokers received a request to withdraw $800,000 from Qin's account. The same day, customer service received a telephone inquiry regarding withdrawing assets.

284.    On Thursday, February 9, 2017, Interactive Brokers received an additional withdrawal request for $3.1 million, from Qin's account.  The same day, customer service received a telephone inquiry regarding the status of the withdrawal request.

285.    The combined withdrawal requests from the Qin account in the week following the

FBI's execution of the search warrant on M. Yin total $6.4 million.

### 4.    Attempted withdrawals from Zhou's account

286.    Between February 5-7, 2017, Interactive Brokers customer service received four telephone inquiries concerning how to make an exceptional withdrawal requests from Zhou's account.

287.    On Monday, February 6, 2017, Interactive Brokers received a request to withdraw $1.7 million from Zhou's account.

288.    On Thursday, February 9, 2017, Interactive Brokers received a request to withdraw $200,000 from Zhou's account.

289.    The combined withdrawal requests from the Zhou account in the week following the FBI's execution of the search warrant on M. Yin total $1.9 million USD.

### 5.    Attempted withdrawals from Xie's account

290.    On Monday February 6, 2017, Interactive Brokers received a request to withdraw approximately $1.2 million from Xie's account, which was the total withdrawal request from the Xie account in the week following the FBI's execution of the search warrant on M. Yin.

291.    From February 5 to February 9, 2017, Interactive Brokers received withdrawal requests exceeding a combined $35.56 million for the five Interactive Brokers accounts.

### G.    Chow's Lies to the Financial Industry Regulatory Authority

292.    In March 2017, the Financial Industry Regulatory Authority ("FINRA") was reviewing the trading activity in Lattice surrounding the November 3, 2016 announcement of its acquisition by Canyon Bridge.  As part of that review, FINRA sent a request to counsel for Canyon Bridge asking Canyon Bridge to circulate a list of suspicious traders, including M. Yin, to all officers at Canyon Bridge, asking them to identify anyone on that list that they know.  For any traders that were identified as being known by someone at Canyon Bridge, FINRA requested a

detailed description of any past or present relationship between the Canyon Bridge employee and the trader, including a synopsis of any contact from September 9, 2016 through November 2, 2016, and a statement as to any circumstances under which any information about the potential transaction may have been given to the trader.

293.     In April 2017, Chow, through counsel for Canyon Bridge, identified M. Yin as a "former colleague at Warburg Pincus Asia and as a social acquaintance."  Despite the repeated texts, phone calls, and in-person meetings between M. Yin and Chow throughout the months leading up to the Lattice announcement, Chow only disclosed two conversations with M. Yin to FINRA, one in July and one in August, as well as possible "social WeChat messages."  Chow falsely stated that he did not recall discussing Lattice with M. Yin and was not aware of any circumstance by which M. Yin may have gained knowledge of Canyon Bridge's business activities relating to the acquisition of Lattice.

**H.     Chow's Arrest and Conviction**

294.     On October 30, 2017, the U.S. Attorney's Office for the Southern District of New York announced the indictment of Chow for 13 counts of securities fraud and one count of conspiring to commit securities fraud arising from his alleged tipping of material nonpublic information relating to the Lattice transaction.

295.     On April 24, 2018, Chow was found guilty of one count of conspiracy to commit securities fraud and seven counts of securities fraud.

**I.     M. Yin's Possession of, and Trading on, Material Nonpublic Information Provided to Him by Ji and Chow**

296.     M. Yin has worked in the financial industry for over 10 years.  For at least the past five years, he had worked for an investment firm based in Hong Kong and Beijing.  He has numerous contacts in the business world through his employment and education at Wharton School

of Business and his prior work at UBS and Warburg Pincus.

297.    M. Yin admitted in his FBI interview that one of his friends and former colleagues is Ji.  He also admitted that Ji is a relative of Xie and that the Interactive Brokers account in Xie's name is really Ji's "family account."  Crucially, at the same time that PAG was attempting to acquire DreamWorks in April 2016, it was also engaged in an effort to buy Lexmark.  PAG's buyer's consortium for the Lexmark deal included Legend Capital, an affiliate of Legend.  Ji is a managing director at Legend, a fact that M. Yin withheld from the FBI during his February 3 interview.  Last, M. Yin had earlier agreed to manage Ji's family account – specifically, the Xie Interactive Brokers account.  That account was first opened in February 2016.  It did not begin trading until April 2016, just as PAG was pursuing the DreamWorks acquisition, and when it commenced trading, it almost immediately began acquiring a soon to be profitable stake in DreamWorks securities.  Ji and M. Yin were also engaged in frequent phone and email contact.  M. Yin's trading in DreamWorks came on the heels of the DreamWorks board's decision on April 4, 2016 to authorize continued discussions with PAG pursuant to its confidential term sheet and begin drafting a merger agreement.  Accordingly, M. Yin and Ji had both a preexisting relationship and history of communications with one another, M. Yin's trading pattern suggests he had knowledge of specific steps in the DreamWorks' deal chronology, and on information and belief, Ji is one potential source of the material nonpublic information about the DreamWorks acquisition that M. Yin possessed when he executed the trades described above.

