UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

SECURITIES AND EXCHANGE
COMMISSION,
                             Plaintiff,                17-CV-972 (JPO)

                     -v-                   OPINION AND ORDER

SHAOHUA MICHAEL YIN,
                             Defendant.

─────────────────────────────────────────

J. PAUL OETKEN, District Judge:

      Before the Court are several motions in this insider trading case. Certain Relief Defendants, who are alleged to possess assets potentially subject to any judgment in the matter, move to modify the Court's previously imposed asset freeze. (*See* Dkt. No. 149.) The SEC, for its part, moves for various discovery sanctions against Defendant Shaohua Yin and Relief Defendants. (*See* Dkt. Nos. 156, 159.) Most significantly, the SEC asks that the Court enter a default judgment against Yin for disobeying the Court's prior order to appear for a deposition in Taiwan. (*See* Dkt. No. 156.) For the reasons that follow, default judgment is granted against Yin, the remaining motions for sanctions are granted in part and denied in part, and the motion to modify the asset freeze is denied.

**I.    Background**

      The Court recounts only those facts necessary to the disposition of the pending motions. Additional details are described in this Court's prior orders. (Dkt. Nos. 48, 53.)

Defendant Shaohua Yin,[1] a hedge fund manager, is alleged to have traded securities in DreamWorks Animation SKG, Inc. and Lattice Semiconductor Corporation on the basis of insider information. (*See* Dkt. No. 68 ("SAC").) In order to facilitate the scheme and avoid detection, the SEC alleges, Yin partially made the trades using five brokerage accounts (the "Interactive Broker" or "IB" accounts) nominally held by the Relief Defendants, most of whom are related to or friends with Yin.[2] (SAC 68 ¶ 1.) The Relief Defendants are not alleged to have engaged in any wrongdoing.

Upon filing this suit in early 2017, the SEC moved to freeze the assets contained in the IB accounts. (*See* Dkt. No. 3.) The parties eventually stipulated to a freeze, though the Relief Defendants reserved the right to later move to modify the freeze. (*See* Dkt. No. 26.) Approximately $81 million remains frozen in the accounts, pursuant to that stipulation. (*See* Dkt. No. 213 ("3/10/20 Hearing Tr.") at 9:2.)

On June 28, 2017, Defendants moved to dismiss the operative complaint for failure to state a claim. (*See* Dkt. No. 37.) On March 27, 2018, the Court denied the motion to dismiss, and on May 14, 2018, it rejected the Relief Defendants' motion for reconsideration, permitting the case to proceed to discovery. (*See* Dkt. No. 53.) Since then, discovery has proceeded haltingly and acrimoniously, to the extent it has proceeded at all. The parties' various disputes are detailed in the discussion that follows.

---

[1] There are two defendants with the surname Yin. As used in this opinion, "Yin" refers to Shaohua Yin, the main defendant, and "Z. Yin" refers to Relief Defendant Zhiqing Yin.

[2] Lizhao Su (Yin's mother), Zhiqing Yin (Yin's father), Jun Qin (Yin's cousin), Yan Zhou (Yin's children's piano teacher), Chaofeng Ji (Yin's friend), and Bei Xie (Ji's cousin) are each named as Relief Defendants in the matter. (*See* Dkt. No. 68 at 7–12).

Before the Court now are (1) a motion by certain Relief Defendants to modify the asset freeze (*see* Dkt. No. 149) and (2) motions by the SEC for various discovery sanctions against both Yin and the Relief Defendants, including a motion for a default judgment against Yin (*see* Dkt. Nos. 156, 159).  The Court held a hearing on the various motions on March 10, 2020.  (*See* 03/10/20 Hearing Tr.)

## II.     Discussion

The Court first addresses the SEC's motion for sanctions against Yin before addressing the motion to modify the asset freeze and the motion for sanctions against the Relief Defendants.

### A.     Sanctions Against Yin

#### 1.     Yin's Failure to Appear at his Deposition in Taiwan

The SEC moves for a default judgment against Yin in light of his failure to abide this Court's order to appear for his deposition in Taiwan.  Under Federal Rule of Civil Procedure 37(b)(2)(A), a court may sanction a party who disobeys a discovery order, including, in an appropriate case, "rendering a default judgment against the disobedient party[.]"  Fed. R. Civ. P. 37(b)(2)(A)(vi).  Factors that bear on a district court's exercise of discretion in imposing and selecting a sanction under Rule 37 include "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302–03 (2d Cir. 2009) (internal quotation marks, alteration, and citation omitted).  "These factors are not exclusive and none is dispositive," however, "[b]ecause the text of the rule requires only that the district court's orders be 'just,'" and a court's discretion thereunder is "wide."  *Coach Inc. v. O'Brien*, No. 10 Civ. 6071, 2011 WL 6122265, at *9 (S.D.N.Y. Nov. 28, 2011) (quoting *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 149 (2d Cir. 2010)).