298.    When each of the relief defendants' Interactive Brokers accounts purchased shares of DreamWorks stock from April 4 to April 25, 2016, as alleged above, M. Yin directed those trades and was in possession of material, nonpublic information about the DreamWorks acquisition.

299.    At the time he traded in the securities of DreamWorks, M. Yin knew, or was reckless

in not knowing, that the information he possessed concerning the potential acquisition of DreamWorks was material nonpublic information.

300.    M. Yin also knew, or was reckless in not knowing, that he owed his source of that material nonpublic information a duty of trust or confidence to keep the material, nonpublic information he possessed concerning the potential acquisition confidential, and to not trade on it.

301.    By trading on material nonpublic information about DreamWorks' potential acquisition, M. Yin misappropriated confidential information belonging to his source for securities trading purposes, in breach of a duty of trust or confidence that he owed to his source.

302.    Alternatively, the source of M. Yin's material nonpublic information about DreamWorks' potential acquisition tipped M. Yin that information, and in doing so, personally benefited from that disclosure of material nonpublic information.

303.    By tipping M. Yin, M. Yin's source of material non-public information about DreamWorks' potential acquisition breached a fiduciary duty or similar relationship of trust and confidence owed to the source of that information.

304.    At the time he traded in the securities of DreamWorks, M. Yin knew or should have known that the material nonpublic information about DreamWorks' potential acquisition that M. Yin's tipper had disclosed to him was either disclosed or misappropriated by M. Yin's tipper in breach of a fiduciary duty, or similar relationship of trust and confidence.

305.    At the time he traded in the securities of DreamWorks, M. Yin knew or should have known that M. Yin's tipper had disclosed that material nonpublic information to M. Yin for a personal benefit.

306.    Another friend and former colleague of M. Yin is Chow.  Chow described M. Yin as a social acquaintance and former colleague from Warburg Pincus.  Chow had material, nonpublic

information about the Lattice deal starting in April 2016.  From July-November 2016, while M. Yin

was amassing a huge position in Lattice shares, Chow communicated with M. Yin on multiple

occasions in person, by phone, and through WeChat.  The timing of many of these conversations

coincided with both key developments in the negotiations and large purchases by the accounts

controlled by M. Yin.  Several of these communications concerned details relating to the Lattice

transaction, including the specific type of semiconductor technology Lattice produces, the law firm

that represented Canyon Bridge in the Lattice transaction, the U.S. regulator responsible for

reviewing a potential acquisition of Lattice (CFIUS), Chow's travel to the U.S. for due diligence on

a U.S.-based deal, and the progress of the deal.  At least one other communication concerned

Chow's attempt to find investors to be limited partners in Canyon Bridge, which was formed for the

sole purpose of acquiring Lattice.

307.    Chow had a duty to keep material nonpublic information regarding the Lattice

acquisition confidential.  He learned the information about the potential Lattice acquisition as a

result of his employment first at China Reform Fund and then at Canyon Bridge, and he knew or

recklessly disregarded that he owed a fiduciary or similar duty of trust and confidence to China

Reform Fund and Canyon Bridge to keep the information confidential and refrain from tipping the

information to others.  Chow also knew or recklessly disregarded that he owed a fiduciary or similar

duty of trust and confidence to Lattice to keep information about a potential acquisition of Lattice

confidential and refrain from tipping others.  He was only given access to information about Lattice

and the potential acquisition after signing a non-disclosure agreements twice, once while with China

Reform Fund and once after establishing Canyon Bridge.

308.    In breach of those duties, Chow knowingly or recklessly communicated material

nonpublic information to M. Yin so that M. Yin could use the information in connection with

securities trading.  Chow communicated material nonpublic information to M. Yin in exchange for a personal benefit or with the expectation of receiving a benefit.