3

These factors support the grant of a severe sanction against Yin. The SEC initially noticed Yin's deposition in New York (*see* Dkt. No. 96), but Yin resisted appearing in the United States (*see* Dkt. No. 99). On June 20, 2019, over the SEC's vigorous objections, and based on defense counsel's representation that Yin would appear in Taiwan but not New York, this Court ordered Yin to appear in Taiwan for his deposition. (Dkt. No. 124 ("06/20/19 Tr.") at 10:6–10, 11:25–13:9.) When issuing that order from the bench, however, the Court cautioned that Yin risked a default judgment if he failed to comply. (06/20/19 Tr. at 13:8–9.) Notwithstanding the Court's warning, Yin willfully failed to appear at his deposition in Taiwan on October 16, 2019.

Yin protests that a default judgment — undoubtedly a severe punishment — is "not a reasonable sanction for a defendant's non-appearance at a single deposition." (Dkt. No. 190 at 5.) But this argument downplays the severity of Yin's misconduct. Yin did not merely fail to appear for a deposition; rather, he willfully disobeyed the Court's extensively litigated order for him to appear and its concomitant warning that a default judgment would follow noncompliance. Nor does Yin's excuse for his nonappearance warrant lenity. According to Yin's counsel, appearance in Taiwan would have risked Yin's arrest or detention, because the SEC had alerted the U.S. Department of Justice ("DOJ") of Yin's travel plans and DOJ declined to grant Yin safe passage. (*See* Dkt. No. 190 at 5–6.) But Yin's fear of arrest on any pending criminal charges against him does not give him carte blanche to disobey this Court's unambiguous order. Indeed, the potential for his arrest was raised and considered when the order was initially entered. (*See* 06/20/19 Tr. at 6:20–7:17.) Yin, like other fugitives, is "exposed to the same sanctions as any other uncooperative party." *Degen v. United States*, 517 U.S. 820, 827 (1996).

The severity and nature of Yin's transgression places this case on all fours with *Securities Exchange Commission v. Razmilovic*, in which the Second Circuit affirmed a district court's

4

default judgment against a defendant who willfully violated a court's order to appear at a deposition. *See* 738 F.3d 14, 25 (2d Cir. 2013). Though the defendant in *Razmilovic* had failed to appear for a prior deposition before the court's order, that fact was not material to the Second Circuit's affirmance of the sanction. Instead, the Second Circuit observed that the defendant's willful "adamance in the face of the court's warning of possible sanctions that included the extreme sanction of default clearly supported an inference that renewed orders to appear would be unavailing and that no lesser sanction would be effective to induce [the defendant] to appear . . . for his deposition." *Id.* In this case, like *Razmilovic*, the circumstances of the misconduct suggest that no lesser sanction will yield compliance. Perhaps most tellingly, Yin has not represented that he will appear for a deposition if a lesser sanction than default judgment is imposed; rather, he has implied that he will appear for a deposition if and only if he is granted safe passage by DOJ, a condition that this Court has neither the authority nor the inclination to guarantee and to which Yin has no entitlement. (*See* Dkt. No. 190 at 5 n.8.)

In the alternative, Yin argues that the operative complaint fails to state facts sufficient to establish each of the elements of insider trading, and therefore that default judgment is inappropriate, the severity of his misconduct notwithstanding. (*See* Dkt. No. 206 at 4–5.) Yin is correct that when considering entry of a default judgment — even as a sanction for discovery misconduct — a district court must assess whether "the alleged facts constitute a valid cause of action." *TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd.*, 536 Fed. App'x 45, 46 (2d. Cir. 2013) (unpublished opinion). But this Court has already addressed and rejected each of Yin's challenges to the sufficiency of the SEC's complaint at the motion to dismiss stage, and that decision is the law of the case. *See SEC v Shaohua Yin* ("*Yin I*"), No. 17 Civ. 972, 2018 WL

5

2209493 (S.D.N.Y. May 14, 2018).  Having already decided that the complaint sufficiently states an insider trading claim, the Court need not rehash its previous analysis.