309.    Chow personally benefitted because:  (i) he tipped M. Yin without a corporate purpose and with the expectation that Yin would trade; (ii) he tipped M. Yin, on information and belief, a close friend of Chow's given the frequency of their communications and in-person contact and shared professional history, for the purpose of gifting M. Yin valuable information; and/or (iii) he tipped M. Yin as part of a quid *pro quo* exchange of information from Yin, a useful networking contact who was in a position to enhance Chow's reputation in their financial circles.

310.    At the time he traded in the securities of Lattice, M. Yin knew, or was reckless in not knowing, that the information he possessed concerning the potential acquisition of Lattice was material nonpublic information.

311.     At the time he traded in the securities of Lattice, M. Yin knew or should have known that the material nonpublic information about Lattice's potential acquisition that Chow had disclosed to him was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

312.    At the time he traded in the securities of Lattice, M. Yin knew or should have known that Chow had disclosed that material nonpublic information to M. Yin for a personal benefit.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c)**

**(against Defendants M. Yin and Chow)**

313.    The SEC realleges and incorporates by reference paragraphs 1 through 312 above.

314.    By engaging in the conduct described above, defendants M. Yin and Chow, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

exchange:  (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in acts,

practices, or courses of business which operated or would operate as a fraud or deceit upon other

persons.

315.    Upon information and belief, M. Yin and Chow knew, or were reckless in not

knowing, that they employed devices, schemes and artifices to defraud; and/or engaged in acts,

practices or courses of conduct that operated as a fraud on the investing public by the conduct

described in detail above.

316.    By engaging in the conduct described above, defendants M. Yin and Chow, directly

or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of

the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§

240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment

### (against Relief Defendants Su, Z. Yin, Qin, Zhou, Xie and Ji)

317.    The SEC realleges and incorporates by reference paragraphs 1 through 312 above.

318.    By engaging in the conduct described above, relief defendants Su, Z. Yin, Qin, Zhou,

Xie and Ji, and each of them, received ill-gotten gains from trades based on material nonpublic

information, over which he or she has no legitimate claim.

319.    Relief defendants Su, Z. Yin, Qin, Zhou, Xie and Ji each obtained the ill-gotten gains

described above as part of the securities law violations alleged above, under circumstances in which

it is not just, equitable, or conscionable for them to retain the funds.  Relief defendants Su, Z. Yin,

Qin, Zhou, Xie and  Ji each do not have a legitimate claim to these gains.

320.    By engaging in the foregoing conduct, relief defendants Su, Z. Yin, Qin, Zhou, Xie

and Ji have been unjustly enriched and must disgorge their ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that each of defendants M. Yin and Chow committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining and restraining defendants M. Yin and Chow, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Order defendant M. Yin to disgorge all trading profits and other ill-gotten gains from his illegal conduct, together with prejudgment interest thereon.

### IV.

Order relief defendants Su, Z. Yin, Qin, Zhou, Xie and Ji to disgorge all trading profits and other ill-gotten gains to which they do not have a legitimate claim, which they received as a result of the conduct alleged in this Complaint, together with prejudgment interest thereon.

### V.

Order defendants M. Yin and Chow to pay civil penalties under Section 21(d)(3) and Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(2) and 78u-1.]

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal

Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

may be entered, or to entertain any suitable application or motion for additional relief within the

jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated:  September 17, 2018

*/s/ Gary Y. Leung*
Gary Y. Leung

David Stoelting
Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
Tel: (212) 336-0174
stoeltingd@sec.gov

Gary Y. Leung
leungg@sec.gov
Amy J. Longo
longoa@sec.gov
Jasmine M. Starr
starrja@sec.gov
Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street
Los Angeles, CA 90071
Tel: (323) 965-3835

*Counsel for Plaintiff Securities and Exchange*
*    Commission*

<u>**CERTIFICATE OF SERVICE**</u>

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On September 17, 2018, I caused to be served the document entitled **SECOND AMENDED COMPLAINT** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  September 17, 2018                    _/s/ Sarah Mitchell_____
                                          SARAH MITCHELL

**SEC v. SHAOHUA (MICHAEL) YIN, et al.**
**United States District Court—Southern District of New York**
**Case No. 1:17-cv-00972-JPO**

**SERVICE LIST**

Michael Sommer (via ECF)
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Phone: (212) 497-7728
Email: msommer@wsgr.com
*Counsel for Defendant Shaohua (Michael) Yin and Relief Defendants Jun Qin,*
*Lizhao Su, Bei Xie, Zhiqing Yin, and Yan Zhou*

73