Yin claims that the Court's prior decision does not control the present motion, but that position flies in the face of abundant authority establishing that the legal sufficiency of a complaint is reviewed under the same standard whether on a motion to dismiss or a motion for default judgment.  *See, e.g., Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014) ("The district court properly applied an identical standard in assessing the two motions [for default judgment and dismissal] and accepted all of the complaint's factual allegations as true.") (emphasis added).  And though the Court applied the "relaxed" pleading standard applicable to insider tips at the motion to dismiss stage, *see Yin I*, 17 Civ. 972, 2018 WL 2209493 at *4, no authority supports erecting a higher bar for default judgment.  Indeed, applying a more stringent standard would flout common sense: Both dismissals for failure to state a claim and default judgments typically occur, by definition, without any opportunity to conduct discovery; thus, the same rationale that justifies the relaxed pleading standard at the motion to dismiss stage (facts regarding insider tips are often, before discovery, peculiarly within the knowledge of the adverse party) commands applying the same "relaxed" standard to a default judgment.  The Court therefore concludes that Yin's willful disregard for the Court's prior order entitles the SEC to a default judgment on its insider trading claims, and the complaint is sufficient to support the judgment.

Default judgment against Yin notwithstanding, ownership of the funds in the Relief Defendants' IB accounts — and whether the judgment against Yin could be satisfied with them — is still in issue, because the Relief Defendants have not defaulted.  The outstanding discovery disputes therefore remain live, and the Court proceeds to address those motions.

### 2. Appointment of a Special Master

Invoking Federal Rule of Civil Procedure 53, the SEC seeks the appointment of a special master to assist with discovery related to Yin's computer. (*See* Dkt. No. 175 at 4.) Pursuant to Rule 53, and consistent with its broad discretion to manage pretrial discovery, the Court may appoint a special master to "address pretrial and post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). "In appointing a master, the court must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3).

The history of the disputed computer is long and troubled. On February 10, 2017, the SEC served the summons, complaint, and this Court's temporary restraining order — including an injunction against the destruction of relevant documents — on Yin. (Dkt. No. 4.) Later that week, unbeknownst to the SEC, over 91,000 files were manually deleted from Yin's work computer using Yin's administrator account. (Dkt. No. 158 ¶ 9.a.) Despite years of intervening discovery, some of it expressly regarding the work computer, and Yin's identification of the work computer as a relevant device, Yin did not admit the deletions until the SEC filed its spoliation motion on November 22, 2019. (*See* Dkt. No. 156.) In response to that motion, Yin represented that the 91,000 files were all transferred to his now-inoperable personal computer before deletion from the work computer. (*See* Dkt. No. 174 at 2.) Yin subsequently retained an IT expert, and defense counsel claims the expert was able to retrieve and review many of the deleted-and-transferred files the SEC flagged as potentially relevant. (*See* 03/10/20 Hearing Tr. at 75:16–25.) Despite that partial retrieval, however, the SEC notes that many of the 91,000 files were never searched for responsive material, and that Yin's expert's methodology did not reliably establish whether the retrieved files were in fact the files deleted from the work laptop.

7

(*See* 03/10/20 Hearing Tr. at 76:13–24.)  Specifically, the expert confirmed that the retrieved files were those deleted from the work computer by cross-referencing only the file names, but not any of the other available and more revealing metadata.  (*See id.*)

The Court agrees with the SEC that the facts and circumstances here — Yin's belated admission of the massive deletions, Yin's failure to preserve or disclose his transfer of discoverable but undisclosed material on the personal laptop before its failure, the unknown circumstances of the failure of the personal laptop, and the possible unreliability of the partial retrieval — justify the Court's intervention and outweigh any potential expense to the parties or risk of delay.  Accordingly, appointment of a special master is warranted.  The Court therefore orders that the parties shall confer and agree upon a neutral forensic expert to serve as a special master, and submit the expert for approval.  If the parties fail to do so within 14 days, the Court will appoint an expert independently.  The expert shall:

- Examine the hard drive of the personal computer for the transferred files, and review and produce any responsive documents found among the transferred files to Yin's counsel, with Yin's counsel having the opportunity to review for privilege prior to the forensic neutral's production of the non-privileged responsive documents and Defendant's privilege log to the SEC; and

- examine and prepare a report on the facts and circumstances of Yin's claimed file transfer, any subsequent preservation, alteration, and/or deletion of any of the asserted transferred files from 2017 to the present, and the nature of the failure that caused the personal computer to be inoperable as represented by the defense in summer 2019.

The hard drive shall be made available to the special master for examination at the earliest possible juncture, and not later than seven days after the Court's naming of the special master.

### B.  Sanctions Against Relief Defendants

Next, the SEC requests that the Court impose sanctions on the Relief Defendants for alleged discovery failures, including an adverse inference against Z. Yin, Su, Qin, and Zhou, for

spoliation of electronically stored information ("ESI").[3] (*See* Dkt. No. 159.)  The SEC additionally seeks an order to compel a new search of some ESI, with the assistance of a neutral, professional interpreter and/or translator.  (*Id.*)

Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  The purpose of a spoliation sanction is to "(1) deter parties from violating discovery obligations; (2) place the risk of an erroneous judgment on the party that wrongfully created the risk; and (3) restore the prejudiced party to the same position that it would have been in absent the discovery violation by an opposing party." *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010).  A party seeking an adverse inference for the spoliation of ESI must establish, among other things, that the opposing party "acted with the intent to deprive another party of the information's use in litigation."  Fed. R. Civ. P. 37(e)(2).  In the absence of such a finding, a court may "order measures no greater than necessary to cure [any] prejudice" suffered as a result of the information's loss.  Fed. R. Civ. P. 37(e)(1).

In arguing for an adverse inference, the SEC emphasizes, among other things, that at least two of the Relief Defendants, Z. Yin and Qin, undisputedly disposed of and never recovered relevant, unsearched cellphones.  Qin admits that he disposed of an unsearched cellphone in late 2017, after litigation had commenced, while Z. Yin could not recall when he threw away his

---

[3] The SEC also complains that the Relief Defendants have not provided a fulsome disclosure of their bank accounts and assets but has not moved to compel any specific disclosures on that front.

9

unsearched phone.[4]  (*See* Dkt. No. 159 at 3; Dkt. No. 184, Ex. 6–7; 03/10/20 Hearing Tr. at 67:22–68:5.)  The SEC also notes that Zhou deleted WeChat messages and other ESI from her old phone before searching it (which Zhou admits), and contends that her assertion that the deleted ESI was not relevant is not credible.  (*See* Dkt. No. 182 at 2; 03/10/20 Hearing Tr. at 74:15–3.)  (Though the SEC also alleges that Su and Xie lost or replaced unsearched cellphones, each has averred that she later located and searched the cellphones in question, and the SEC has given the Court no reason to doubt that testimony. (*See* Dkt. No. 184, Exs. 6–7.).)

Concerning as these specific deficiencies may be, the Court's election of an appropriate remedy is informed by its view that the troubling dynamic among the Relief Defendants, Yin, and their shared counsel[5] may have impeded compliance with discovery obligations more so than any bad intent on the part of the Relief Defendants.  Virtually all of the Relief Defendants' searches for responsive material were conducted at Yin's direction, with no direct oversight by their attorneys from Wilson Sonsini Goodrich & Rosati ("WSGR"), who also represent Yin.  Indeed, at the time that the Relief Defendants averred that they had "received instructions from [their] attorneys" regarding their obligations to conduct reasonable searches for material responsive to the SEC's discovery requests, including relevant ESI (Dkt. No. 159 at 2), none of the Relief Defendants had ever met or spoken to anyone at WSGR.  (*Id.*)  Remarkably, it is unclear whether Zhou was aware that WSGR attorneys were her counsel of record for two years, and Qin does not know who is paying their fees on his behalf.  (*See* Dkt. No. 160 at App'x, Ex. E ("Zhou Depo. Tr.") at 10:22–11:18; Dkt. No. 160 at App'x, Ex. C. ("Qin Depo. Tr.") at 86:21–

---

[4] Qin argues that lost ESI on his phone is irrelevant given that he has admitted the money in his IB account was not his, but Qin has continued to argue that the account should be unfrozen, and to contest *Yin's* ownership of the funds, belying any claim of mootness.

[5] Su, Z. Yin, Qin, and Xie are all represented by the same counsel as Yin; Zhou was represented by the same counsel until January 2019.  (*See* Dkt. Nos. 9, 91.)

10

88:24.)  Instead, until the week before the depositions, the Relief Defendants had corresponded with their attorneys exclusively through Yin, to the extent they had corresponded at all.  No written material or information passed between Relief Defendants and their counsel without first going through Yin.

Counsel for Relief Defendants respond that because none of the Relief Defendants speaks English and none of the attorneys speaks Mandarin, reliance on Yin as a makeshift translator was a reasonable means of communication.  But that decision seriously undermines the Court's confidence that Relief Defendants' discovery obligations were communicated to them, that their search was conducted competently, and that all responsive material was disclosed to the SEC.  Fluency is not tantamount to proficiency as an interpreter or translator; indeed, exclusive reliance on a layperson interpreter to communicate with a client may constitute a breach of an attorney's obligations to provide competent counsel, to keep his client's confidences, to adequately prepare a client's case, and to associate with professionals with the requisite skills to assist in the preparation of the case.  *See* New York City Bar Association, Formal Opinion 1995-12 (July 6, 1996).  And even if fluency sufficed, in attempting to explain away an unfavorable deposition answer given by Yin, defense counsel implied that Yin lacks complete English fluency.  (*See* 03/10/20 Hearing Tr. at 28:10–25.)

Moreover, Yin's lack of formal training is far from the only problem with his use as a go-between.  Yin himself is a party to the suit and has an obvious interest in the contents of the Relief Defendants' disclosures.  He has proven uncooperative in fulfilling his own discovery obligations.  That all of the Relief Defendants' responsive documents and ESI first passed through his unreliable hands en route to the SEC raises serious concerns about the accuracy and completeness of the discovery obtained to date.  It bears noting that on top of Yin's potential

interest in impeding fulsome disclosures, he also possesses a potential conflict of interest with the Relief Defendants.  If the disputed funds in the IB accounts are not Yin's, as Relief Defendants contend, Yin would receive a windfall if the SEC were to prevail against Relief Defendants: his liability could be satisfied in part with someone else's money, rather than his own.[6]  This apparent conflict lends further credence to the possibility that the use of Yin as an intermediary has tainted discovery to date.

WSGR states that these concerns were aired by the SEC and rejected by Magistrate Judge Cott at a prior hearing.  (03/10/20 Hearing Tr. at 67:16–21.)  Not so.  At that hearing, Judge Cott expressed his view that Yin's search of his own emails may not have been reliable because no one on WSGR's team has Chinese proficiency and WSGR had not employed a third party to independently ascertain whether Yin had conducted the search consistent with his discovery obligations.  (*See* Dkt. No. 126 at 18:8–23:6.)  Judge Cott therefore directed WSGR to file an affidavit detailing those efforts, and opined that the SEC might reup its objections after that threshold step had been taken.  (*See id.*)  Contrary to counsel's representation, however, Judge Cott never resolved the propriety of that arrangement with respect to Yin, let alone with respect to the remaining Relief Defendants.

In light of the foregoing, the Court cannot conclude that an adverse inference against Relief Defendants is warranted.  Ameliorating one or more of these irregularities may be sufficient to restore the SEC to the position it would have occupied in the absence of the Relief Defendants' alleged spoliation and to guarantee the smooth progression of the litigation.  And on the evidence before it, the Court cannot infer the requisite intent on behalf of Relief Defendants

---

[6] The Court notes that Relief Defendants could not possibly have effectively waived any potential conflict, given that their exclusive communications with their counsel, until shortly before their depositions, had occurred indirectly *through Yin.*

to support an adverse inference, when blame may lie at someone else's feet. It is significant, in this respect, that upon direct questioning using a professional interpreter at deposition, Relief Defendants admitted to various deficiencies in their earlier disclosures.

Nonetheless, the current state of affairs calls for intervention by the Court to preserve the integrity of the truth-seeking process and to guard the rights of both the SEC and Relief Defendants. The Court therefore orders Relief Defendants to file a proposed discovery protocol for re-searching their preserved devices and email accounts for responsive material without Yin's oversight or involvement within 14 days of this Opinion and Order. Relief Defendants and their counsel shall, to the extent necessary to communicate reliably on substantive matters relating to this litigation, engage professional translators, interpreters, and third-party vendors. Defense counsel shall not rely on Yin to act as an intermediary between them and their Relief Defendant clients when communicating about the substance of their representation. Google Translate or other analogous automated services do not constitute professional translation or interpretation services within the meaning of this Opinion and Order, and such automated services may be employed solely to communicate with Relief Defendants regarding routine administrative matters. Counsel for Yin, Su, Z. Yin, Xie, and Qin shall submit a letter within 14 days of this Opinion and Order explaining why the interests of their clients do not conflict or how they secured an effective waiver of any potential conflict before the initiation of their joint representation.

### C. Motion to Modify the Asset Freeze

A subset of the Relief Defendants[7] move to modify the existing asset freeze. (*See* Dkt. No. 149.) They contend that the SEC's maximum recovery against them is limited as a matter of

---

[7] Relief Defendants Zhou and Ji do not join the motion to modify the asset freeze.

law to disgorgement of ill-gotten gains, which — given the default judgment on both the Lattice and DreamWorks claims — would amount to approximately $35.8 million.[8] (*See* Dkt. No. 150 at 13.)  Accordingly, they seek a modification to the extent the frozen assets exceed that total. (*Id.*)  The SEC responds that frozen funds are in fact owned by Yin, despite the Relief Defendants being the nominal accountholders, or are inextricably comingled with Yin's money. (*See* Dkt. No. 171.)  The entire sum, the SEC contends, is therefore subject to any civil penalties assessed in connection with Yin's liability, which exceed the total amount frozen in the accounts. (*Id.*)

An asset freeze is an ancillary remedy that merely "assures that any funds that become due can be collected."  *SEC v. Unifund Sal*, 910 F.2d 1028, 1041 (2d Cir. 1990).  "To obtain an asset-freeze order, the SEC must establish only that it is likely to succeed on the merits, a lesser showing than is necessary for other forms of equitable relief."[9]  *SEC v. I-Cubed Domains, LLC*, 664 Fed. App'x 53, 55 (2016) (unpublished opinion) (quoting *SEC v. Miller*, 808 F.3d 623, 635 (2d Cir. 2015)).

The Court has now granted a default judgment as to Yin, so there is no question that the SEC will prevail on its insider trading claim.  The only remaining issue with respect to the freeze is whether the SEC has a likelihood of success of showing that the funds are "actually owned by

---

[8] Relief Defendants also argue that the SEC cannot show a likelihood of success on the merits as to the DreamWorks trading and that any plausible disgorgement remedy would therefore be limited to Lattice profits. (Dkt. No. 150 at 9–13, 14.)  That argument is now moot: the Court's grant of a default judgment against Yin renders irrelevant any evidentiary deficiency with respect to Yin's liability.

[9] Because the freeze was entered pursuant to an agreement of the parties rather than this Court's independent determination, and Relief Defendants reserved the right to challenge the extent of the stipulated freeze, the SEC must carry the described burden as if the freeze were being imposed in the first instance.

14

[Yin], such that the [R]elief [D]efendants [are] 'nominee[s]' for" Yin.  *I-Cubed Domains*, 664 Fed. App'x at 55.

The balance of the evidence demonstrates the SEC will likely prevail on the issue of the Relief Defendants' nominee status.  Most significantly, Yin stated in a February 3, 2017 interview with the FBI that he opened and used the Z. Yin, Su, and Qin IB accounts (as well as various bank accounts under their names) to conduct trades with his own money, in order to avoid certain regulatory requirements that would attach if he traded in his own name.  (*See* Dkt. No. 172, Ex. 5 at 51:3–66:11.)  Though Yin was not entirely pellucid as to how long that practice continued, this demonstrates unequivocally that Yin opened those accounts with the intention to use them as nominee accounts and that, at least for some period of time, he was in the practice of funding the accounts with his own money for his own trading.  In a similar vein, text messages between Z. Yin and his son show that Z. Yin regarded at least one other bank account in his own name as his son's.  (*See* Dkt. No. 172, Ex. 9.)  The SEC's evidence also indicates that Yin at times impersonated his mother, Su, in order to manage transfers of money among various bank accounts in her name.  (*See* Dkt. No. 172, Ex. 9.)  And Qin, for his part, simply admitted that he opened the IB account at Yin's direction and that the funds in the account were not his.  (*See* Qin Depo. Tr. at 105:7–18, 107:2–108:5; 112:14–115:17.)[10]

Relief Defendants' virtually complete lack of control over and knowledge of the IB accounts also suggest they do not own the funds.  Su and Z. Yin could not explain the flow of multimillion dollar transfers in and out of the accounts.  (*See* Dkt. No. 160 at App'x, Ex. A ("Z. Yin Depo. Tr.") at 150:14-152:1 (Z. Yin unable to explain two deposits totaling $996,570); *id.* at

---

[10] Though Qin also suggested, albeit vaguely, that some of the funds were neither his nor Yin's, Yin directed Qin to open the IB account and controlled all trading in the account. (*See id.* at 103:2–19, 105:7–18, 150:19–153:1.)

152:2–154:7 (Z. Yin unable to explain a $4.5 million deposit and withdrawal); *id.* at 154:20–155:25 (Z. Yin unable to explain a series of round trip-transfers in $1 million HKD increments); *id.* at 158:4–162:5 (Z. Yin unable to explain a $1.2 million deposit); *id.* at 162:23–164:16 (Z. Yin unable to explain a $1 million HKD transfer); *id.* Ex. B ("Su Depo. Tr.") at 124:5–127:8 (Su unable to explain a $3.65 million deposit); *id.* at 131:13–19 (Su unable to explain a $6 million deposit).) And Xie too was unable to explain a large transfer into her account from Ji. (Dkt. No. 160 at App'x, Ex. D ("Xie Depo. Tr.") at 96:14–99:16.) The Relief Defendants' apparent ignorance as to the source and movement of large sums of money strongly undermines their claims of ownership. *See SEC v. Ahmed*, No. 15 Civ. 675, 2017 WL 5505320, at *7 (D. Conn. Jul. 18, 2017) (declining to modify an asset freeze in part because relief defendants could not recall basic facts about the assets, including their source). In response, Relief Defendants emphasize that by 2013, three years before any alleged insider trading, Z. Yin and Su had accumulated a combined net worth of $10 million from their own investing, and the deposits could reflect those legitimate earnings. (*See* Dkt. No. 180 at 6–7.) But that fact renders their ownership of the funds in the IB accounts even more implausible, given the size of the apparently unrecalled cashflows relative to the couple's estimated net worth. Xie also testified at her deposition that the bulk of the money in her IB account is the result of a sale of a painting to Yin. (*See* Xie Depo. Tr. at 72:16–73:4.) But in more than two years of litigation, neither Xie nor Yin has produced any evidence corroborating the sale or even demonstrating possession of a painting of approximately that value, despite the presumable ease of doing so.[11]

---

[11] When pressed by the SEC, Relief Defendants produced an appraisal report, created five days before it was filed, identifying a painting and estimating its value. (*See* Dkt. No. 181, Ex. N.) But the report makes no reference to a sale between Xie and Yin or to the painting's ownership; rather, it consists only of a publicly available picture of a painting and the appraiser's analysis. (*See id.*) Moreover, the analysis was not based on any in-person inspection of the

16

Indeed, Yin and Relief Defendants concede that Yin entirely controlled the trading activity in all of the IB accounts and that Relief Defendants were entirely ignorant as to the gains and losses — sometimes amounting to eight figures — they incurred. (*See, e.g.,* 03/10/20 Hearing Tr. at 35:20–36:6.) Standing alone, this evidence might not suffice to maintain the freeze: it is generally consistent with Yin's acting as a manager for his friends and family, as Relief Defendants contend. Taken in concert, however, with the SEC's other evidence — including Yin's admissions to the FBI, Relief Defendants' inability to explain basic facts about the accounts, including the money's provenance, and Yin's complete control over the funds — the factual record more plausibly supports the inference that the funds were Yin's.

In response to this and other evidence, Relief Defendants proffer the "tracing analysis" of forensic accountant Nicole Sliger. (*See* Dkt. No. 181, Ex. A ("Sliger Rpt.").) Sliger's report, however, does not outweigh the SEC's countervailing evidence. To determine the source of the IB account funds, Sliger "traced" the funds from one account to the next. (*See* Sliger Rpt. at 8–9.) In order to "trace" a given tranche, Sliger began by identifying a given deposit into the disputed IB accounts. (Sliger Rpt. at 8.) She then compared the amount and time of that deposit to withdrawals from 18 other brokerage and bank accounts held in Relief Defendants' names. (*Id.*) Withdrawals matching a deposit in time and size were deemed to be the corresponding source of the deposit (because many of the transactions lacked counterparty information, Sliger was confined to rely on this crude matching method); thereafter, Sliger repeated the process, continuing to "trace" the deposit through the 18 accounts until she reached the "last traceable deposit." (*Id.*) Upon determining the "last traceable deposit," Sliger cross-referenced the deposit

---

painting, but rather on an analysis of auction prices of similar works. (*See id.*) The Court therefore cannot conclude that the appraisal is probative as to the alleged sale.

with Yin's banking records to determine if there was a corresponding withdrawal that could have been the source of the funds. (*Id.*) Using this method, Sliger determined that only $1.8 million of the funds in the IB accounts were traceable to Yin. (*Id.*)

Sliger's report says little, however, about the actual ownership and source of the funds. There is nothing sacrosanct about the last traceable account or last traceable deposit; it is simply the farthest Sliger was able to trace a given tranche of money, given the limitations of her methodology and the closed universe of financial statements[12] upon which she based her analysis. She does not, for example, opine on how the funds came to be in the last traceable account, nor does she opine on whether the nominal account holders are, in fact, the actual owners of the last traceable accounts. Sliger's methodology therefore fails to address the key issue in the case: actual, rather than nominal, ownership.[13] Her analysis fails to persuade, and the Court concludes that the SEC has shown a likelihood of success sufficient to maintain the entire asset freeze.

Before concluding, however, the Court notes that the parties have litigated this issue on a shared but now arguably outdated understanding of the applicable law. Both sides assume that the SEC can disgorge any profits that flowed from Yin's illicit trades, even if the funds in the IB accounts are wholly owned by the Relief Defendants. (*See, e.g.*, 3/10/20 Hearing Tr. at 11:18–

---

[12] Relief Defendants admit that the 18 accounts Sliger considered do not represent the totality of Relief Defendants' financial accounts. (03/10/20 Hearing Tr. at 54:1–8.)

[13] The SEC proffers a competing expert, who opines that the Sliger Report suffers from several additional issues. (*See* Dkt. Nos. 196, Ex. 15, 210.) Relief Defendants move to exclude that competing report and an associated declaration. (*See* Dkt. Nos. 197, 219.) Given the Court's determination that the SEC's other evidence suffices to show a likelihood of success on the merits on the question of ownership without consideration of the substance of the SEC's expert's filings, the motions to strike are denied as moot.

25; *id.* at 27:17–28:5.)  They have therefore focused solely on the freeze of the funds *in excess* of any disgorgeable profits.

Recent case law, however, casts serious doubt on the Court's authority to disgorge innocent parties' investment profits, even if they flow from a culpable party's misconduct, and the SEC has not alleged any pertinent wrongdoing by Relief Defendants.  At the time the pending motions were argued, Second Circuit case law established beyond peradventure that an insider trader could "be required to disgorge not only the profit that he personally enjoyed from his exploitation of inside information, but also the profits of such exploitation that he channeled to friends, family, or clients."  *SEC v. Controrinis*, 743 F.3d 296, 304 (2d Cir. 2014).  The Supreme Court's recent decision in *Liu v. Securities Exchange Commission*, however, specifically described that precedent as "at odds with the common-law rule requiring individual liability for wrongful profits," and contrary to the prevailing rule that defendants may be "liable to account for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which they have no participation."  140 S. Ct. 1936, 1949 (2020).  Thus, if Relief Defendants are able to show that some portion of the funds in the accounts is their own and can be disentangled from any comingled funds of Yin's, that portion arguably would not be subject to disgorgement under *Liu*.  Nonetheless, because Relief Defendants have not raised the issue and only seek a modification to the extent the freeze exceeds the insider trading profits, and because the Court finds that the SEC has carried its burden to maintain the entire asset freeze at this stage, that intervening change in law does not affect the disposition of the present motion.

**III.   Conclusion**

For the foregoing reasons, Plaintiff's motion for a default judgment against Defendant Shaohua Yin is GRANTED; Plaintiff's motion for the appointment of a special master is

GRANTED; and Plaintiff's motion for discovery sanctions against Relief Defendants is GRANTED IN PART AND DENIED IN PART.  Relief Defendants' motion to modify the asset freeze is DENIED; their motions to strike filings at Docket Numbers 197 and 212 are DENIED; and their letter motion for a conference at Docket Number 221 is DENIED as moot.

The parties shall jointly submit their proposed special master for approval within 14 days after the date of this Opinion and Order.

Relief Defendants shall submit the proposed discovery protocol described herein within 14 days of this Opinion and Order.

Counsel for Defendant Yin and Relief Defendants Su, Z. Yin, Qin, and Xie shall submit the letter described herein within 14 days of this Opinion and Order.

The Clerk of Court is directed to close the motions at Docket Numbers 98, 149, 156, 159, 197, 212, and 221.

SO ORDERED.

Dated: November 19, 2020
      New York, New York

_____
J. PAUL OETKEN
United States District Judge